UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**11 CIV 6195**

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

___ CIV. ___ (___)

JUDGE KEENAN          Plaintiff,

**COMPLAINT**

-against-

**JURY TRIAL DEMANDED**

BANK OF AMERICA CORPORATION;
BANK OF AMERICA, NATIONAL
ASSOCIATION; MERRILL LYNCH,
PIERCE, FENNER & SMITH, INC. (f/k/a
BANC OF AMERICA SECURITIES LLC);
ASSET BACKED FUNDING
CORPORATION; BANC OF AMERICA
MORTGAGE SECURITIES, INC.; BANC
OF AMERICA FUNDING CORPORATION;
GEORGE C. CARP; ROBERT CARUSO;
GEORGE E. ELLISON; ADAM D.
GLASSNER; DANIEL B. GOODWIN;
JULIANA JOHNSON; AASHISH KAMAT;
MICHAEL J. KULA; JAMES H. LUTHER;
WILLIAM L. MAXWELL; MARK I. RYAN;
AND ANTOINE SCHETRITT,

SEP 02 2011

U.S.D.C. S.D. N.Y.
CASHIERS

Defendants.

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ................................................................................................1

PARTIES ..................................................................................................................6

    *The Plaintiff and the GSEs*................................................................................6

    *The Defendants* .................................................................................................7

    *The Non-Party Originators* .............................................................................10

JURISDICTION AND VENUE ...............................................................................11

FACTUAL ALLEGATIONS ...................................................................................12

I.      THE SECURITIZATIONS.............................................................................12

    A.    Residential Mortgage-Backed Securitizations In General.....................12

    B.    The Securitizations At Issue In This Case ...........................................13

    C.    The Securitization Process...................................................................15

          1.    BOA National Groups Mortgage Loans in Special Purpose Trusts .........15

          2.    The Trusts Issue Securities Backed by the Loans....................................16

II.     THE DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS .........................................................................................................20

    A.    The Role of Each of the Defendants ....................................................20

          1.    BOA National ...................................................................................20

          2.    ABF Corp........................................................................................22

          3.    BOA Mortgage.................................................................................22

          4.    BOA Funding ...................................................................................23

          5.    MLPF&S, As Successor-in-Interest to BOA Securities ...........................24

          6.    BOA Corporation.............................................................................24

          7.    The Individual Defendants.................................................................25

B. The Defendants' Failure To Conduct Proper Due Diligence...............................27

III. THE REGISTRATION STATEMENTS AND THE PROSPECTUS
SUPPLEMENTS.........................................................................................................29

    A. Compliance With Underwriting Guidelines ........................................29

    B. Statements Regarding Occupancy Status of Borrower.........................31

    C. Statements Regarding Loan-to-Value Ratios.......................................33

    D. Statements Regarding Credit Ratings ..................................................36

IV. THE FALSITY OF STATEMENTS IN THE REGISTRATION STATEMENTS
AND PROSPECTUS SUPPLEMENTS ........................................................................38

    A. The Statistical Data Provided in the Prospectus Supplements Concerning
Owner Occupancy and LTV Ratios Was Materially False....................38

        1. Owner Occupancy Data Was Materially False ...........................39

        2. Loan-to-Value Data Was Materially False ................................41

    B. The Originators of the Underlying Mortgage Loans Systematically
Disregarded Their Underwriting Guidelines ........................................45

        1. Government Investigations and Private Litigants Have Confirmed
That the Originators of the Loans in the Securitizations
Systematically Failed to Adhere to Their Underwriting Guidelines .........45

        2. The Collapse of the Certificates' Credit Ratings Further Indicates
that the Mortgage Loans Were Not Originated in Adherence to the
Stated Underwriting Guidelines................................................51

        3. The Surge in Mortgage Delinquency and Default Further
Demonstrates that the Mortgage Loans Were Not Originated in
Adherence to the Stated Underwriting Guidelines .....................53

V. FANNIE MAE'S AND FREDDIE MAC'S PURCHASES OF THE GSE
CERTIFICATES AND THE RESULTING DAMAGES .................................54

FIRST CAUSE OF ACTION .......................................................................57

SECOND CAUSE OF ACTION ..................................................................61

THIRD CAUSE OF ACTION ......................................................................65

FOURTH CAUSE OF ACTION ..................................................................68

FIFTH CAUSE OF ACTION .................................................................................................72

SIXTH CAUSE OF ACTION .................................................................................................75

SEVENTH CAUSE OF ACTION ............................................................................................79

EIGHTH CAUSE OF ACTION ...............................................................................................83

PRAYER FOR RELIEF .........................................................................................................87

JURY TRIAL DEMANDED ....................................................................................................88

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator of The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint herein against Bank of America Corporation ("BOA Corp."); Bank of America, National Association ("BOA National"); Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S"), as successor-in-interest to Banc of America Securities, LLP ("BOA Securities"); Asset Backed Funding Corporation ("ABF Corp."); Banc of America Mortgage Securities, Inc. ("BOA Mortgage"); Banc of America Funding Corporation ("BOA Funding") (collectively, "BOA"); George C. Carp; Robert Caruso; George E. Ellison; Adam D. Glassner; Daniel B. Goodwin; Juliana Johnson; Aashish Kamat; Michael J. Kula; William L. Maxwell; Mark I. Ryan; James H. Luther; and Antoine Schetritt (the "Individual Defendants") (together with BOA, the "Defendants") alleges as follows:

## NATURE OF ACTION

1.      This action arises out of Defendants' actionable conduct in connection with the offer and sale of certain residential mortgage-backed securities to Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Enterprises" or "GSEs").  These securities were sold pursuant to registration statements, including prospectuses and prospectus supplements that formed part of those registration statements, which contained materially false or misleading statements and omissions.  Defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the ability of the borrowers to repay their mortgage loans.  These representations were material to the GSEs, as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq*., Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-

5606.05(c) of the District of Columbia Code, and constitutes common law negligent misrepresentation.

2.      Between September 30, 2005 and November 5, 2007, Fannie Mae and Freddie Mac purchased over $6 billion in residential mortgage-backed securities (the "GSE Certificates") issued in connection with 23 BOA-sponsored and/or BOA-underwritten securitizations.[1]  The GSE Certificates purchased by Freddie Mac, along with date and amount of the purchases, are listed below in Table 10.  The GSE Certificates purchased by Fannie Mae, along with the date and amount of the purchases, are listed below in Table 11.  The 23 securitizations at issue are:

i.      ABFC Trust, Series 2005-WMC1 ("ABFC 2005-WMC1");

ii.     ABFC Trust, Series 2006-HE1 ("ABFC 2006-HE1");

iii.    ABFC Trust, Series 2006-OPT1 ("ABFC 2006-OPT1");

iv.     ABFC Trust, Series 2006-OPT2 ("ABFC 2006-OPT2");

v.      ABFC Trust, Series 2006-OPT3 ("ABFC 2006-OPT3");

vi.     ABFC Trust, Series 2007-WMC1 ("ABFC 2007-WMC1");

vii.    Banc of America Funding Trust, Series 2006-G ("BAFC 2006-G");

viii.   Banc of America Funding Trust, Series 2006-H ("BAFC 2006-H");

ix.     Banc of America Funding Trust, Series 2007-A ("BAFC 2007-A");

x.      Banc of America Funding Trust, Series 2007-C ("BAFC 2007-C");

xi.     Banc of America Alternative Loan Trust, Series 2005-10 ("BOAA 2005-10");

xii.    Banc of America Alternative Loan Trust, Series 2005-11 ("BOAA 2005-11");

xiii.   Banc of America Alternative Loan Trust, Series 2005-12 ("BOAA 2005-12");

---

[1]  For purposes of this Complaint, the securities issued under the Registration Statements (as defined in note 2 below) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates."  Holders of Certificates are referred to as "Certificateholders."

xiv.  Banc of America Alternative Loan Trust, Series 2006-1 ("BOAA 2006-1");

xv.  Banc of America Alternative Loan Trust, Series 2006-2 ("BOAA 2006-2");

xvi.  Banc of America Alternative Loan Trust, Series 2006-3 ("BOAA 2006-3");

xvii.  NationStar Home Equity Loan Asset-Backed Certificates, Series 2007-C ("NSTR 2007-C");

xviii.  Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2005-5 ("OOMLT 2005-5");

xix.  Option One Mortgage Loan Asset-Backed Certificates, Series 2007-2 ("OOMLT 2007-2");

xx.  Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2007-6 ("OOMLT 2007-6");

xxi.  Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2007-FXD1 ("OOMLT 2007-FXD1");

xxii.  Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2007-HL1 ("OOMLT 2007-HL1");

xxiii.  SunTrust Alternative Loan Trust, Series 2005-1F ("STALT 2005-1F");

(collectively, the "Securitizations").

3.    The Certificates were offered for sale pursuant to one of nine shelf registration statements (the "Shelf Registration Statements") filed with the Securities and Exchange Commission (the "SEC").   Defendants ABF Corp., BOA Mortgage, and BOA Funding filed six Shelf Registration Statements that pertained to seventeen of the Securitizations in this action. These six Shelf Registration Statements, and the amendments thereto, were signed by or on behalf of the Individual Defendants.  With respect to all of the Securitizations, BOA Securities was the lead underwriter and the underwriter who sold the Certificates to the GSEs.

4.      For each Securitization, a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement") were filed with the SEC as part of the Registration Statement[2] for that Securitization.  The GSE Certificates were marketed and sold to Fannie Mae and Freddie Mac pursuant to the Registration Statements, including the Shelf Registration Statements and the corresponding Prospectuses and Prospectus Supplements.

5.      The Registration Statements contained statements about the characteristics and credit quality of the mortgage loans underlying the Securitizations, the creditworthiness of the borrowers of those underlying mortgage loans, and the origination and underwriting practices used to make and approve the loans.  Such statements were material to a reasonable investor's decision to invest in mortgage-backed securities by purchasing the Certificates.  Unbeknownst to Fannie Mae and Freddie Mac, these statements were materially false, as significant percentages of the underlying mortgage loans were not originated in accordance with the represented underwriting standards and origination practices and had materially poorer credit quality than what was represented in the Registration Statements.

6.      The Registration Statements also contained statistical summaries of the groups of mortgage loans in each Securitization, such as the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges.  This information was also material to reasonable investors.  However, a loan level analysis of a sample of loans for each Securitization – a review that encompassed thousands of mortgages across all of the Securitizations – has revealed that these statistics were also false and omitted material facts.

---

[2]   The term "Registration Statement" as used herein incorporates the Shelf Registration Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization, except where otherwise indicated.

7.      For example, the percentage of owner-occupied properties is a material risk factor to the purchasers of Certificates, such as Fannie Mae and Freddie Mac, since a borrower who lives in mortgaged property is generally less likely to stop paying his or her mortgage and more likely to take better care of the property.  The loan level review reveals that the true percentage of owner-occupied properties for the loans supporting the GSE Certificates was materially lower than what was stated in the Prospectus Supplements.  Likewise, the Prospectus Supplements misrepresented other material factors, including the true value of the mortgaged properties relative to the amount of the underlying loans.

8.      Defendant BOA Securities (an underwriter) is directly responsible for the misstatements and omissions of material fact contained in the Registration Statements because it prepared these documents to market and sell the Certificates to Fannie Mae and Freddie Mac. Defendants ABF Corp. (a depositor), BOA Mortgage (a depositor), BOA Funding (a depositor), and the Individual Defendants are also directly responsible for the misstatements and omissions of material fact contained in the Registration Statements filed by ABF Corp., BOA Mortgage, and BOA Funding because they prepared, signed, filed and/or used these documents to market and sell the Certificates to Fannie Mae and Freddie Mac.

9.      Defendants BOA National, BOA Corp., and the Individual Defendants are also responsible for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over BOA Securities and Defendants ABF Corp., BOA Mortgage, and BOA Funding.  BOA Corp. directly participated in and exercised dominion and control over the business operations of BOA Securities and Defendants ABF Corp., BOA Mortgage, and BOA Funding.  BOA National (the sponsor) and the Individual

Defendants directly participated in and exercised dominion and control over the business operations of Defendants ABF Corp., BOA Mortgage, and BOA Funding.

10.     Fannie Mae and Freddie Mac purchased over $6 billion of the Certificates pursuant to the Registration Statements filed with the SEC.  These documents contained misstatements and omissions of material facts concerning the quality of the underlying mortgage loans, the creditworthiness of the borrowers, and the practices used to originate such loans.  As a result of Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

11.     FHFA, as Conservator of Fannie Mae and Freddie Mac, brings this action against the Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and for common law negligent misrepresentation.

## PARTIES

### *The Plaintiff and the GSEs*

12.     The Federal Housing Finance Agency is a federal agency located at 1700 G Street, NW in Washington, D.C.  FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorship and appointed FHFA as conservator.  In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including but not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac.  12 U.S.C. § 4617(b)(2).

13.     Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac invested in residential mortgage-backed securities.  Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

### The Defendants

14.     Defendant BOA Corp. purports to be one of the world's largest financial institutions and delivers banking and financial services throughout the world.  BOA Corp. is a Delaware corporation principally located in Charlotte, North Carolina.  It maintains offices and conducts substantial business operations at the Bank of America Tower at One Bryant Park, New York, New York.  BOA Corp. is the sole parent corporation of each of the other BOA Defendants:  BOA National, BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding.

15.     Defendant BOA National is one of the nation's largest banks and a wholly-owned subsidiary of BOA Corp.  BOA National is a Delaware corporation principally located in Charlotte, North Carolina, with offices and substantial business operations at the Bank of America Tower at One Bryant Park, New York, New York.  BOA National was the sponsor of sixteen of the Securitizations.

16.     Defendant MLPF&S is a Delaware corporation and an SEC-registered broker-dealer.  It principally located at 4 World Financial Center, 250 Vesey Street, New York, New York and is a wholly-owned subsidiary of BOA Corp.  MLPF&S is liable as successor-in-interest to BOA Securities, which was the lead underwriter for each of the Securitizations and intimately involved in the offerings.  Fannie Mae and Freddie Mac also purchased all of the GSE Certificates from BOA Securities in its capacity as underwriter of the Securitizations.  On November 1, 2010, BOA Securities – at the time a Delaware Corporation and wholly-owned

subsidiary of BOA Corp. – was merged with and into MLPF&S.   This merger followed BOA

Corp.'s acquisition in January 2009 of MLPF&S as part of its acquisition of Merrill Lynch & Co.

Defendant MLPF&S is liable as a matter of law as successor to BOA Securities by virtue of its

status as the surviving entity in its merger with BOA Securities.

17.     Defendant ABF Corp. is a Delaware corporation with its principal place of

business in Charlotte, North Carolina.  ABF Corp. is a direct subsidiary of BOA National and an

indirect wholly-owned subsidiary of BOA Corp.  BOA Funding was the depositor for six of the

Securitizations.  BOA Funding, as depositor, was also responsible for preparing and filing

reports required under the Securities Exchange Act of 1934.

18.     Defendant BOA Mortgage is a Delaware corporation with its principal place of

business in Charlotte, North Carolina and offices at the Bank of America Tower at One Bryant

Park, New York, New York.  BOA Mortgage is a direct subsidiary of BOA National and an

indirect wholly-owned subsidiary of BOA Corp.  BOA Mortgage was the depositor for six of the

Securitizations.  BOA Mortgage, as depositor, was also responsible for preparing and filing

reports required under the Securities Exchange Act of 1934.

19.     Defendant BOA Funding is a Delaware corporation with its principal place of

business in Charlotte, North Carolina and offices at the Bank of America Tower at One Bryant

Park, New York, New York.  BOA Funding is a direct subsidiary of BOA National and an

indirect wholly-owned subsidiary of BOA Corp.  BOA Funding was the depositor for five of the

Securitizations.  BOA Funding, as depositor, was also responsible for preparing and filing

reports required under the Securities Exchange Act of 1934.

20.     Defendant George C. Carp is an individual residing in Charlotte, North Carolina.

Mr. Carp was Treasurer, Chief Accounting Officer, and Chief Financial Officer of ABF Corp.

and BOA Funding.  Mr. Carp was also a Managing Director and Capital Markets Finance Executive of BOA Corp.  Mr. Carp signed four of the Shelf Registration Statements and any amendment thereto.

21.     Defendant Robert Caruso is an individual residing in New York, New York.  Mr. Caruso was a Director of BOA Mortgage.  Mr. Caruso was also a Senior Vice President at BOA National.  Mr. Caruso signed two of the Shelf Registration Statements and any amendment thereto.

22.     Defendant George E. Ellison is an individual residing in Charlotte, North Carolina.  Mr. Ellison was a Director of ABF Corp. and BOA Funding.  Mr. Ellison was also Managing Director of the Global Structured Finance Division at BOA Securities.  Mr. Ellison signed four of the Shelf Registration Statements and any amendment thereto.

23.     Defendant Adam D. Glassner is an individual residing in Charlotte, North Carolina.  Mr. Glassner was President, Chief Executive Officer, and Chairman of the Board of BOA Mortgage.  Mr. Glassner was also a Managing Director at BOA Securities.  Mr. Glassner signed the amendment to one of the Shelf Registration Statements.

24.     Defendant Daniel B. Goodwin is an individual residing in New Jersey.  Defendant Daniel B. Goodwin was President and Chief Executive Officer of ABF Corp.  Mr. Goodwin was also a Managing Director at BOA Securities.  Mr. Goodwin signed two of the Shelf Registration Statements and any amendment thereto.

25.     Defendant Juliana Johnson is an individual residing in Charlotte, North Carolina.  Ms. Johnson was a Director of BOA Mortgage.  Ms. Johnson signed two of the Shelf Registration Statements and any amendment thereto.

9

26.     Defendant Aashish R. Kamat is an individual residing in New York, New York. Mr. Kamat was a Director of BOA Mortgage. Mr. Kamat signed one of the Shelf Registration Statements and any amendment thereto.

27.     Defendant Michael J. Kula was a Director of BOA Mortgage. Mr. Kula was also a Senior Vice President at BOA National. Mr. Kula signed one of the Shelf Registration Statements and any amendment thereto.

28.     Defendant James H. Luther was a Director of ABF Corp. and BOA Funding. Mr. Luther signed three of the Shelf Registration Statements and any amendment thereto.

29.     Defendant William L. Maxwell was a Director of ABF Corp. Mr. Maxwell signed two Shelf Registration Statements that were not subsequently amended.

30.     Defendant Mark I. Ryan is an individual residing in Charlotte, North Carolina. Mr. Ryan was President and Chief Executive Officer of BOA Funding. Mr. Ryan signed two of the Shelf Registration Statements and any amendment thereto.

31.     Defendant Antoine Schetritt is an individual residing in New York, New York. Mr. Schetritt was President, Chief Executive Officer, and Chairman of the Board of BOA Mortgage. Mr. Schetritt was also a Managing Director and the Head of Residential Finance at BOA Securities. Mr. Schetritt signed one Shelf Registration Statement.

### The Non-Party Originators

32.     In eight Securitizations sponsored either by BOA National or non-party Option One Mortgage Corporation ("Option One"), 100 percent of the mortgage loans were originated

by Option One.  As to six Securitizations in which it acted as sponsor, BOA National itself

originated or acquired 100 percent of the mortgage loans underlying the Securitizations.[3]

<u>**JURISDICTION AND VENUE**</u>

33.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal

courts original jurisdiction over claims brought by FHFA in its capacity as conservator of Fannie

Mae and Freddie Mac.

34.     Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the

Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities

Act, 15 U.S.C.  §§ 77k, 77*l*(a)(2), 77o.  This Court further has jurisdiction over the Securities Act

claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

35.     This Court has jurisdiction over the statutory claims of violations of Sections

13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code and Sections 31-5606.05(a)(1)(B) and 31-

5606.05(c) of the District of Columbia Code pursuant to this Court's supplemental jurisdiction

under 28 U.S.C. § 1367(a).  This Court also has jurisdiction over the common law claim of

negligent misrepresentation pursuant to this Court's supplemental jurisdiction under 28 U.S.C. §

1367(a).

36.     Venue is proper in this district pursuant to Section 22 of the Securities Act of

1933, 15 U.S.C. § 77v and 28 U.S.C. § 1391(b).  The BOA Defendants conduct business in this

district, BOA Securities is principally located in this district, at least two of the Individual

Defendants reside in this district, and many of the acts and transactions alleged herein, including

---

[3]   The remaining nine Securitizations were sponsored by BOA National (seven), NationStar Mortgage LLC (one) and SunTrust Asset Funding LLC (one).  In those Securitizations, the underlying mortgage loans were originated or acquired by a mix of originators including but not limited to BOA National, non-party Option One, and other non-party originators.

the preparation and dissemination of the Registration Statements, and offer and sale of the
Certificates, occurred in substantial part within this district.  Defendants are also subject to
personal jurisdiction in this district.

**FACTUAL ALLEGATIONS**

I. **THE SECURITIZATIONS**

 A. **Residential Mortgage-Backed Securitizations In General**

 37. Asset-backed securitization distributes risk by pooling cash-producing financial
assets and issuing securities backed by those pools of assets.  In residential mortgage-backed
securitizations, the cash-producing financial assets are residential mortgage loans.

 38. The most common form of securitization of mortgage loans involves a sponsor –
the entity that acquires or originates the mortgage loans and initiates the securitization – and the
creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage
loans.  The trust is established pursuant to a Pooling and Servicing Agreement entered into by,
among others, the "depositor" for that securitization.  In many instances, the transfer of assets to
a trust "is a two-step process:  the financial assets are transferred by the sponsor first to an
intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly
called a depositor, and then the depositor will transfer the assets to the [trust] for the particular
asset-backed transactions."  Asset-Backed Securities, Securities Act Release No. 33-8518,
Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

 39. Residential mortgage-backed securities are backed by the underlying mortgage
loans.  Some residential mortgage-backed securitizations are created from more than one cohort
of loans called collateral groups, in which case the trust issues securities backed by different
groups.  For example, a securitization may involve two groups of mortgages, with some
securities backed primarily by the first group, and others primarily by the second group.

12

Purchasers of the securities acquire an ownership interest in the assets of the trust, which in turn

owns the loans.  Within this framework, the purchasers of the securities acquire rights to the

cash-flows from the designated mortgage group, such as homeowners' payments of principal and

interest on the mortgage loans held by the related trust.

40.     Residential mortgage-backed securities are issued pursuant to registration

statements filed with the SEC.  These registration statements include prospectuses, which explain

the general structure of the investment, and prospectus supplements, which contain detailed

descriptions of the mortgage groups underlying the certificates.  Certificates are issued by the

trust pursuant to the registration statement, the prospectus, and the prospectus supplement.

Underwriters sell the certificates to investors.

41.     A mortgage servicer is necessary to manage the collection of proceeds from the

mortgage loans.  The servicer is responsible for collecting homeowners' mortgage loan

payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The

servicer's duties include making collection efforts on delinquent loans, initiating foreclosure

proceedings, and determining when to charge off a loan by writing down its balance.  The

servicer is required to report key information about the loans to the trustee.  The trustee (or trust

administrator) administers the trust's funds and delivers payments due each month on the

certificates to the investors.

      **B.     The Securitizations At Issue In This Case**

42.     This case involves the 23 Securitizations listed in paragraph 2 above, sixteen of

which were sponsored by BOA National, and all of which were underwritten by BOA Securities.

For each of the 23 Securitizations, Table 1 identifies:  (1) the sponsor; (2) the depositor; (3) the

lead underwriter; (4) the principal amount issued for the tranches[4] purchased by the GSEs; (5) the date of issuance; and (6) the loan group or groups backing the GSE Certificate for that Securitization (referred to as the "Supporting Loan Groups").

**Table 1**

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Group(s) |
|---|---|---|---|---|---|---|---|
| ABFC 2005-WMC1 | A1 | BOA National | ABF Corp. | BOA Securities | 235,900,000 | 9/30/2005 | Group 1 |
| ABFC 2006-HE1 | A1 | BOA National | ABF Corp. | BOA Securities | 305,011,000 | 12/14/2006 | Group 1 |
| ABFC 2006-OPT1 | A2 | BOA National | ABF Corp. | BOA Securities | 166,946,000 | 8/10/2006 | Group 2 |
| | A1 | BOA National | ABF Corp. | BOA Securities | 167,027,000 | 8/10/2006 | Group 1 |
| ABFC 2006-OPT2 | A2 | BOA National | ABF Corp. | BOA Securities | 232,465,000 | 10/12/2006 | Group 2 |
| | A1 | BOA National | ABF Corp. | BOA Securities | 232,459,000 | 10/12/2006 | Group 1 |
| ABFC 2006-OPT3 | A2 | BOA National | ABF Corp. | BOA Securities | 114,343,000 | 11/14/2006 | Group 2 |
| | A1 | BOA National | ABF Corp. | BOA Securities | 114,273,000 | 11/14/2006 | Group 1 |
| ABFC 2007-WMC1 | A1A | BOA National | ABF Corp. | BOA Securities | 631,248,000 | 11/5/2007 | Group 1 |
| BAFC 2006-G | 1A1 | BOA National | BOA Funding | BOA Securities | 396,306,000 | 7/31/2006 | Group 1 |
| BAFC 2006-H | 5A1 | BOA National | BOA Funding | BOA Securities | 431,225,000 | 10/2/2006 | Group 5 |
| BAFC 2007-A | 1A1 | BOA National | BOA Funding | BOA Securities | 94,441,000 | 1/31/2007 | Group 1 |
| BAFC 2007-C | 6A1 | BOA National | BOA Funding | BOA Securities | 68,349,000 | 4/30/2007 | Group 6 |
| BOAA 2005-10 | 2CB1 | BOA National | BOA Mortgage | BOA Securities | 92,219,000 | 10/27/2005 | Group 2 |
| BOAA 2005-11 | 2CB1 | BOA National | BOA Mortgage | BOA Securities | 86,674,000 | 11/29/2005 | Group 2 |
| BOAA 2005-12 | 2CB1 | BOA National | BOA Mortgage | BOA Securities | 128,037,000 | 12/29/2005 | Group 2 |
| BOAA 2006-1 | 1CB1 | BOA National | BOA Mortgage | BOA Securities | 71,582,000 | 1/30/2006 | Group 1 |
| | 3CB1 | BOA National | BOA Mortgage | BOA Securities | 94,235,000 | 1/30/2006 | Group 3 |
| BOAA 2006-2 | 1CB1 | BOA National | BOA Mortgage | BOA Securities | 51,314,000 | 3/1/2006 | Group 1 |
| | 3CB1 | BOA National | BOA Mortgage | BOA Securities | 75,638,000 | 3/1/2006 | Group 3 |
| BOAA 2006-3 | 5CB1 | BOA National | BOA Mortgage | BOA Securities | 49,085,000 | 3/30/2006 | Group 5 |
| NSTR 2007-C | 1AV1 | NationStar Mortgage LLC | NationStar Funding LLC | BOA Securities (co-lead) | 224,590,000 | 6/7/2007 | Group 1 |
| OOMLT 2005-5 | A1 | Option One | Option One Mortgage Acceptance Corporation | BOA Securities (co-lead) | 227,921,000 | 11/10/2005 | Group I |

---

[4] A tranche is one of a series of certificates or interests created and issued as part of the same transaction.

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Group(s) |
|---|---|---|---|---|---|---|---|
| OOMLT 2007-2 | IA1 | Option One | Option One Mortgage Acceptance Corporation | BOA Securities (co-lead) | 190,306,000 | 3/9/2007 | Group I |
| | IIA1 | Option One | Option One Mortgage Acceptance Corporation | BOA Securities (co-lead) | 190,288,000 | 3/12/2007 | Group II |
| OOMLT 2007-6 | IA1 | Option One | Option One Mortgage Acceptance Corporation | BOA Securities (co-lead) | 435,470,000 | 5/30/2007 | Group I |
| OOMLT 2007-FXD1 | IIA1 | Option One | Option One Mortgage Acceptance Corporation | BOA Securities (co-lead) | 272,242,000 | 1/30/2007 | Group II |
| | IA1 | Option One | Option One Mortgage Acceptance Corporation | BOA Securities (co-lead) | 273,043,000 | 1/30/2007 | Group I |
| OOMLT 2007-HL1 | IA1 | Option One | Option One Mortgage Acceptance Corporation | BOA Securities (co-lead) | 304,935,000 | 4/26/2007 | Group I |
| STALT 2005-1F | 4A1 | SunTrust Asset Funding, LLC | BOA Funding | BOA Securities | 117,447,000 | 1/5/2006 | Group 4 |

## C.    The Securitization Process

### 1.    BOA National Groups Mortgage Loans in Special Purpose Trusts

43.    With respect to the sixteen of the 23 Securitizations for which it was the sponsor, BOA National either originated the mortgage loans underlying the Certificates or purchased the loans after they were originated, either directly from the originators or through affiliates of the originators.[5]

44.    BOA National then sold the mortgage loans for the sixteen Securitizations that it sponsored to one of three depositors, all of which are BOA-affiliated entities:  ABF Corp., BOA Mortgage, and BOA Funding (collectively, the "Depositor Defendants").  With respect to one of the remaining seven Securitizations, non-party SunTrust Asset Funding, LLC, as sponsor, sold

---

[5]    Non-party sponsors SunTrust Asset Funding LLC, Option One, and NationStar Mortgage LLC each sponsored one or more of the remaining six Securitizations.  The sponsor for each Securitization is specified in Table 1, at paragraph 42 above.

the mortgage loans to Defendant BOA Funding, as depositor.  With respect to six of the remaining Securitizations, non-party sponsors Option One and NationStar Mortgage LLC sold the mortgage loans to non-party depositors Option One Mortgage Acceptance Corporation and NationStar Funding LLC (formerly known as CHEC Funding LLC), respectively, as reflected in Table 1, above at paragraph 42.  Defendant BOA Securities was the lead or co-lead underwriter, as well as the selling underwriter, for all 23 Securitizations.

45.     ABF Corp., BOA Mortgage, and BOA Funding were wholly-owned, limited-purpose financial subsidiaries of BOA National.  The sole purpose of ABF Corp., BOA Funding, and BOA Mortgage as depositors was to act as a conduit through which loans acquired by the sponsor could be securitized and sold to investors.

46.     As depositors for seventeen of the Securitizations, ABF Corp., BOA Mortgage, and BOA Funding transferred the relevant mortgage loans to the trusts.  As part of each of the Securitizations, the trustee, on behalf of the Certificateholders, executed a Pooling and Servicing Agreement ("PSA") with the relevant depositor and the parties responsible for monitoring and servicing the mortgage loans in that Securitization.  The trust, administered by the trustee, held the mortgage loans pursuant to the related PSA and issued Certificates, including the GSE Certificates, backed by such loans.  The GSEs purchased the GSE Certificates, through which they obtained an ownership interest in the assets of the trust, including the mortgage loans.

### 2.     The Trusts Issue Securities Backed by the Loans

47.     Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans.  The Certificates were then sold to investors like Fannie Mae and Freddie Mac, which thereby acquired an ownership interest in the assets of the corresponding trust.  Each Certificate entitles its holder to a specified portion of the cashflows from the underlying mortgages in the Supporting Loan

Group. The level of risk inherent in the Certificates was a function of the capital structure of the related transaction and the credit quality of the underlying mortgages.

48.    The Certificates were issued pursuant to one of nine Shelf Registration Statements filed with the SEC on a Form S-3. The Shelf Registration Statements were amended by one or more Forms S-3/A filed with the SEC (the "Amendments"). Six of the Shelf Registration Statements and the Amendments were filed by ABF Corp., BOA Mortgage, and BOA Funding. Each Individual Defendant signed one or more of the six Shelf Registration Statements, including any amendments thereto, that were filed by ABF Corp., BOA Mortgage, and BOA Funding. The SEC filing number, registrants, signatories and filing dates for the nine Shelf Registration Statements with Amendments, as well as the Certificates covered by each Shelf Registration Statement, are reflected in Table 2 below.

### Table 2

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrants | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-118843 | 9/7/2004 | 9/29/2004 | BOA Mortgage | BOAA 2005-11; BOAA 2005-12; BOAA 2006-1; BOAA 2006-2; BOAA 2005-10; | Sal Mirran, Aashish Kamat, Juliana Johnson, Robert Caruso | Sal Mirran, Aashish Kamat, Juliana Johnson, Robert Caruso |
| 333-121559 | 12/22/2004 | Not applicable | BOA Funding | STALT 2005-1F | Mark I. Ryan, George C. Carp, George E. Ellison, William L. Maxwell, James H. Luther | Not applicable |
| 333-126920 | 7/27/2005 | Not applicable | Option One Mortgage Acceptance Corporation | OOMLT 2005-5 | Robert E. Dubrish, Steven L. Nadon, William L. O'Neill | Not applicable |
| 333-127970 | 8/30/2005 | Not applicable | ABF Corp. | ABFC 2005-WMC1 | Daniel B. Goodwin, George C. Carp, George E. Ellison, William L. Maxwell | Not applicable |

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrants | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-130524 | 12/20/2005 | 3/15/2006<br>3/31/2006 | ABF Corp. | ABFC 2006-OPT1;<br>ABFC 2006-OPT2;<br>ABFC 2006-OPT3;<br>ABFC 2007-WMC1;<br>ABFC 2006-HE1 | Daniel B. Goodwin,<br>George C. Carp,<br>George E. Ellison,<br>James H. Luther | Daniel B. Goodwin, George C. Carp, George E. Ellison, James H. Luther |
| 333-130536 | 12/20/2005 | 3/15/2006<br>3/21/2006 | BOA Funding | BAFC 2006-H;<br>BAFC 2007-A;<br>BAFC 2007-C;<br>BAFC 2006-G | Mark I. Ryan,<br>George C. Carp,<br>George E. Ellison,<br>James H. Luther | Mark I. Ryan, George C. Carp, George E. Ellison, James H. Luther |
| 333-130642 | 12/22/2005 | 3/3/2006<br>4/3/2006<br>4/19/2006<br>4/28/2006 | Chec Funding, LLC | NSTR 2007-C | Anthony H. Barone,<br>Jesse K. Bray,<br>Gerard A. Berrens,<br>Leldon E. Echols | Anthony H. Barone, Jesse K. Bray, Gerard A. Berrens, Leldon E. Echols, Adam J. DeYoung |
| 333-132249 | 3/7/2006 | 5/12/2006 | BOA Mortgage | BOAA 2006-3 | Antoine Schetritt,<br>Michael J. Kula,<br>Juliana C. Johnson,<br>Robert Caruso | Adam D. Glassner, Michael J. Kula, Juliana C. Johnson, Robert Caruso |
| 333-130870 | 1/5/2006 | 3/31/2006<br>3/30/2006<br>3/17/2006<br>3/02/2006<br>2/10/2006 | Option One Mortgage Acceptance Corporation | OOMLT 2007-2;<br>OOMLT 2007-6;<br>OOMLT 2007-FXD1;<br>OOMLT 2007-HL1 | Robert E. Dubrish,<br>Steven L. Nadon,<br>William L. O'Neill | Robert E. Dubrish, Steven L. Nadon, William L. O'Neill |

49.     The Prospectus Supplement for each Securitization describes the underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide accurate statistics regarding the mortgage loans in each group, including the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the debt-to-income ratios, the geographic distribution of the loans, the extent to which the loans were for purchase or refinance purposes; information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property; and information concerning whether the loans were delinquent.

18

50.     The Prospectus Supplements associated with each Securitization were filed with

the SEC as part of the Registration Statements.  The Form 8-Ks attaching the PSAs for each

Securitization were also filed with the SEC.  The date on which the Prospectus Supplement and

Form 8-K were filed for each Securitization, as well as the filing number of the Shelf

Registration Statement related to each, are set forth in Table 3 below.

### Table 3

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA | Filing No. of Related Registration Statement |
|---|---|---|---|
| ABFC 2005-WMC1 | 9/30/2005 | 10/17/2005 | 333-127970 |
| ABFC 2006-HE1 | 12/15/2006 | 12/29/2006 | 333-130524 |
| ABFC 2006-OPT1 | 8/10/2006 | 8/25/2006 | 333-130524 |
| ABFC 2006-OPT2 | 10/16/2006 | 10/27/2006 | 333-130524 |
| ABFC 2006-OPT3 | 11/15/2006 | 11/29/2006 | 333-130524 |
| ABFC 2007-WMC1 | 11/7/2007 | 11/20/2007 | 333-130524 |
| BAFC 2006-G | 7/31/2006 | 8/15/2006 | 333-130536 |
| BAFC 2006-H | 10/2/2006 | 10/16/2006 | 333-130536 |
| BAFC 2007-A | 1/31/2007 | 2/15/2007 | 333-130536 |
| BAFC 2007-C | 5/1/2007 | 5/15/2007 | 333-130536 |
| BOAA 2005-10 | 10/27/2005 | 11/10/2005 | 333-118843 |
| BOAA 2005-11 | 11/29/2005 | 12/14/2005 | 333-118843 |
| BOAA 2005-12 | 12/29/2005 | 1/6/2006 | 333-118843 |
| BOAA 2006-1 | 1/30/2006 | 2/14/2006 | 333-118843 |
| BOAA 2006-2 | 3/1/2006 | 3/14/2006 | 333-118843 |
| BOAA 2006-3 | 3/30/2006 | 4/13/2006 | 333-132249 |
| NSTR 2007-C | 6/11/2007 | 6/22/2007 | 333-130642 |
| OOMLT 2005-5 | 11/8/2005 | 11/23/2005 | 333-126920 |
| OOMLT 2007-2 | 3/9/2007 | 3/27/2007 | 333-130870 |
| OOMLT 2007-6 | 5/25/2007 | 6/18/2007 | 333-130870 |
| OOMLT 2007-FXD1 | 1/30/2007 | 3/15/2007 | 333-130870 |
| OOMLT 2007-HL1 | 4/26/2007 | 6/1/2007 | 333-130870 |
| STALT 2005-1F | 1/5/2006 | 1/12/2006 | 333-121559 |

51.     The Certificates were issued pursuant to the PSAs, and Defendant BOA Securities

offered and sold the GSE Certificates to Fannie Mae and Freddie Mac pursuant to the

Registration Statements, which, as noted previously, included the Prospectuses and Prospectus

Supplements.

## II.     THE DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS

### A.     The Role of Each of the Defendants

52.     Each of the Defendants, including the Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates, which included purchasing the mortgage loans from the originators, arranging the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, structuring and issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

53.     With respect to each Securitization, the Depositor Defendants, MLPF&S (as successor-in-interest to BOA Securities), and the Individual Defendants who signed the Registration Statement, as well as the BOA Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

### 1.     BOA National

54.     BOA National is one of the nation's largest banks and a leading sponsor of mortgage-backed securities. BOA National is also the direct parent corporation of ABF Corp., BOA Mortgage, and BOA Funding. As stated in the Prospectus Supplement for the ABFC 2006-OPT3 Securitization, "[BOA National] and its affiliates have been active in the securitization market since inception." The volume of loans originated and aggregated by BOA National made it possible for BOA Corp. to consistently securitize tens of billions of dollars worth of mortgage loans during the time period relevant here. In 2005, BOA Corp. securitized a

total of $95.1 billion of mortgages.  *See Bank of America Corp., 2006 Annual Report*, at 119.  In 2006, BOA Corp. securitized a total of $65.5 billion of mortgages.  *Id.*  In 2007, BOA Corp. securitized a total of $84.5 billion of mortgages.  *See Bank of America Corp., 2007 Annual Report*, at 135.  In 2007, BOA was ranked the 14th largest sponsor of non-agency mortgage-backed securities.[6]  *See* Financial Crisis Inquiry Commission, *Preliminary Staff Report: Securitization and the Mortgage Crisis*, April 7, 2010, at 13.

55.     Defendant BOA National was the sponsor of sixteen of the 23 Securitizations.  In that capacity, BOA National determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the Certificates.  BOA National also selected the Depositor Defendants – ABF Corp., BOA Mortgage, or BOA Funding – as the special purpose vehicles that would be used to transfer the mortgage loans from BOA National to the trusts, and selected BOA Securities as the underwriter for the Securitizations.  In its role as sponsor, BOA National knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

56.     For the sixteen Securitizations that it sponsored, BOA National also conveyed the mortgage loans to ABF Corp., BOA Mortgage, or BOA Funding as depositor, pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.  In these agreements, BOA National made certain representations and warranties to ABF Corp., BOA Mortgage, and BOA Funding regarding the groups of loans collateralizing the Certificates.

---

[6]  "Agency" mortgage-backed securities are guaranteed by a government agency or government-sponsored enterprise such as Fannie Mae or Freddie Mac, while "non-agency" mortgage-backed securities are issued by banks and financial companies not associated with a government agency or government sponsored enterprise.

These representations and warranties were assigned by ABF Corp., BOA Mortgage, and BOA Funding to the trustees for the benefit of the Certificateholders.

### 2.    ABF Corp.

57.    Defendant ABF Corp. is a wholly-owned direct subsidiary of BOA National and a wholly-owned indirect subsidiary of BOA Corp.  ABF Corp. is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

58.    ABF Corp. was the depositor for six of the 23 Securitizations.  In its capacity as depositor, ABF Corp. purchased the mortgage loans from the sponsor (which was BOA National for all six Securitizations) pursuant to the Assignment and Recognition Agreements or Mortgage Loan Purchase Agreements, as applicable.  ABF Corp. then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts.  ABF Corp., together with the other Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the sole benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 3.    BOA Mortgage

59.    Defendant BOA Mortgage is a wholly-owned direct subsidiary of BOA National and a wholly-owned indirect subsidiary of BOA Corp.  BOA Mortgage is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests

in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

60. BOA Mortgage was the depositor for six of the 23 Securitizations. In its capacity as depositor, BOA Mortgage purchased the mortgage loans from the sponsor (which was BOA National for all six Securitizations) pursuant to the Assignment and Recognition Agreements or Mortgage Loan Purchase Agreements, as applicable. BOA Mortgage then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts. BOA Mortgage, together with the other Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale. The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 4.   BOA Funding

61. Defendant BOA Funding is a wholly-owned direct subsidiary of BOA National and a wholly-owned indirect subsidiary of BOA Corp. BOA Funding is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts

62. BOA Funding was the depositor for five of the 23 Securitizations. In its capacity as depositor, BOA Funding purchased the mortgage loans from the sponsor (which, for all but one of the five Securitizations, was BOA National) pursuant to the Assignment and Recognition Agreements or Mortgage Loan Purchase Agreements, as applicable. BOA Funding then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts. BOA Funding, together with the other Defendants, was also responsible for preparing and filing the

23

Registration Statements pursuant to which the Certificates were offered for sale. The trusts in turn held the mortgage loans for the sole benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 5.      MLPF&S, As Successor-in-Interest to BOA Securities

63.      BOA Securities was an investment bank, and was, at all relevant times, a registered broker/dealer and one of the leading underwriters of mortgage and other asset-backed securities in the United States.

64.      BOA Securities was one of the nation's largest underwriters of asset-backed securities. For the period 2005 through 2007, BOA Securities was the tenth largest underwriter of subprime mortgage-backed securities and had a 4.5 percent market share. During the same period, BOA Securities underwrote over $24 billion of subprime mortgage-backed securities: approximately $10 billion, $3.9 billion and $10.1 billion in 2005, 2006, and 2007, respectively. *See* Compass Point Research & Trading LLC, *Mortgage Finance*, August 17, 2010.

65.      BOA Securities was the lead underwriter for the Securitizations. In that role, it was responsible for underwriting and managing the offer and sale of the Certificates to Fannie Mae and Freddie Mac and other investors. BOA Securities was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

66.      As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities by virtue of its status as the surviving entity in its merger with BOA Securities.

### 6.      BOA Corporation

67.      BOA Corp. employed its wholly-owned subsidiaries, BOA National, BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding, in the key steps of the securitization

process.  Unlike typical arms' length securitizations, sixteen of the 23 Securitizations here involved various BOA subsidiaries and affiliates at virtually each step in the chain.  With respect to all but seven of the Securitizations, the sponsor was BOA National, the depositor was ABF Funding, BOA Mortgage, or BOA Funding, and the lead underwriter was BOA Securities.  As to the remaining Securitizations, non-parties served as sponsor and depositor (except in one instance in which BOA Funding acted as depositor), and BOA Securities was the lead and selling underwriter.

68.     As the sole corporate parent of BOA Securities, ABF Funding, BOA Mortgage, BOA Funding, and BOA National, BOA Corp. had the practical ability to direct and control the actions of BOA Securities, ABF Funding, BOA Mortgage, and BOA Funding related to the Securitizations, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.

69.     As detailed above, the Securitizations here involved BOA entities, including the aforementioned subsidiaries of the BOA Corp., at virtually each step in the process.  BOA Corp. profited substantially from this vertically integrated approach to mortgage-backed securitization.

### 7.     The Individual Defendants

70.     Defendant George C. Carp was Treasurer, Chief Accounting Officer, and Chief Financial Officer of ABF Corp. and BOA Funding.  Mr. Carp signed four of the Shelf Registration Statements and any amendment thereto.

71.     Defendant Robert Caruso was a Director of BOA Mortgage.  Mr. Caruso signed two of the Shelf Registration Statements and any amendment thereto.

72.     Defendant George E. Ellison was a Director of BOA Funding and ABF Corp. Mr. Ellison signed four of the Shelf Registration Statements and any amendment thereto.

73.     Defendant Adam D. Glassner was President, Chief Executive Officer, and Chairman of the Board of BOA Mortgage.  Mr. Glassner signed the amendment to one of the Shelf Registration Statements.

74.     Defendant Daniel B. Goodwin was President and Chief Executive Officer of ABF Corp.  Mr. Goodwin was also a Managing Director at BOA Securities.  Mr. Goodwin signed two of the Shelf Registration Statements and any amendment thereto.

75.     Defendant Juliana Johnson was a Director of BOA Mortgage.  Ms. Johnson signed two of the Shelf Registration Statements and any amendment thereto.

76.     Defendant Aashish Kamat was a Director of BOA Mortgage.  Mr. Kamat signed one of the Shelf Registration Statements and any amendment thereto.

77.     Defendant Michael J. Kula was a Director of BOA Mortgage.  Mr. Kula signed one of the Shelf Registration Statements and any amendment thereto.

78.     Defendant James H. Luther was a Director of BOA Funding and ABF Corp.  Mr. Luther signed three of the Shelf Registration Statements and any amendment thereto.

79.     Defendant William L. Maxwell was a director of ABF Corp.  Mr. Maxwell signed two of the Shelf Registration Statements that were not subsequently amended.

80.     Defendant Mark I. Ryan was President and Chief Executive Officer of BOA Funding.  Mr. Ryan signed two of the Shelf Registration Statements and any amendment thereto.

81.     Defendant Antoine Schetritt was President, Chief Executive Officer, and Chairman of the Board of BOA Mortgage.  Mr. Schetritt signed one Shelf Registration Statement.

**B.     The Defendants' Failure To Conduct Proper Due Diligence**

82.     Defendants failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the representations in the Registration Statements.

83.     As discussed above at paragraphs 54 and 64, from approximately 2005 through 2007, BOA's involvement in the mortgage-backed securitization industry was substantial. Defendants indeed had enormous financial incentives to complete as many offerings as quickly as possible without regard to ensuring the accuracy or completeness of the Registration Statements, or conducting adequate and reasonable due diligence. For example, ABF Corp., BOA Mortgage, and BOA Funding, as the depositors, were paid a percentage of the total dollar amount of the offerings upon completion of the Securitizations, and BOA Securities, as the underwriter, was paid a commission based on the amount it received from the sale of the Certificates to the public.

84.     The push to securitize large volumes of mortgage loans contributed to the absence of controls needed to prevent the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements. In particular, Defendants failed to conduct adequate diligence or to otherwise ensure the accuracy of the statements in the Registration Statements pertaining to the Securitizations.

85.     For instance, BOA retained third-parties, including Clayton Holdings, Inc. ("Clayton"), to analyze the loans it was considering placing in its securitizations, but waived a significant number of loans into the Securitizations that these firms had recommended for exclusion, and did so without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with applicable guidelines or had compensating factors that excused the loans' non-compliance with those guidelines. On January 27, 2008, Clayton revealed that it

had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  According to *The New York Times*, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

86.    BOA was negligent in allowing into the Securitizations a substantial number of mortgage loans that, as reported to BOA by third-party due diligence firms, did not conform to the underwriting standards stated in the Registration Statements, including the Prospectuses and Prospectus Supplements.  Even upon learning from the third-party due diligence firms that there were high percentages of defective or at least questionable loans in the sample of loans reviewed by the third-party due diligence firms, BOA failed to take any additional steps to verify that the population of loans in the Securitizations did not include a similar percentage of defective and/or questionable loans.

87.    Clayton's trending reports revealed that in the period from the first quarter of 2006 to the second quarter of 2007, 30 percent of the mortgage loans BOA submitted to Clayton to review in residential mortgage-backed securities groups were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 27 percent of the loans were subsequently waived in by BOA without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  *See* Clayton Trending Reports, available at http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis-sacramento#documents.

88.     In May 2011, the NYAG opened an investigation into the mortgage securitization practices of Bank of America.  *The New York Times* reported on May 16, 2011, that the Attorney General had subpoenaed information "covering many aspects" of BOA's "pooling operations" in connection with the "bundling" of home loans into securities.  Upon information and belief, that investigation is ongoing.

## III.    THE REGISTRATION STATEMENTS AND THE PROSPECTUS SUPPLEMENTS

### A.      Compliance With Underwriting Guidelines

89.     The Prospectus Supplements for each Securitization describe the mortgage loan underwriting guidelines pursuant to which the mortgage loans underlying the related Securitizations were to have been originated.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.

90.     The statements made in the Prospectus Supplements, which, as discussed, formed part of the Registration Statement for each Securitization, were material to a reasonable investor's decision to purchase and invest in the Certificates because the failure to originate a mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency and default by the borrower, as well as a risk that losses upon liquidation will be higher, thus resulting in a greater economic risk to an investor.

91.     The Prospectus Supplements for the Securitizations contained several key statements with respect to the underwriting standards of the entities that originated the loans in the Securitizations.  For example, the Prospectus Supplement for the ABFC 2006-OPT3 Securitization, for which Option One was the originator, BOA National was the sponsor, BOA Securities was the underwriter, and ABF Corp. was the depositor, stated that:  "All of the

mortgage loans were originally originated or acquired by Option One Mortgage Corporation in accordance with the underwriting guidelines described under 'Underwriting Standards' in this prospectus supplement" and that "the Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan."

92.     The ABFC 2006-OPT3 Prospectus Supplement further stated that "exceptions to the Option One Underwriting Guidelines" (including "a debt-to-income ratio exception, a pricing exception, a loan-to-value exception, a credit score exception or an exception from certain requirements of a particular risk category") are made on a "case-by-case basis," but only "where compensating factors exist."

93.     With respect to the information evaluated by the originator, the Prospectus Supplement stated that:  "Each mortgage loan applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  The Option One Underwriting Guidelines require a credit report and, if available, a credit score on each applicant from a credit-reporting agency.  The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments."

94.     The ABFC 2006-OPT3 Prospectus Supplement further stated that:  "The Option One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and require

Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal supports the loan balance."

95.     The Prospectus and Prospectus Supplements for each of the Securitizations had similar representations to those quoted above.  The relevant representations in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting standards for each Securitization are reflected in Appendix A to this Complaint.  As discussed below in Section IV, in fact, the originators of the mortgage loans in the Supporting Loan Group for the Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectus and Prospectus Supplements false and misleading.

### B.     Statements Regarding Occupancy Status of Borrower

96.     The Prospectus Supplements contained collateral group-level information about the occupancy status of the borrowers of the loans in the Securitizations.  Occupancy status refers to whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property.  The Prospectus Supplements for each of the Securitizations presented this information in tabular form, usually in a table entitled "Occupancy Status of the Mortgage Loans."  This table divided all the loans in the collateral group by occupancy status, *e.g.*, into the following categories:  (i) "Primary," or "Owner Occupied;" (ii) "Second Home," or "Secondary"; and (iii) "Investment" or "Non-Owner."  For each category, the table stated the number of loans in that category.

97.     In the case of six of the 23 Securitizations,[7] the Prospectus Supplement stated that all or nearly all of the mortgage loans in the Supporting Loan Group were "Investment" or "Non-Owner" properties.  The Prospectus Supplements for the remaining seventeen Securitizations, however, reported that an overwhelming majority of the mortgage loans in the Supporting Loan Groups were owner-occupied, while a small percentage were reported to be non-owner occupied (*i.e.* a second home or investor home).  The occupancy statistics for the Supporting Loan Groups for the seventeen Securitizations were reported in the Prospectus Supplements as follows:[8]

**Table 4**

| Transaction | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|
| ABFC 2005-WMC1 | Group 1 | 90.50 | 5.08 | 4.42 |
| ABFC 2006-HE1 | Group 1 | 95.55 | 0.60 | 3.85 |
| ABFC 2006-OPT1 | Group 1 | 91.41 | 0.90 | 7.70 |
| | Group 2 | 88.19 | 1.26 | 10.55 |
| ABFC 2006-OPT2 | Group 1 | 92.97 | 0.95 | 6.08 |
| | Group 2 | 91.41 | 0.42 | 8.17 |
| ABFC 2006-OPT3 | Group 1 | 91.44 | 2.02 | 6.54 |
| | Group 2 | 91.41 | 0.94 | 7.66 |
| ABFC 2007-WMC1 | Group 1 | 90.87 | 3.96 | 5.17 |
| BAFC 2006-G | Group 1 | 79.90 | 9.00 | 11.09 |
| BAFC 2006-H | Group 5 | 83.95 | 4.69 | 11.36 |
| BAFC 2007-A | Group 1 | 58.38 | 13.35 | 28.27 |
| BAFC 2007-C | Group 6 | 82.89 | 8.72 | 8.39 |
| BOAA 2006-3 | Group 5 | 88.47 | 11.53 | 0.00 |
| NSTR 2007-C | Group 1 | 97.19 | 0.87 | 1.94 |
| OOMLT 2005-5 | Group I | 86.47 | 1.70 | 11.82 |
| OOMLT 2007-2 | Group I | 91.56 | 0.74 | 7.70 |
| | Group II | 84.95 | 1.79 | 13.26 |
| OOMLT 2007-6 | Group I | 82.50 | 1.69 | 15.81 |
| OOMLT 2007-FXD1 | Group I | 95.07 | 0.70 | 4.22 |
| | Group II | 92.17 | 0.91 | 6.92 |

---

[7]  These six Securitizations are BOAA 2005-10, BOAA 2005-11, BOAA 2005-12, BOAA 2006-1, BOAA 2006-2, and STALT 2005-1F.

[8]  Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories:  owner occupied, investor, and second home.  These numbers have been converted to percentages.

| Transaction | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|
| OOMLT 2007-HL1 | Group I | 92.84 | 0.92 | 6.25 |

98.     The statements about occupancy status were material to a reasonable investor's decision to invest in the Certificates.  Information about occupancy status is an important factor in determining the credit risk associated with a mortgage loan and, therefore, the securitization that it collateralizes.  Because borrowers who reside in mortgaged properties are less likely to default than borrowers who purchase homes as second homes or investments and live elsewhere, and are more likely to care for their primary residence, the percentage of loans in the collateral group of a securitization that are secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.

99.     Other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss to the certificateholders.  Even small differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.  As discussed below at paragraphs 111 through 115, the Registration Statement for each Securitization materially overstated the percentage of loans in the Supporting Loan Groups that were owner-occupied, thereby misrepresenting the degree of risk of the GSE Certificates.

### C.     Statements Regarding Loan-to-Value Ratios

100.     The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

101.    The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan. Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

102.    The Prospectus Supplements for each Securitization also contained group-level information about the LTV ratio for the underlying group of loans as a whole.  The percentage of loans with an LTV ratio at or less than 80 percent and the percentage of loans with an LTV ratio greater than 100 percent as reported in the Prospectus Supplements for the Supporting Loan Groups are reflected in Table 5 below.[9]

### Table 5

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|
| ABFC 2005-WMC1 | Group 1 | 60.68 | 0.00 |
| ABFC 2006-HE1 | Group 1 | 56.39 | 0.00 |
| ABFC 2006-OPT1 | Group 1 | 49.60 | 0.00 |
| | Group 2 | 52.53 | 0.00 |
| ABFC 2006-OPT2 | Group 1 | 70.79 | 0.00 |
| | Group 2 | 67.04 | 0.00 |
| ABFC 2006-OPT3 | Group 1 | 0.00 | 0.00 |
| | Group 2 | 0.00 | 0.00 |
| ABFC 2007-WMC1 | Group 1 | 52.49 | 0.00 |
| BAFC 2006-G | Group 1 | 84.93 | 0.00 |

[9]    As used in this Complaint, "LTV" refers to the original loan-to-value ratio for first lien mortgages and for properties with second liens that are subordinate to the lien that was included in the securitization (*i.e.*, only the securitized lien is included in the numerator of the LTV calculation).  However, for second lien mortgages, where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined-loan-to-value ratio, or "CLTV").

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|
| BAFC 2006-H | Group 5 | 93.53 | 0.08 |
| BAFC 2007-A | Group 1 | 84.18 | 0.00 |
| BAFC 2007-C | Group 6 | 97.31 | 0.00 |
| BOAA 2005-10 | Group 2 | 87.60 | 0.00 |
| BOAA 2005-11 | Group 2 | 90.29 | 0.00 |
| BOAA 2005-12 | Group 2 | 91.35 | 0.00 |
| BOAA 2006-1 | Group 1 | 95.76 | 0.00 |
| | Group 3 | 89.40 | 0.00 |
| BOAA 2006-2 | Group 1 | 94.87 | 0.00 |
| | Group 3 | 90.92 | 0.00 |
| BOAA 2006-3 | Group 5 | 84.94 | 0.14 |
| NSTR 2007-C | Group 1 | 25.94 | 0.00 |
| OOMLT 2005-5 | Group I | 39.86 | 0.00 |
| OOMLT 2007-2 | Group I | 64.26 | 0.00 |
| | Group II | 63.15 | 0.00 |
| OOMLT 2007-6 | Group I | 51.49 | 0.00 |
| OOMLT 2007-FXD1 | Group I | 65.81 | 0.00 |
| | Group II | 62.64 | 0.00 |
| OOMLT 2007-HL1 | Group I | 0.00 | 0.00 |
| STALT 2005-1F | Group 4 | 94.73 | 0.00 |

103.    As Table 5 makes clear, the Prospectus Supplement for nearly all of the Securitizations reported that many or most of the mortgage loans in the Supporting Loan Groups had an LTV ratio of 80 percent or less,[10] and the Prospectus Supplement for nearly all of the Securitizations reported that *zero* mortgage loans in the Supporting Loan Group had an LTV ratio over 100 percent.

104.    The LTV ratio is among the most important measures of the risk of a mortgage loan, and thus, it is one of the most important indicators of the default risk of the mortgage loans underlying the Certificates.  The lower the ratio, the less likely that a decline in the value of the

---

[10]    The lone exceptions are the ABFC 2006-OPT3 and OOMLT 2007-HL1 Securitizations, for which the majority of mortgages were reported as having an LTV ratio greater than 80 percent and below 100 percent.

property will wipe out an owner's equity, and thereby give an owner an incentive to stop making mortgage payments and abandon the property. This ratio also predicts the severity of loss in the event of default. The lower the LTV ratio, the greater the "equity cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

105.    Thus, LTV ratio is a material consideration to a reasonable investor in deciding whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate. As discussed below at paragraphs 116 through 121, the Registration Statements for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and materially *understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk of the GSE Certificates.[11]

### D.    Statements Regarding Credit Ratings

106.    Credit ratings are assigned to the tranches of mortgage-backed securitizations by the credit rating agencies, including Moody's Investors Service, Standard & Poor's, and Fitch Ratings. Each credit rating agency uses its own scale with letter designations to describe various levels of risk. In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments. C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for

---

[11]    The lone exceptions are the ABFC 2006-OPT3 and OOMLT 2007-HL1 Securitizations, for which the Registration Statements solely understated the percentage of loans with an LTV ratio above 100 percent by more than 40 percent.

recovery.  At the time the GSEs purchased the GSE Certificates, investments with AAA or its equivalent ratings historically experienced a loss rate of less than .05 percent.  Investments with a BBB rating, or its equivalent, historically experienced a loss rate of less than one percent.  As a result, securities with credit ratings between AAA or its equivalent through BBB- or its equivalent were generally referred to as "investment grade."

107.    Rating agencies determine the credit rating for each tranche of a mortgage-backed securitization by comparing the likelihood of contractual principal and interest repayment to the "credit enhancements" available to protect investors.  Rating agencies determine the likelihood of repayment by estimating cashflows based on the quality of the underlying mortgages by using sponsor-provided loan level data.  Credit enhancements, such as subordination, represent the amount of "cushion" or protection from loss incorporated into a given securitization.[12]  This cushion is intended to improve the likelihood that holders of highly rated certificates receive the interest and principal to which they are contractually entitled.  The level of credit enhancement offered is based on the make-up of the loans in the underlying collateral group and entire securitization.  Riskier loans underlying the securitization necessitate higher levels of credit enhancement to insure payment to senior certificate holders.  If the collateral within the deal is of a higher quality, then rating agencies require less credit enhancement for an AAA or its equivalent rating.

108.    Credit ratings have been an important tool to gauge risk when making investment decisions.  For almost a hundred years, investors like pension funds, municipalities, insurance

---

[12]  "Subordination" refers to the fact that the certificates for a mortgage-backed securitization are issued in a hierarchical structure, from senior to junior.  The junior certificates are "subordinate" to the senior certificates in that, should the underlying mortgage loans become delinquent or default, the junior certificates suffer losses first.  These subordinate certificates thus provide a degree of protection to the senior certificates from losses on the underlying loans.

companies, and university endowments have relied heavily on credit ratings to assist them in distinguishing between safe and risky investments.   Fannie Mae's and Freddie Mac's respective internal policies limited their purchases of private label residential mortgage-backed securities to those rated AAA (or its equivalent), and in very limited instances, AA or A bonds (or their equivalent).

109.    Each tranche of the Securitizations received a credit rating upon issuance, which purported to describe the riskiness of that tranche.  The Defendants reported the credit ratings for each tranche in the Prospectus Supplements.  The credit rating provided for each of the GSE Certificates was "investment grade," almost always "AAA" or its equivalent.  The accuracy of these ratings was material to a reasonable investor's decision to purchase the GSE Certificates. As set forth in Table 8, below at paragraph 142, the ratings for the Securitizations were inflated as a result of Defendants' provision of incorrect data concerning the attributes of the underlying mortgage collateral to the ratings agencies, and, as a result, Defendants sold and marketed the GSE Certificates as AAA (or its equivalent) when, in fact, they were not.

## IV.    THE FALSITY OF STATEMENTS IN THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS

### A.    The Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False

110.    A review of loan-level data was conducted in order to assess whether the statistical information provided in the Prospectus Supplements was true and accurate.  For each Securitization, the sample consisted of 1,000 randomly selected loans per Supporting Loan Group, or all of the loans in the group if there were fewer than 1,000 loans in the Supporting Loan Group.  The sample data confirms, on a statistically-significant basis, material misrepresentations of underwriting standards and of certain key characteristics of the mortgage

loans across the Securitizations.  The data review demonstrates that the data concerning owner

occupancy and LTV ratios was materially false and misleading.

<strong>1.      Owner Occupancy Data Was Materially False</strong>

111.    The data review has revealed that the owner occupancy statistics reported in the

Prospectus Supplements were materially false and inflated.  In fact, for the seventeen

Securitizations whose Prospectus Supplement represented the Supporting Loan Groups to be

overwhelmingly owner-occupied, far fewer underlying properties were occupied by their owners

than disclosed in the Prospectus Supplement and more correspondingly were held as second

homes or investment properties.

112.    To determine whether a given borrower actually occupied the property as

claimed, a number of tests were conducted, including, *inter alia*, whether, months after the loan

closed, the borrower's tax bill was being mailed to the property or to a different address; whether

the borrower had claimed a tax exemption on the property; and whether the mailing address of

the property was reflected in the borrower's credit reports, tax records, or lien records.  Failing

two or more of these tests is a strong indication that the borrower did not live at the mortgaged

property and instead used it as a second home or an investment property, both of which make it

much more likely that a borrower will not repay the loan.

113.    A significant number of the loans in the Supporting Loan Groups backing the

seventeen Securitizations for which the majority of mortgage loans were purportedly for owner-

occupied properties failed two or more of these tests, indicating that the owner occupancy

statistics provided to Fannie Mae and Freddie Mac were materially false and misleading.  For

example, for the ABFC 2006-HE1 Securitization, for which BOA National was the sponsor,

BOA Securities was the underwriter, and ABF Corp. was the depositor, the Prospectus

Supplement stated that 4.45 percent of the underlying properties by loan count in the Supporting

39

Loan Group were not owner-occupied.  But the data review revealed that, for 11.32 percent of the properties represented as owner-occupied, the owners lived elsewhere, indicating that the true percentage of non-owner occupied properties was 15.27 percent, more than triple the percentage reported in the Prospectus Supplement.[13]

114.    The data review revealed that for each of the seventeen Securitizations, the Prospectus Supplement misrepresented the percentage of non-owner occupied properties.  The true percentage of non-owner occupied properties, as determined by the data review, versus the percentage stated in the Prospectus Supplement for each Securitization, is reflected in Table 6 below.  Table 6 demonstrates that the Prospectus Supplements for the majority of the Securitizations understated the percentage of non-owner occupied properties by at least 6.53 percent, and for several Securitizations by 10 percent or more.

115.    In the case of six of the 23 Securitizations,[14] the Prospectus Supplement stated that all or nearly all of the mortgage loans in the Supporting Loan Group were "Investment" or "Non-Owner" properties.  The Prospectus Supplements for the remaining seventeen Securitizations, however, reported that an overwhelming majority of the mortgage loans in the Supporting Loan Groups were owner-occupied, while a small percentage were reported to be non-owner occupied (*i.e.* a second home or investor home).  The occupancy statistics for the Supporting Loan Groups for the seventeen Securitizations were reported in the Prospectus Supplements as follows.

---

[13]    This conclusion is arrived at by summing (a) the stated non-owner-occupied percentage in the Prospectus Supplement (here, 4.45 percent), and (b) the product of (i) the stated owner-occupied percentage (here, 96.13 percent) and (ii) the percentage of the properties represented as owner-occupied in the sample that showed strong indications that their owners in fact lived elsewhere (here, 11.32 percent).

[14]    These six Securitizations are BOAA 2005-10, BOAA 2005-11, BOAA 2005-12, BOAA 2006-1, BOAA 2006-2, and STALT 2005-1F.

**Table 6**

| Transaction | Supporting Loan Group | Reported Percentage of Non-Owner Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[15] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|
| ABFC 2005-WMC1 | Group 1 | 9.50 | 9.89 | 18.45 | 8.95 |
| ABFC 2006-HE1 | Group 1 | 4.45 | 11.32 | 15.27 | 10.82 |
| | Group 1 | 8.59 | 10.06 | 17.79 | 9.19 |
| ABFC 2006-OPT1 | Group 2 | 11.81 | 10.77 | 21.31 | 9.50 |
| | Group 1 | 7.03 | 8.20 | 14.65 | 7.63 |
| ABFC 2006-OPT2 | Group 2 | 8.59 | 11.56 | 19.16 | 10.57 |
| ABFC 2006-OPT3 | Group 1 | 8.56 | 8.24 | 16.10 | 7.54 |
| | Group 2 | 8.59 | 11.57 | 19.17 | 10.57 |
| ABFC 2007-WMC1 | Group 1 | 9.13 | 11.80 | 19.85 | 10.72 |
| BAFC 2006-G | Group 1 | 20.10 | 16.19 | 33.03 | 12.93 |
| BAFC 2006-H | Group 5 | 16.05 | 11.01 | 25.30 | 9.25 |
| BAFC 2007-A | Group 1 | 41.62 | 22.39 | 54.69 | 13.07 |
| BAFC 2007-C | Group 6 | 17.11 | 16.97 | 31.18 | 14.07 |
| BOAA 2006-3 | Group 5 | 11.53 | 13.85 | 23.78 | 12.26 |
| NSTR 2007-C | Group 1 | 2.81 | 11.27 | 13.76 | 10.95 |
| OOMLT 2005-5 | Group I | 13.53 | 10.52 | 22.62 | 9.10 |
| OOMLT 2007-2 | Group II | 15.05 | 10.36 | 23.85 | 8.80 |
| | Group I | 8.44 | 10.78 | 18.32 | 9.87 |
| OOMLT 2007-6 | Group I | 17.50 | 8.76 | 24.72 | 7.22 |
| OOMLT 2007-FXD1 | Group II | 7.83 | 9.40 | 16.49 | 8.67 |
| | Group I | 4.93 | 11.05 | 15.43 | 10.50 |
| OOMLT 2007-HL1 | Group I | 7.16 | 10.08 | 16.52 | 9.36 |

## 2.      Loan-to-Value Data Was Materially False

116.    The data review has further revealed that the LTV ratios disclosed in the

Prospectus Supplements were materially false and understated, as more specifically set out

below.  For each of the sampled loans, an industry standard automated valuation model

("AVM") was used to calculate the value of the underlying property at the time the mortgage

loan was originated.  AVMs are routinely used in the industry as a way of valuing properties

---

[15]   As described more fully in paragraph 112, failing two or more tests of owner-occupancy is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property.

during prequalification, origination, portfolio review and servicing.  AVMs rely upon similar

data as appraisers—primarily county assessor records, tax rolls, and data on comparable

properties.  AVMs produce independent, statistically-derived valuation estimates by applying

modeling techniques to this data.

117.    Applying the AVM to the available data for the properties securing the sampled

loans shows that the appraised value given to such properties was significantly higher than the

actual value of such properties.  The result of this overstatement of property values is a material

understatement of the LTV ratio.  That is, if a property's true value is significantly less than the

value used in the loan underwriting, then the loan represents a significantly higher percentage of

the property's value.  This, of course, increases the risk a borrower will not repay the loan as

well as the risk of greater losses in the event of a default.

118.    For example, for the BAFC 2006-G Securitization, which was sponsored by BOA

National and underwritten by BOA Securities, and for which BOA Funding was the depositor,

the Prospectus Supplement stated that zero LTV ratios for the Supporting Loan Group were

above 100 percent.  In fact, 11.13 percent of the sample of loans included in the data review had

LTV ratios above 100 percent.  In addition, the Prospectus Supplement stated that 84.93 percent

of the loans had LTV ratios at or below 80 percent.  The data review indicated that only 48.08

percent of the loans had LTV ratios at or below 80 percent.

119.    The data review revealed that for all but two of the 23 Securitizations (ABFC

2006-OPT3 and OOMLT 2007-HL1),[16] the Prospectus Supplement misrepresented the

percentage of loans with an LTV ratio that were above 100 percent, as well the percentage of

loans that had an LTV ratio at or below 80 percent.  Table 7 reflects (i) the true percentage of

---

[16]    Even in the case of those two exceptions, the percentage of mortgage loans with an
LTV ratio at or under 80 percent was understated and thus misrepresented.

mortgages in the Supporting Loan Group with LTV ratios above 100 percent, versus the

percentage reported in the Prospectus Supplement; and (ii) the true percentage of mortgages in

the Supporting Loan Group with LTV ratios at or below 80 percent, versus the percentage

reported in the Prospectus Supplement.  The percentages listed in Table 7 were calculated by

aggregated principal balance.

## Table 7

| Transaction | Supporting Loan Group | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio At Or Under 80% | DATA REVIEW True Percentage of Loans With LTV Ratio At Or Under 80% | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio Over 100% | DATA REVIEW True Percentage of Loans With LTV Ratio Over 100% |
|---|---|---|---|---|---|
| ABFC 2005-WMC1 | Group 1 | 60.68 | 38.88 | 0.00 | 15.56 |
| ABFC 2006-HE1 | Group 1 | 56.39 | 38.67 | 0.00 | 18.78 |
| ABFC 2006-OPT1 | Group 1 | 49.60 | 35.42 | 0.00 | 20.48 |
| | Group 2 | 52.53 | 37.82 | 0.00 | 17.62 |
| ABFC 2006-OPT2 | Group 1 | 70.79 | 48.98 | 0.00 | 14.56 |
| | Group 2 | 67.04 | 49.05 | 0.00 | 12.81 |
| ABFC 2006-OPT3 | Group 1 | 0.00 | 3.38 | 0.00 | 40.68 |
| | Group 2 | 0.00 | 2.17 | 0.00 | 43.89 |
| ABFC 2007-WMC1 | Group 1 | 52.49 | 29.48 | 0.00 | 23.38 |
| BAFC 2006-G | Group 1 | 84.93 | 48.08 | 0.00 | 11.13 |
| BAFC 2006-H | Group 5 | 93.53 | 51.32 | 0.08 | 8.23 |
| BAFC 2007-A | Group 1 | 84.18 | 58.30 | 0.00 | 8.85 |
| BAFC 2007-C | Group 6 | 97.31 | 62.94 | 0.00 | 6.17 |
| BOAA 2005-10 | Group 2 | 87.60 | 74.27 | 0.00 | 4.21 |
| BOAA 2005-11 | Group 2 | 90.29 | 75.33 | 0.00 | 4.47 |
| BOAA 2005-12 | Group 2 | 91.35 | 78.31 | 0.00 | 3.65 |
| BOAA 2006-1 | Group 1 | 95.76 | 81.22 | 0.00 | 2.54 |
| | Group 3 | 89.40 | 68.65 | 0.00 | 5.69 |
| BOAA 2006-2 | Group 1 | 94.87 | 84.87 | 0.00 | 2.59 |
| | Group 3 | 90.92 | 75.31 | 0.00 | 6.34 |
| BOAA 2006-3 | Group 5 | 84.94 | 65.77 | 0.14 | 6.46 |
| NSTR 2007-C | Group 1 | 25.94 | 22.32 | 0.00 | 27.02 |
| OOMLT 2005-5 | Group I | 39.86 | 30.73 | 0.00 | 17.38 |
| OOMLT 2007-2 | Group I | 64.26 | 42.77 | 0.00 | 16.94 |
| | Group II | 63.15 | 40.37 | 0.00 | 16.03 |
| OOMLT 2007-6 | Group I | 51.49 | 31.85 | 0.00 | 22.48 |
| OOMLT 2007-FXD1 | Group I | 65.81 | 49.53 | 0.00 | 14.45 |
| | Group II | 62.64 | 48.04 | 0.00 | 12.98 |
| OOMLT 2007-HL1 | Group I | 0 | 2.64 | 0.00 | 46.52 |
| STALT 2005-1F | Group 4 | 94.73 | 65.06 | 0.00 | 8.62 |

120.     As Table 7 demonstrates, the Prospectus Supplements for all of the Securitizations reported that virtually *none* of the mortgage loans in the Supporting Loan Groups had an LTV ratio over 100 percent.[17]  In contrast, the data review revealed that at least 2.54 percent of the mortgage loans for each Securitization had an LTV ratio over 100 percent, and for most Securitizations this figure was much larger.  Indeed, for thirteen of the Securitizations, the data review revealed that more than ten percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.  For six Securitizations, the data review revealed that more than 20 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.

121.     These inaccuracies with respect to reported LTV ratios also indicate that the representations in the Registration Statements relating to appraisal practices were false, and that the appraisers themselves, in many instances, furnished appraisals that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.  Indeed, independent appraisers following proper practices, and providing genuine estimates as to valuation, would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.  This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission (the "FCIC"), which identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results.  *See* FCIC, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (January 2011).

---

[17]   In the BAFC 2006-H and BOAA 2006-3 Securitizations, the percentage of mortgage loans with a reported LTV ratio over 100 percent was .08 and .14 percent, respectively.

**B.      The Originators of the Underlying Mortgage Loans Systematically
           Disregarded Their Underwriting Guidelines**

122.     The Registration Statements contained material misstatements and omissions
regarding compliance with underwriting guidelines.  Indeed, the originators for the loans
underlying the Securitizations systematically disregarded their respective underwriting
guidelines in order to increase production and profits derived from their mortgage lending
businesses.  This is confirmed by the systematically misreported owner occupancy and LTV
statistics, discussed above, and by (1) investigations into originators' underwriting practices by
government officials and private litigants, which have revealed widespread abandonment of
originators' reported underwriting guidelines during the relevant period; (2) the collapse of the
Certificates' credit ratings; and (3) the surge in delinquency and default in the mortgages in the
Securitizations.

**1.      Government Investigations and Private Litigants Have Confirmed
           That the Originators of the Loans in the Securitizations
           Systematically Failed to Adhere to Their Underwriting Guidelines**

123.     The abandonment of underwriting guidelines is further demonstrated by
government reports and investigations that have described rampant underwriting failures
throughout the period of the Securitizations, and, more specifically, have described underwriting
failures by the very originator whose loans were included by the Defendants in the majority of
the Securitizations.

124.     As described above at paragraph 32, Option One Originated 100 percent of the
mortgage loans underlying eight Securitizations, and BOA National originated 100 percent of the
mortgage loans underlying six Securitizations.  Each additionally originated smaller portions of
the loans underlying one or more additional Securitizations.  These fourteen Securitizations

comprise approximately 59 percent of Fannie Mae's and Freddie Mac's $6 billion worth of purchases of the 23 Securitizations.

125.     In November 2008, the Office of the Comptroller of the Currency (the "OCC"), an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas.  The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations.  Option One, which originated many of the loans for the Securitizations at issue here, was on that list.  *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release, November 13, 2008.

126.     Option One has been identified through multiple reports and investigations for its faulty underwriting.  On June 3, 2008, for instance, the Attorney General for the Commonwealth of Massachusetts filed an action against Option One (the "Option One Complaint"), and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans.  *See* Complaint, *Commonwealth v. H&R Block, Inc*., CV NO. 08-2474-BLS (Mass. Super. Ct. June 3, 2008).  According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards . . . and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market."  *See* Option One Complaint.

127.     The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home," and that Option One "avoided implementing

reasonable measures that would have prevented or limited these fraudulent practices." Option One's "origination policies … employed from 2004 through 2007 have resulted in an explosion of foreclosures." *Id.* at 1.

128.    On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction that prevented Option One from foreclosing on thousands of its loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, No. 08-2474-BLS1, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008). On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction. *See Commonwealth v. Option One Mortgage Co.*, No. 09-P-134, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009).

129.    On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, had agreed to settle the suit for approximately $125 million. *See* Massachusetts Attorney General Press Release, "H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions," Aug. 9, 2011. Media reports noted that the suit was being settled amidst ongoing discussions among multiple states' attorneys general, federal authorities, and five major mortgage servicers, aimed at resolving investigations of the lenders' foreclosure and mortgage-servicing practices. The Massachusetts Attorney General released a statement saying that no settlement should include a release for conduct relating to the lenders' packaging of mortgages into securitizations. *See, e.g.,* Bloomberg.com, H&R Block, Massachusetts Reach $125 Million Accord in State Mortgage Suit, Aug. 9, 2011.

130.    BOA also departed from its own underwriting standards as a consequence of striving to increase the volume of subprime mortgage loans it originated between 2004 and 2007. In 2004, Bank of America announced its commitment to invest $750 billion over 10 years in

low- and moderate-income ("LMI") communities through consumer loans and other programs. FCIC Report at 97; *see also* BOA Press Release, "Bank of America Community Development Lending Exceeds $85 Billion," May 22, 2006.  Pursuant to this initiative, in 2005 alone, BOA provided more than $33.2 billion in mortgage loans to LMI borrowers and made "more than $40 million in loans and investments every business hour."  *Id.*  As disclosed to the FCIC in June 2010, almost 17 percent of the LMI loans originated by Bank of America between 2004 and 2007 were delinquent at some point for 90 days or more.  *See* 6/16/10 BOA letter to FCIC, Schedule 2.5.  Bank of America retained only about 50 percent of those LMI loans on its balance sheet and either sold or securitized the rest.  *Id*.

131.    The FCIC reports that, in 2005, examiners from the Federal Reserve and other agencies conducted a confidential "peer group" study of mortgage practices at six companies, including BOA.  According to Sabeth Siddique, then head of credit risk at the Federal Reserve Board's Division of Banking Supervision and Regulation, the study "showed a very rapid increase in the volume of these irresponsible loans, very risky loans."  The study also showed that "[a] large percentage of their loans issued were subprime and Alt-A mortgages, and the underwriting standards for these products had deteriorated."  FCIC Report at 172.

132.    BOA was one of the most aggressive competitors in the mortgage origination market.  Even the top executives of Countrywide Financial Corp., the notorious mortgage lender singled out by the FCIC for having originated high-risk loans destined to bring "financial and reputational catastrophe," FCIC Report at xxii, complained to each other at the time that BOA's appetite for risky products was greater than that of Countywide.  In a June 13, 2005 e-mail Countrywide CEO Angelo Mozilo wrote to President and COO David Sambol:  "This is the third deal in the last 10 days that BoA has offered that is impossible to beat.  In fact **the other two**

*were substantially worse* than this one.  It appears to me that ***BofA is making an aggressive move into mortgages once again***." (Emphasis added).

133.    BOA also participated in "warehouse lending" – extending a line of credit to a third-party loan originator to fund mortgage loans – to ensure that it had access to a steady stream of mortgage loans to securitize and sell to investors.  In 2001, BOA sold EquiCredit, the division of BOA that, at the time, was primarily responsible for making subprime loans.  In order to guarantee that it could obtain sufficient mortgages to pool into its residential mortgage-backed securities securitizations, BOA began to directly fund originating banks, including Countrywide and New Century Mortgage Corporation.  According to *Inside Mortgage Funding*, BOA was the leading participant in the warehouse lending channel, with nearly 26 percent market share by 2009.  *See* BOA press release, "Bank of America Exits First Mortgage Wholesale Channel," October 5, 2010.

134.    In addition, BOA sought to expand its share of the mortgage securities market by aggressively pursuing subprime mortgage originators, including Option One, offering to pay more for their mortgages than competing Wall Street banks and offering to perform less due diligence than its competitors.

135.    Plaintiffs with access to files compiled by BOA in originating loans have confirmed that Bank of America routinely originated loans that failed to comply with its guidelines.  In its recently filed action alleging that BOA National and BOA Securities, among others, engaged in common law fraud and violated the Securities Act of 1933, the insurer American International Group, Inc. ("AIG"), has described that after managing to obtain the loan files relating to a 2007 securitization of mortgage-backed securities (OOMLT 2007-FXD2), AIG arranged for a third-party consultant to review a sample of the files to assess whether the loans

met stated underwriting guidelines.  *See* Complaint, *Am. Int'l Group, Inc. v. Bank of Am. Corp., et al.*, CV No. 652199/2011 (NY Sup. August 8, 2011) at 128-29.

136.    The results of that review confirmed what the publicly available data already showed:  that BOA's mortgage pools contain loans rife with violations of BOA's representations and its underwriting guidelines.  AIG's review of 100 loan files from OOMLT 2007-FXD2 revealed violations of underwriting guidelines in 82 percent of the loans, including violations of guidelines relating to income, employment, and owner-occupancy.  *Id.*

137.    The originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines.  Indeed, as the FCIC has confirmed, mortgage loan originators throughout the industry pressured appraisers, during the period of the Securitizations, to issue inflated appraisals that met or exceeded the amount needed for the subject loans to be approved, regardless of the accuracy of such appraisals, and especially when the originators aimed at putting the mortgages into a package of mortgages that would be sold for securitization.  This resulted in lower LTV ratios, discussed above, which in turn made the loans appear to the investors less risky than they were.

138.    As described by Patricia Lindsay, a former wholesale lender who testified before the FCIC in April 2010, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."  *See* Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5.  Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again …. [T]oo often state licensed and certified appraisers are forced into making a

'Hobson's Choice.'"  *See* Testimony of Jim Amorin to the FCIC, available at

www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRA-

NAIFATestimonyonMortgageReform042309final.pdf.  Faced with this choice, appraisers

systematically abandoned applicable guidelines and over-valued properties in order to facilitate

the issuance of mortgages that could then be collateralized into mortgage-backed securitizations.

> **2.    The Collapse of the Certificates' Credit Ratings Further Indicates
> that the Mortgage Loans Were Not Originated in Adherence to the
> Stated Underwriting Guidelines**

139.    The total collapse in the credit ratings of the GSE Certificates, typically from

AAA or its equivalent to non-investment speculative grade, is further evidence of the originators'

systematic disregard of underwriting guidelines, amplifying that the GSE Certificates were

impaired from the start.

140.    The GSE Certificates that Fannie Mae and Freddie Mac purchased were originally

assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of

the mortgage loan collateral and underwriting practices set forth in the Registration Statements.

These ratings were artificially inflated, however, as a result of the very same misrepresentations

that the Defendants made to investors in the Prospectus Supplements

141.    BOA provided or caused to be provided loan-level information to the rating

agencies that they relied upon in order to calculate the Certificates' assigned ratings, including

the borrower's LTV ratio, debt-to-income ratio, owner occupancy status, and other loan-level

information described in aggregation reports in the Prospectus Supplements.  Because the

information that BOA provided or caused to be provided was false, the ratings were inflated and

the level of subordination that the rating agencies required for the sale of AAA (or its equivalent)

certificates was inadequate to provide investors with the level of protection that those ratings

signified.  As a result, the GSEs paid Defendants inflated prices for purported AAA (or its

equivalent) Certificates, unaware that those Certificates actually carried a severe risk of loss and carried inadequate credit enhancement.

142.    Since the issuance of the Certificates, the ratings agencies have dramatically downgraded their ratings to reflect the revelations regarding the true underwriting practices used to originate the mortgage loans, and the true value and credit quality of the mortgage loans. Table 8 details the extent of the downgrades.[18]

**Table 8**

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| ABFC 2005-WMC1 | A1 | Aaa/AAA/AAA | Aaa/AAA/AAA |
| ABFC 2006-HE1 | A1 | Aaa/AAA/AAA | Caa3/CCC/C |
| ABFC 2006-OPT1 | A2 | Aaa/AAA/AAA | Caa1/A/CCC |
| | A1 | Aaa/AAA/AAA | Caa1/A/CCC |
| ABFC 2006-OPT2 | A2 | Aaa/AAA/AAA | Caa2/BB-/CC |
| | A1 | Aaa/AAA/AAA | Caa3/B+/CC |
| ABFC 2006-OPT3 | A2 | Aaa/--/AAA | Caa2/-/C |
| | A1 | Aaa/--/AAA | Caa2/--/C |
| ABFC 2007-WMC1 | A1A | --/AAA/AAA | --/CCC/C |
| BAFC 2006-G | 1A1 | Aaa/AAA/-- | Caa2/BB/-- |
| BAFC 2006-H | 5A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| BAFC 2007-A | 1A1 | Aaa/AAA/AAA | Caa3/CCC/C |
| BAFC 2007-C | 6A1 | Aaa/AAA/AAA | Caa1/BB/CCC |
| BOAA 2005-10 | 2CB1 | Aaa/--/AAA | Caa2/--/C |
| BOAA 2005-11 | 2CB1 | Aaa/--/AAA | Caa2/--/C |
| BOAA 2005-12 | 2CB1 | Aaa/--/AAA | Caa2/--/C |
| BOAA 2006-1 | 1CB1 | Aaa/--/AAA | Caa1/--/CC |
| | 3CB1 | Aaa/--/AAA | Caa2/--/C |
| BOAA 2006-2 | 1CB1 | Aaa/--/AAA | Caa1/--/CC |
| | 3CB1 | Aaa/--/AAA | Caa3/--/C |
| BOAA 2006-3 | 5CB1 | Aaa/--/AAA | Caa3/--/C |
| NSTR 2007-C | 1AV1 | Aaa/AAA/-- | Caa3/CCC/-- |
| OOMLT 2005-5 | A1 | Aaa/AAA/AAA | Aa3/AAA/BBB |
| OOMLT 2007-2 | IIA1 | Aaa/AAA/-- | Caa3/CCC/-- |

---

[18]    Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch.  The hyphens between forward slashes indicate that the relevant agency did not provide a rating at issuance.

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| | IA1 | Aaa/AAA/-- | Caa3/CCC/-- |
| OOMLT 2007-6 | IA1 | Aaa/AAA/-- | Caa3/CCC/-- |
| OOMLT 2007-FXD1 | IIA1 | Aaa/AAA/AAA | Ca/CC/WD |
| | IA1 | Aaa/AAA/AAA | Ca/CC/WD |
| OOMLT 2007-HL1 | IA1 | Aaa/AAA/-- | Ca/CCC/-- |
| STALT 2005-1F | 4A1 | Aaa/AAA/-- | Ca/D/-- |

### 3. The Surge in Mortgage Delinquency and Default Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines

143. Even though the Certificates purchased by Fannie Mae and Freddie Mac were supposed to represent long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders. The overall poor performance of the mortgage loans is a direct consequence of the fact that they were not underwritten in accordance with applicable underwriting guidelines as represented in the Registration Statements.

144. Loan groups that were properly underwritten and contained loans with the characteristics represented in the Registration Statements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies than occurred here. Table 9 reflects the percentage of loans in the Supporting Loan Groups that are in default, have been foreclosed upon, or are delinquent as of July 2011.

**Table 9**

| Transaction | Tranche | Percentage of Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|
| ABFC 2005-WMC1 | A1 | 32.7 |
| ABFC 2006-HE1 | A1 | 50.9 |
| ABFC 2006-OPT1 | A2 | 61.5 |
| | A1 | 61.6 |
| ABFC 2006-OPT2 | A2 | 48.6 |
| | A1 | 53.6 |

| ABFC 2006-OPT3 | A2 | 43.8 |
|---|---|---|
| | A1 | 44.7 |
| ABFC 2007-WMC1 | A1A | 50.8 |
| BAFC 2006-G | 1A1 | 22.2 |
| BAFC 2006-H | 5A1 | 34.1 |
| BAFC 2007-A | 1A1 | 45.1 |
| BAFC 2007-C | 6A1 | 26.2 |
| BOAA 2005-10 | 2CB1 | 17.2 |
| BOAA 2005-11 | 2CB1 | 19.7 |
| BOAA 2005-12 | 2CB1 | 13.0 |
| BOAA 2006-1 | 1CB1 | 10.7 |
| | 3CB1 | 21.9 |
| BOAA 2006-2 | 1CB1 | 7.6 |
| | 3CB1 | 18.1 |
| BOAA 2006-3 | 5CB1 | 28.9 |
| NSTR 2007-C | 1AV1 | 31.4 |
| OOMLT 2005-5 | A1 | 41.3 |
| OOMLT 2007-2 | IIA1 | 42.1 |
| | IA1 | 42.7 |
| OOMLT 2007-6 | IA1 | 38.5 |
| OOMLT 2007-FXD1 | IIA1 | 32.8 |
| | IA1 | 34.2 |
| OOMLT 2007-HL1 | IA1 | 48.0 |
| STALT 2005-1F | 4A1 | 29.3 |

145.    The confirmed misstatements concerning owner occupancy and LTV ratios, the confirmed systematic underwriting failures by the originators responsible for the mortgage loans across the Securitizations, and the extraordinary drop in credit rating and rise in delinquencies across those Securitizations, all confirm that the mortgage loans in the Supporting Loan Groups, contrary to the representations in the Registration Statements, were not originated in accordance with the stated underwriting guidelines.

## V.    FANNIE MAE'S AND FREDDIE MAC'S PURCHASES OF THE GSE CERTIFICATES AND THE RESULTING DAMAGES

146.    In total, between September 30, 2005 and November 5, 2007, Fannie Mae and Freddie Mac purchased over $6 billion in residential mortgage-backed securities issued in

connection with the Securitizations.  Table 10 reflects each of Freddie Mac's purchases of the

Certificates.[19]

**Table 10**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| ABFC 2005-WMC1 | A1 | 04542BNX6 | 9/30/2005 | 235,900,000 | 100 | BOA Securities |
| ABFC 2006-OPT1 | A2 | 00075QAR3 | 8/10/2006 | 166,946,000 | 100 | BOA Securities |
| ABFC 2006-OPT2 | A2 | 00075XAB3 | 10/12/2006 | 232,465,000 | 100 | BOA Securities |
| ABFC 2006-OPT3 | A2 | 00075VAB7 | 11/14/2006 | 114,343,000 | 100 | BOA Securities |
| ABFC 2007-WMC1 | A1A | 04545EAA1 | 11/5/2007 | 631,248,000 | 100 | BOA Securities |
| NSTR 2007-C | 1AV1 | 63860KAA0 | 6/7/2007 | 224,590,000 | 100 | BOA Securities |
| OOMLT 2005-5 | A1 | 68389FKK9 | 11/10/2005 | 227,921,000 | 100 | BOA Securities |
| OOMLT 2007-2 | IIA1 | 68401TAB4 | 3/12/2007 | 190,288,000 | 100 | BOA Securities |
| OOMLT 2007-6 | IA1 | 68403KAQ8 | 5/30/2007 | 435,470,000 | 100 | BOA Securities |
| OOMLT 2007-FXD1 | IIA1 | 68402VAB8 | 1/30/2007 | 272,242,000 | 99.99 | BOA Securities |
| OOMLT 2007-HL1 | IA1 | 68402SAA7 | 4/26/2007 | 304,935,000 | 100 | BOA Securities |

147.    Table 11 reflects each of Fannie Mae's purchases of the Certificates:

**Table 11**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| ABFC 2006-HE1 | A1 | 00075WAA7 | 12/14/2006 | 304,800,000 | 100 | BOA Securities |
| ABFC 2006-OPT1 | A1 | 00075QAQ5 | 8/10/2006 | 167,027,000 | 100 | BOA Securities |
| ABFC 2006-OPT2 | A1 | 00075XAA5 | 10/12/2006 | 232,459,000 | 100 | BOA Securities |
| ABFC 2006-OPT3 | A1 | 00075VAA9 | 11/14/2006 | 114,273,000 | 100 | BOA Securities |
| BAFC 2006-G | 1A1 | 05950MAA8 | 7/31/2006 | 396,306,000 | 100 | BOA Securities |
| BAFC 2006-H | 5A1 | 05950PAS2 | 9/29/2006 | 431,225,000 | 100 | BOA Securities |
| BAFC 2007-A | 1A1 | 05952DAA6 | 1/31/2007 | 94,441,000 | 100 | BOA Securities |
| BAFC 2007-C | 6A1 | 059522AA0 | 4/30/2007 | 68,349,000 | 99.99 | BOA Securities |
| BOAA 2005-10 | 2CB1 | 05948KR84 | 10/31/2005 | 92,219,000 | 101.11 | BOA Securities |
| BOAA 2005-11 | 2CB1 | 05948KV55 | 11/30/2005 | 86,674,000 | 99.78 | BOA Securities |
| BOAA 2005-12 | 2CB1 | 05948KY52 | 12/30/2005 | 128,037,000 | 99.91 | BOA Securities |
| BOAA 2006-1 | 1CB1 | 05948K2G3 | 2/28/2006 | 71,491,241 | 100.67 | BOA Securities |
|  | 3CB1 | 05948K2K4 | 2/28/2006 | 93,494,428 | 102.16 | BOA Securities |
| BOAA 2006-2 | 1CB1 | 05948K2V0 | 3/31/2006 | 50,937,925 | 100.16 | BOA Securities |
|  | 3CB1 | 05948K3A5 | 3/31/2006 | 75,289,333 | 101.70 | BOA Securities |

---

[19]    Purchases of securities in Tables 10 and 11 are stated in terms of unpaid principal balance of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| BOAA 2006-3 | 5CB1 | 05948K4Q9 | 8/24/2007 | 37,470,787 | 99.03 | BOA Securities |
| OOMLT 2007-2 | IA1 | 68401TAA6 | 3/12/2007 | 190,306,000 | 100 | BOA Securities |
| OOMLT 2007-FXD1 | IA1 | 68402VAA0 | 1/30/2007 | 273,043,000 | 99.99 | BOA Securities |
| STALT 2005-1F | 4A1 | 86789MAV9 | 12/30/2005 | 87,447,000 | 101.75 | BOA Securities |

148.    The statements and assurances in the Registration Statements regarding the credit quality and characteristics of the mortgage loans underlying the GSE Certificates, and the origination and underwriting practices pursuant to which the mortgage loans were originated, which were summarized in such documents, were material to a reasonable investor's decision to purchase the GSE Certificates.

149.    The false statements of material facts and omissions of material facts in the Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and Freddie Mac to suffer hundreds of millions of dollars in damages, including without limitation depreciation in the value of the Certificates.  The mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statements, and the payments to the trusts were therefore much lower than they would have been had the loans been underwritten as described in the Registration Statements.

150.    Fannie Mae's and Freddie Mac's losses have been much greater than they would have been if the mortgage loans had the credit quality represented in the Registration Statements.

151.    BOA's misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchases of the GSE Certificates.  Based upon sales of the Certificates or

similar certificates in the secondary market, BOA proximately caused hundreds of millions of

dollars in damages to Fannie Mae and Freddie Mac in an amount to be determined at trial.

## FIRST CAUSE OF ACTION

### Violation of Section 11 of the Securities Act of 1933
**(Against Defendants MLPF&S, ABF Corp., BOA Mortgage, BOA Funding, George C. Carp, Robert Caruso, George E. Ellison, Adam D. Glassner, Daniel B. Goodwin, Juliana Johnson, Aashish Kamat, Michael J. Kula, Mark I. Ryan, James H. Luther, and Antoine Schetritt)**

152.    Plaintiff realleges each allegation above as if fully set forth herein, except to the

extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

153.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of

1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE

Certificates issued pursuant to the Registration Statements.  This claim is brought against

Defendant MLPF&S  (as successor-in-interest to BOA Securities) with respect to each of the

Registration Statements.  This claim is also brought against (i) Defendants ABF Corp., BOA

Mortgage, and BOA Funding, and (ii) Defendants George C. Carp, Robert Caruso, George E.

Ellison, Adam D. Glassner, Daniel B. Goodwin, Juliana Johnson, Aashish Kamat, Michael J.

Kula, Mark I. Ryan, James H. Luther, and Antoine Schetritt (collectively, the "Section 11

Individual Defendants"), each with respect to the Registration Statements filed by ABF Corp.,

BOA Mortgage, or BOA Funding that registered securities that were bona fide offered to the

public on or after September 6, 2005.

154.    This claim is predicated upon the strict liability of Defendant MLPF&S (as

successor-in-interest to BOA Securities) for making false and materially misleading statements

in each of the Registration Statements for the Securitizations, and for omitting facts necessary to

make the facts stated therein not misleading.  As discussed above at paragraph 16, MLPF&S is

liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.

Depositor Defendants ABF Corp., BOA Mortgage, BOA Funding, and the Section 11 Individual Defendants are strictly liable for making false and materially misleading statements in the Registration Statements filed by the Depositor Defendants that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to ten of the 23 securitizations (as specified in Table 2, above at paragraph 48), and for omitting facts necessary to make the facts stated therein not misleading.

155.    BOA Securities served as underwriter of each of the Securitizations, and as such, is liable for the misstatements and omissions in the Registration Statements under Section 11 of the Securities Act.  As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.

156.    Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding filed six of the Registration Statements, under which seventeen of the 23 securitizations were carried out. As depositors, ABF Corp., BOA Mortgage, and BOA Funding are issuers of the GSE Certificates issued pursuant to the Registration Statements they filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).  As such, they are liable under Section 11 of the Securities Act for the misstatements and omissions in those three Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

157.    At the time Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding filed six Registration Statements applicable to seventeen of the Securitizations, the Section 11 Individual Defendants were officers and/or directors of ABF Corp., BOA Mortgage, and/or BOA Funding.  In addition, the Section 11 Individual Defendants signed those Registration Statements and either signed or authorized another to sign on their behalf the amendments to those

Registration Statements. As such, the Section 11 Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in those three Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

158. At the time that they became effective, each of the Registration Statements contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading, as set forth above. The facts misstated or omitted were material to a reasonable investor reviewing the Registration Statements.

159. The untrue statements of material facts and omissions of material fact in the Registration Statements are set forth above in Section IV and pertain to compliance with underwriting guidelines, occupancy status and loan-to-value ratios.

160. Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE Certificates pursuant to the false and misleading Registration Statements. Fannie Mae and Freddie Mac made these purchases in the primary market. At the time they purchased the GSE Certificates, Fannie Mae and Freddie Mac did not know of the facts concerning the false and misleading statements and omissions alleged herein, and if the GSEs would have known those facts, they would not have purchased the GSE Certificates.

161. BOA Securities owed to Fannie Mae, Freddie Mac, and other investors a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading. The Section 11 Individual Defendants owed the same duty with respect to the three Registration Statements that they signed that registered

59

securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to ten of the Securitizations.

162.    BOA Securities and the Section 11 Individual Defendants did not exercise such due diligence and failed to conduct a reasonable investigation.  In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein.  As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.  Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding, though subject to strict liability without regard to whether they performed diligence, also failed to take reasonable steps to ensure the accuracy of the representations.

163.    Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statements.

164.    The time period from July 13, 2009 through August 30, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae, BOA Corp., BOA Securities, BOA Mortgage, BOA National, and BOA Funding.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

165.    By reason of the conduct herein alleged, BOA Securities, ABF Corp., BOA Mortgage, BOA Funding, and the Section 11 Individual Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION

### Violation of Section 12(a)(2) of the Securities Act of 1933
### (Against MLPF&S, ABF Corp., BOA Mortgage, and BOA Funding)

166.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

167.    This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements in the Securitizations listed in paragraph 2.

168.    This claim is predicated upon BOA Securities' negligence for making false and materially misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for the Securitizations listed in paragraph 2.  As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.  Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the six Registration Statements they filed, which are applicable to seventeen of the Securitizations.

169.    BOA Securities is prominently identified in the Prospectuses, the primary documents that it used to sell the GSE Certificates.  BOA Securities offered the Certificates publicly, including selling to Fannie Mae and Freddie Mac their GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

170.    BOA Securities offered and sold the GSE Certificates to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances

under which they were made, not misleading.  BOA Securities reviewed and participated in drafting the Prospectuses.

171.    BOA Securities successfully solicited Fannie Mae's and Freddie Mac's purchases of the GSE Certificates.  As underwriter, BOA Securities obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

172.    BOA Securities offered the GSE Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

173.    Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for the seventeen Securitizations under those Registration Statements. ABF Corp., BOA Mortgage, and BOA Funding offered the Certificates publicly and actively solicited their sale, including to Fannie Mae and Freddie Mac.

174.    With respect to the seventeen Securitizations for which they filed Registration Statements, ABF Corp., BOA Mortgage, and BOA Funding offered the GSE Certificates to Fannie Mae and Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  Upon information and belief, ABF Corp., BOA Mortgage, and BOA Funding reviewed and participated in drafting the Prospectuses.

175.    Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding offered the GSE Certificates for sale by the use of means or instruments of transportation and communication in interstate commerce.

176.    Each of BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

177.    Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

178.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

179.    BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding offered and sold the GSE Certificates directly to Fannie Mae and Freddie Mac, pursuant to the false and misleading Prospectuses.

180.    BOA Securities owed to Fannie Mae and Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.  Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding owed the same duty with respect to

the Prospectuses for the Securitizations carried out under the six Registration Statements filed by them.

181.    BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.   As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.

182.    In contrast, Fannie Mae and Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If the GSEs would have known of those untruths and omissions, they would not have purchased the GSE Certificates.

183.    Fannie Mae and Freddie Mac acquired the GSE Certificates in the primary market pursuant to the Prospectuses.

184.    Fannie Mae and Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

185.    The time period from July 13, 2009 through August 30, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae, BOA Corp., BOA Securities, BOA Mortgage, BOA National, and BOA Funding.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## THIRD CAUSE OF ACTION

**Violation of Section 15 of the Securities Act of 1933**
**(Against BOA Corp., BOA National, and the Individual Defendants)**

186.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

187.    This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against BOA Corp., BOA National, and the Individual Defendants for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

188.    The Individual Defendants at all relevant times participated in the operation and management of ABF Corp., BOA Mortgage, and/or BOA Funding and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of ABF Corp.'s, BOA Mortgage's, and/or BOA Funding's business affairs.  Defendant George C. Carp was Treasurer, Chief Accounting Officer, and Chief Financial Officer of ABF Corp. and BOA Funding. Defendant Robert Caruso was a Director of BOA Mortgage.  Defendant George E. Ellison was a Director of ABF Corp. and BOA Funding.  Defendant Daniel B. Goodwin was President and Chief Executive Officer of ABF Corp.  Defendant Juliana Johnson was a Director of BOA Mortgage.  Defendant Adam D. Glassner was President, Chief Executive Officer, and Chairman of the Board of BOA Mortgage.  Defendant Aashish Kamat was a Director of BOA Mortgage. Defendant Michael J. Kula was a Director of BOA Mortgage.  Defendant James H. Luther was a Director of ABF Corp. and BOA Funding.  Defendant William L. Maxwell was a director of ABF Corp.  Defendant Mark I. Ryan was President and Chief Executive Officer of BOA Funding.  Defendant Antoine Schetritt was President, Chief Executive Officer, and Chairman of the Board of BOA Mortgage.

189.     Defendant BOA National was the sponsor for sixteen of the Securitizations carried out under five of the Registration Statements filed by ABF Corp., BOA Mortgage, and BOA Funding, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting ABF Corp., BOA Mortgage, and BOA Funding as the special purpose vehicles, and selecting BOA Securities as underwriter for the Securitizations.  In its role as sponsor, BOA National knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

190.     Defendant BOA National also acted as the seller of the mortgage loans for the sixteen Securitizations carried out under five of the Registration Statements filed by Defendants ABF Corp., BOA Mortgage, and BOA Funding, in that it conveyed such mortgage loans to ABF Corp., BOA Mortgage, and BOA Funding pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.

191.     Defendant BOA National also controlled all aspects of the business of Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding, as those Defendants were merely special purpose entities created for the purpose of acting as a pass-through for the issuance of the Certificates.  ABF Corp., BOA Mortgage, and BOA Funding were direct, wholly-owned subsidiaries of BOA National, and the officers and directors of BOA National overlapped with the officers and directors of ABF Corp., BOA Mortgage, and BOA Funding.  In addition, because of its position as sponsor, BOA National was able to, and did in fact, control the contents of the five Registration Statements filed by ABF Corp., BOA Mortgage, and BOA

Funding, including the Prospectuses and Prospectus Supplements, which pertained to the sixteen Securitizations sponsored by BOA National and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

192.     Defendant BOA Corp. controlled the business operations of BOA Securities Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding.  As the sole corporate parent of BOA Securities and ABF Corp., BOA Mortgage, and BOA Funding, BOA Corp. had the practical ability to direct and control the actions of ABF Corp., BOA Mortgage, BOA Funding, and BOA Securities in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding in connection with the issuance and sale of the Certificates.

193.     BOA Corp.'s push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

194.     BOA Corp. culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as ABF Corp., BOA Mortgage, BOA Funding, and the issuing trusts to serve as conduits for the mortgage loans.

195.     BOA Corp., BOA National, and the Individual Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

196.     Fannie Mae and Freddie Mac purchased in the primary market Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

197.     Fannie Mae and Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

198.     Fannie Mae and Freddie Mac have sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

199.     The time period from July 13, 2009 through August 30, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae, BOA Corp., BOA Securities, BOA Mortgage, BOA National, and BOA Funding.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## FOURTH CAUSE OF ACTION

### Violation of Section 13.1-522(A)(ii) of the Virginia Code
### (Against MLPF&S, ABF Corp., BOA Mortgage, and BOA Funding)

200.     Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

201.     This claim is brought by Plaintiff pursuant to Section 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this

cause of action pertain to only those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006.

202.    This claim is predicated upon BOA Securities' negligence for making false and materially misleading statements in the Prospectuses for the Securitizations listed in paragraph 2. As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.  Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the six Registration Statements they filed.

203.    BOA Securities is prominently identified in the Prospectuses, the primary documents that it used to sell the GSE Certificates.  BOA Securities offered the Certificates publicly, including selling to Freddie Mac its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

204.    BOA Securities offered and sold the GSE Certificates to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  BOA Securities reviewed and participated in drafting the Prospectuses.

205.    BOA Securities successfully solicited Freddie Mac's purchases of the GSE Certificates.  As underwriter, BOA Securities obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

206.    BOA Securities offered the GSE Certificates for sale, sold them, and distributed them to Freddie Mac in the State of Virginia.

207.    Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for those Securitizations.   ABF Corp., BOA Mortgage, and BOA Funding offered the Certificates publicly and actively solicited their sale, including to Freddie Mac.

208.    With respect to the Securitizations for which they filed Registration Statements, ABF Corp., BOA Mortgage, and BOA Funding offered the GSE Certificates to Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  Upon information and belief, ABF Corp., BOA Mortgage, and BOA Funding reviewed and participated in drafting the Prospectuses.

209.    Each of BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding actively participated in the solicitation of Freddie Mac's purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

210.    Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

211.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

212.    BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding offered and sold the GSE Certificates directly to Freddie Mac, pursuant to the false and misleading Prospectuses.

213.    BOA Securities owed to Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.  Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding owed the same duty with respect to the Prospectuses for the Securitizations carried out under the six Registration Statements filed by them.

214.    BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.   As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.

215.    In contrast, Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If Freddie Mac would have known of those untruths and omissions, they would not have purchased the GSE Certificates.

216.    Freddie Mac sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

217.   This action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## FIFTH CAUSE OF ACTION

### Violation of Section 13.1-522(C) of the Virginia Code
### (Against BOA Corp., BOA National, and the Individual Defendants)

218.   Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

219.   This claim is brought by Plaintiff under Section 13.1-522(C) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006.  This claim is brought against BOA Corp., BOA National, and the Individual Defendants for controlling-person liability with regard to the Fourth Cause of Action set forth above.

220.   The Individual Defendants at all relevant times participated in the operation and management of ABF Corp., BOA Mortgage, and/or BOA Funding and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of ABF Corp.'s, BOA Mortgage's, and/or BOA Funding's business affairs.  Defendant George C. Carp was Treasurer, Chief Accounting Officer, and Chief Financial Officer of ABF Corp. and BOA Funding.  Defendant Robert Caruso was a Director of BOA Mortgage.  Defendant George E. Ellison was a Director of ABF Corp. and BOA Funding.  Defendant Daniel B. Goodwin was President and Chief Executive Officer of ABF Corp.  Defendant Juliana Johnson was a Director of BOA Mortgage.  Defendant Adam D. Glassner was President, Chief Executive Officer, and Chairman of the Board of BOA Mortgage.  Defendant Aashish Kamat was a Director of BOA Mortgage.

Defendant Michael J. Kula was a Director of BOA Mortgage.  Defendant James H. Luther was a Director of ABF Corp. and BOA Funding.  Defendant William L. Maxwell was a director of ABF Corp.  Defendant Mark I. Ryan was President and Chief Executive Officer of BOA Funding.  Defendant Antoine Schetritt was President, Chief Executive Officer, and Chairman of the Board of BOA Mortgage.

221.    Defendant BOA National was the sponsor for Securitizations carried out under five of the Registration Statements filed by ABF Corp., BOA Mortgage, and BOA Funding, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth above with respect to the offering of the GSE Certificates to Freddie Mac by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting ABF Corp., BOA Mortgage, and BOA Funding as the special purpose vehicles, and selecting BOA Securities as underwriter for the Securitizations.  In its role as sponsor, BOA National knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

222.    Defendant BOA National also acted as the seller of the mortgage loans for Securitizations carried out under five of the Registration Statements filed by Defendants ABF Corp., BOA Mortgage, and BOA Funding, in that it conveyed such mortgage loans to ABF Corp., BOA Mortgage, and BOA Funding pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.

223.    Defendant BOA National also controlled all aspects of the business of Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding, as those Defendants were merely special purpose entities created for the purpose of acting as a pass-through for the issuance of the

Certificates.  ABF Corp., BOA Mortgage, and BOA Funding were direct, wholly-owned subsidiaries of BOA National, and the officers and directors of BOA National overlapped with the officers and directors of ABF Corp., BOA Mortgage, and BOA Funding.  In addition, because of its position as sponsor, BOA National was able to, and did in fact, control the contents of five of the Registration Statements filed by ABF Corp., BOA Mortgage, and BOA Funding, including the Prospectuses and Prospectus Supplements, which pertained to Securitizations sponsored by BOA National and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

224.    Defendant BOA Corp. controlled the business operations of BOA Securities Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding.  As the sole corporate parent of BOA Securities and ABF Corp., BOA Mortgage, and BOA Funding, BOA Corp. had the practical ability to direct and control the actions of ABF Corp., BOA Mortgage, BOA Funding, and BOA Securities in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding in connection with the issuance and sale of the Certificates.

225.    BOA Corp.'s push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

226.    BOA Corp. culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as ABF Corp., BOA Mortgage, BOA Funding, and the issuing trusts to serve as conduits for the mortgage loans.

227.    BOA Corp., BOA National, and the Individual Defendants are controlling persons within the meaning of Section 13.1-522(C) by virtue of their actual power over, control of, ownership of, and/or directorship of BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

228.    Freddie Mac purchased Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

229.    Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had Freddie Mac known of those misstatements and omissions, it would not have purchased the GSE Certificates.

230.    Freddie Mac has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

231.    This action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

### SIXTH CAUSE OF ACTION

**Violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code
(Against MLPF&S, ABF Corp., BOA Mortgage, and BOA Funding)**

232.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

233.    This claim is brought by Plaintiff pursuant to 31-5606.05(a)(1)(B) of the District of Columbia Code and is asserted on behalf of Fannie Mae. The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above, which were purchased by Fannie Mae.

234.    This claim is predicated upon BOA Securities' negligence for making false and materially misleading statements in the Prospectuses for the Securitizations listed in paragraph 2. As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010. Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the six Registration Statements they filed.

235.    BOA Securities is prominently identified in the Prospectuses, the primary documents that it used to sell the GSE Certificates. BOA Securities offered the Certificates publicly, including selling to Fannie Mae its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

236.    BOA Securities offered and sold the GSE Certificates to Fannie Mae by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading. BOA Securities reviewed and participated in drafting the Prospectuses.

237.    BOA Securities successfully solicited Fannie Mae's purchases of the GSE Certificates. As underwriter, BOA Securities obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

238.     BOA Securities offered the GSE Certificates for sale, sold them, and distributed them to Fannie Mae in the District of Columbia.

239.     Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for those Securitizations.   ABF Corp., BOA Mortgage, and BOA Funding offered the Certificates publicly and actively solicited their sale, including to Fannie Mae.

240.     With respect to the Securitizations for which they filed Registration Statements, ABF Corp., BOA Mortgage, and BOA Funding offered the GSE Certificates to Fannie Mae by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  Upon information and belief, ABF Corp., BOA Mortgage, and BOA Funding reviewed and participated in drafting the Prospectuses.

241.     Each of BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding actively participated in the solicitation of Fannie Mae's purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

242.     Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

243.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

244.    BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding offered and sold the GSE Certificates directly to Fannie Mae, pursuant to the false and misleading Prospectuses.

245.    BOA Securities owed to Fannie Mae, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.  Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding owed the same duty with respect to the Prospectuses for the Securitizations carried out under the six Registration Statements filed by them.

246.    BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.   As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.

247.    In contrast, Fannie Mae did not know of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If Fannie Mae would have known of those untruths and omissions, they would not have purchased the GSE Certificates.

248.    Fannie Mae sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

249.    The time period from July 13, 2009 through August 30, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae, BOA Corp., BOA Securities, BOA Mortgage, BOA National, and BOA Funding.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

**SEVENTH CAUSE OF ACTION**

**Violation of Section 31-5606.05(c) of the District of Columbia Code**
**(Against BOA Corp., BOA National, and the Individual Defendants)**

250.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

251.    This claim is brought under Section 31-5606.05(c) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above, which were purchased by Fannie Mae.  This claim is brought against BOA Corp., BOA National, and the Individual Defendants for controlling-person liability with regard to the Sixth Cause of Action set forth above.

252.    The Individual Defendants at all relevant times participated in the operation and management of ABF Corp., BOA Mortgage, and/or BOA Funding and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of ABF Corp.'s, BOA Mortgage's, and/or BOA Funding's business affairs.  Defendant George C. Carp was Treasurer, Chief Accounting Officer, and Chief Financial Officer of ABF Corp. and BOA Funding.

Defendant Robert Caruso was a Director of BOA Mortgage.  Defendant George E. Ellison was a Director of ABF Corp. and BOA Funding.  Defendant Daniel B. Goodwin was President and Chief Executive Officer of ABF Corp.  Defendant Juliana Johnson was a Director of BOA Mortgage.  Defendant Adam D. Glassner was President, Chief Executive Officer, and Chairman of the Board of BOA Mortgage.  Defendant Aashish Kamat was a Director of BOA Mortgage.  Defendant Michael J. Kula was a Director of BOA Mortgage.  Defendant James H. Luther was a Director of ABF Corp. and BOA Funding.  Defendant William L. Maxwell was a director of ABF Corp.  Defendant Mark I. Ryan was President and Chief Executive Officer of BOA Funding.  Defendant Antoine Schetritt was President, Chief Executive Officer, and Chairman of the Board of BOA Mortgage.

253.    Defendant BOA National was the sponsor for Securitizations carried out under five of the Registration Statements filed by ABF Corp., BOA Mortgage, and BOA Funding, and culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above with respect to the offering of the GSE Certificates to Fannie Mae by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting ABF Corp., BOA Mortgage, and BOA Funding as the special purpose vehicles, and selecting BOA Securities as underwriter for the Securitizations.  In its role as sponsor, BOA National knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

254.    Defendant BOA National also acted as the seller of the mortgage loans Securitizations carried out under five of the Registration Statements filed by Defendants ABF Corp., BOA Mortgage, and BOA Funding, in that it conveyed such mortgage loans to ABF

Corp., BOA Mortgage, and BOA Funding pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.

255.    Defendant BOA National also controlled all aspects of the business of Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding, as those Defendants were merely special purpose entities created for the purpose of acting as a pass-through for the issuance of the Certificates.  ABF Corp., BOA Mortgage, and BOA Funding were direct, wholly-owned subsidiaries of BOA National, and the officers and directors of BOA National overlapped with the officers and directors of ABF Corp., BOA Mortgage, and BOA Funding.  In addition, because of its position as sponsor, BOA National was able to, and did in fact, control the contents of five Registration Statements filed by ABF Corp., BOA Mortgage, and BOA Funding, including the Prospectuses and Prospectus Supplements, which pertained to the Securitizations sponsored by BOA National and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

256.    Defendant BOA Corp. controlled the business operations of BOA Securities Depositor Defendants ABF Corp., BOA Mortgage, and BOA Funding.  As the sole corporate parent of BOA Securities and ABF Corp., BOA Mortgage, and BOA Funding, BOA Corp. had the practical ability to direct and control the actions of ABF Corp., BOA Mortgage, BOA Funding, and BOA Securities in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding in connection with the issuance and sale of the Certificates.

257.    BOA Corp.'s push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

258.    BOA Corp. culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as ABF Corp., BOA Mortgage, BOA Funding, and the issuing trusts to serve as conduits for the mortgage loans.

259.    BOA Corp., BOA National, and the Individual Defendants are controlling persons within the meaning of Section 31-5606.05(c) by virtue of their actual power over, control of, ownership of, and/or directorship of BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

260.    Fannie Mae purchased Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

261.    Fannie Mae did not know of the misstatements and omissions in the Registration Statements; had Fannie Mae known of those misstatements and omissions, it would not have purchased the GSE Certificates.

262.    Fannie Mae has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

263.    The time period from July 13, 2009 through August 30, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae, BOA Corp., BOA Securities, BOA Mortgage, BOA National, and BOA Funding.  In addition, this

action is brought within three years of the date that the FHFA was appointed as Conservator of

Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## EIGHTH CAUSE OF ACTION

### Common Law Negligent Misrepresentation
### (Against MLPF&S, ABF Corp., BOA Mortgage, and BOA Funding)

264.    Plaintiff realleges each allegation above as if fully set forth herein, except to the

extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

265.    This is a claim for common law negligent misrepresentation against Defendants

MLPF&S (as successor-in-interest to BOA Securities), ABF Corp., BOA Mortgage, and BOA

Funding.

266.    Between September 30, 2005 and November 5, 2007, BOA Securities, ABF

Corp., BOA Mortgage, and BOA Funding sold the GSE Certificates to the GSEs as described

above.  Because ABF Corp., BOA Mortgage, and BOA Funding owned and then conveyed the

underlying mortgage loans that collateralized the Securitizations for which they served as

depositors, ABF Corp., BOA Mortgage, and BOA Funding had unique, exclusive, and special

knowledge about the mortgage loans in the Securitizations through its possession of the loan files

and other documentation.

267.    Likewise, as underwriter for the Securitizations, BOA Securities was obligated –

and had the opportunity – to perform sufficient due diligence to ensure that the Registration

Statements for those Securitizations, including without limitation the corresponding Prospectus

Supplements, did not contain an untrue statement of a material fact or omit to state a material

fact required to be stated therein or necessary to make the statements therein not misleading.  As

a result of this privileged position as underwriter – which gave it access to loan file information

and obligated it to perform adequate due diligence to ensure the accuracy of the Registration

Statements – BOA Securities had unique, exclusive, and special knowledge about the underlying mortgage loans in the Securitizations.  As discussed above at paragraph 16, MLPF&S is liable as successor-in-interest to BOA Securities, which was merged into it in November 2010.

268.    BOA Securities also had unique, exclusive, and special knowledge of the work of third-party due diligence providers, such as Clayton, which identified significant failures by originators to adhere to the underwriting standards represented in the Registration Statements. The GSEs, like other investors, had no access to borrower loan files prior to the closing of the Securitizations and their purchase of the Certificates.  Accordingly, when determining whether to purchase the GSE Certificates, the GSEs could not evaluate the underwriting quality or the servicing practices of the mortgage loans in the Securitizations on a loan-by-loan basis.  The GSEs therefore reasonably relied on BOA Securities' knowledge and their express representations made prior to the closing of the Securitizations regarding the underlying mortgage loans.

269.    BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding were aware that the GSEs reasonably relied on BOA Securities', ABF Corp.'s, BOA Mortgage's, and BOA Funding's reputations and unique, exclusive, and special expertise and experience, as well as their express representations made prior to the closing of the Securitizations, and that the GSEs depended upon these Defendants for complete, accurate, and timely information.  The degree to which the underlying mortgage loans were actually originated in compliance with the underwriting guidelines was known to these Defendants and was not known, and could not be determined, by the GSEs prior to the closing of the Securitizations.

270.    Based upon their unique, exclusive, and special knowledge and expertise about the loans held by the trusts in the Securitizations, BOA Securities, ABF Corp., BOA Mortgage,

and BOA Funding had a duty to provide the GSEs complete, accurate, and timely information regarding the mortgage loans and the Securitizations.  BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding negligently breached their duty to provide such information to the GSEs by instead making to the GSEs untrue statements of material facts in the Securitizations, or otherwise misrepresenting to the GSEs material facts about the Securitizations.  The misrepresentations are set forth in Section IV above, and include misrepresentations as to the accuracy of the represented credit ratings, compliance with underwriting guidelines for the mortgage loans, and the accuracy of the owner-occupancy statistics and the loan-to-value ratios applicable to the Securitizations, as disclosed in the term sheets and Prospectus Supplements.

271.   In addition, having made actual representations about the underlying collateral in the Securitizations and the facts bearing on the riskiness of the Certificates, BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding had a duty to correct misimpressions left by their statements, including with respect to any "half truths."  The GSEs were entitled to rely upon BOA Securities', ABF Corp.'s, BOA Mortgage's, and BOA Funding's representations about the Securitizations, and these Defendants failed to correct in a timely manner any of their misstatements or half truths, including misrepresentations as to compliance with underwriting guidelines for the mortgage loans.

272.   Fannie Mae and Freddie Mac purchased the GSE Certificates based upon the representations by BOA as the sponsor, depositor, and lead and selling underwriter in all sixteen of the BOA-sponsored Securitizations.  The GSEs received term sheets containing critical data as to the Securitizations, including with respect to anticipated credit ratings by the credit rating agencies, loan-to-value and combined loan-to-value ratios for the underlying collateral, and owner occupancy statistics, which term sheets were delivered, upon information and belief, by

BOA Securities.  This data was subsequently incorporated into Prospectus Supplements that were received by the GSEs upon the close of each Securitization.

273.    The GSEs relied upon the accuracy of the data transmitted to them and subsequently reflected in the Prospectus Supplements.  In particular, the GSEs relied upon the credit ratings that the credit rating agencies indicated they would bestow on the Certificates based on the information provided by ABF Corp., BOA Mortgage, BOA Funding, and BOA Securities relating to the collateral quality of the underlying loans and the structure of the Securitization.  These credit ratings represented a determination by the credit rating agencies that the GSE Certificates were AAA quality (or its equivalent) – meaning the Certificates had an extremely strong capacity to meet the payment obligations described in the respective PSAs.

274.    Detailed information about the underlying collateral and structure of each Securitization was provided to the credit rating agencies by, upon information and belief, BOA National.  The credit rating agencies based their ratings on the information provided to them by BOA, and the agencies' anticipated ratings of the Certificates were dependent on the accuracy of that information.  The GSEs relied on the accuracy of the anticipated credit ratings and the actual credit ratings assigned to the Certificates by the credit rating agencies, and upon the accuracy of BOA's representations in the term sheets and Prospectus Supplements.

275.    In addition, the GSEs relied on the fact that the originators of the mortgage loans in the Securitizations had acted in conformity with their underwriting guidelines, which were described in the Prospectus Supplements.  Compliance with underwriting guidelines was a precondition to the GSE's purchase of the GSE Certificates in that the GSEs' decision to purchase the Certificates was directly premised on their reasonable belief that the originators complied with applicable underwriting guidelines and standards.

276.     In purchasing the GSE Certificates, the GSEs justifiably relied on BOA's false representations and omissions of material fact detailed above, including the misstatements and omissions in the term sheets about the underlying collateral, which were reflected in the Prospectus Supplements.

277.     But for the above misrepresentations and omissions, the GSEs would not have purchased or acquired the Certificates as they ultimately did, because those representations and omissions were material to their decision to acquire the GSE Certificates, as described above.

278.     The GSEs were damaged in an amount to be determined at trial as a direct, proximate, and foreseeable result of the Depositor Defendants' and BOA Securities' misrepresentations, including any half truths.

279.     The time period from July 13, 2009 through August 30, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae, BOA Corp., BOA Securities, BOA Mortgage, BOA National, and BOA Funding.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

280.     An award in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including:

a.     Rescission and recovery of the consideration paid for the GSE Certificates, with interest thereon;

b.     Each GSE's monetary losses, including any diminution in value of the GSE Certificates, as well as lost principal and lost interest payments thereon;

c.      Attorneys' fees and costs;

d.      Prejudgment interest at the maximum legal rate; and

e.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

281.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a

trial by jury on all issues triable by jury.

DATED:    New York, New York
          September 2, 2011

                                          QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


                                          By: _____
                                              Christine H. Chung (CC0423)
                                              Julia M. Guaragna

                                          51 Madison Avenue, 22nd Floor
                                          New York, New York  10010-1601
                                          (212) 849-7000

                                          *Attorneys for Plaintiff FHFA*