**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

          Plaintiff,

          − v. −

BANK OF AMERICA CORPORATION,
*et al.*,

          Defendants.

**Case No. 11-cv-6195 (DLC)**

ECF Case

**Electronically Filed**

**<u>Oral Argument Requested</u>**

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>THEIR MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

---

WILLIAMS & CONNOLLY LLP

Brendan V. Sullivan, Jr.
David S. Blatt
Edward J. Bennett
John McNichols
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jmcnichols@wc.com

*Attorneys for Defendants Bank of America*
*Corporation; Bank of America, National*
*Association; Merrill Lynch, Pierce, Fenner &*
*Smith, Inc. (f/k/a Banc of America Securities*
*LLC); Asset Backed Funding Corporation;*
*Bank of America Mortgage Securities, Inc.;*
*and Banc of America Funding Corporation*

RICHARDS KIBBE & ORBE LLP

Daniel C. Zinman
Neil S. Binder
One World Financial Center
New York, NY 10281
Telephone: (212) 530-1800
Facsimile: (212) 530-1801
dzinman@rkollp.com
nbinder@rkollp.com

*Attorneys for Defendants George Carp, Robert*
*Caruso, George Ellison, Adam Glassner,*
*Daniel Goodwin, Juliana Johnson, Michael*
*Kula, William Maxwell, Mark Ryan, and*
*Antoine Schetritt*

## <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................................2

ARGUMENT ...............................................................................................................................11

I.      Standard of Review..................................................................................................11

II.     Plaintiff Cannot Recover for Certificates Purchased Prior to the Issuance of the
        Alleged Misrepresentations. ....................................................................................12

A.      Plaintiff Cannot Recover Under Section 12 or State Securities Laws for
        Alleged Misrepresentations that Post-Date Its Purchases....................................13

B.      Plaintiff's Section 11 Claim Regarding Pre-Committed Securities Also
        Fails.......................................................................................................................14

III.    Plaintiff's Allegations Concerning Abandonment of Underwriting Guidelines Are
        Legally Inadequate for 21 of 23 Securitizations. ....................................................15

A.      Allegations Based on Plaintiff's "Forensic Review" Are Relevant to Only
        Two Securitizations. .............................................................................................15

B.      Generalized Allegations Based on Government Investigations and
        Unadjudicated Complaints Are Legally Inadequate..............................................17

C.      Credit Rating Downgrades Cannot Support Plaintiff's Underwriting
        Claim......................................................................................................................18

D.      Hindsight Reliance on the Allegedly "Overall Poor Performance of the
        Mortgage Loans" Is Improper................................................................................19

IV.     Plaintiff's "Control Person" Claims Are Conclusory. ............................................21

V.      Plaintiff's D.C. Securities Claims Fail....................................................................23

VI.     Plaintiff's Demand for Rescission Fails. .................................................................23

# **TABLE OF AUTHORITIES**

**Page(s)**

### **FEDERAL CASES**

*APA Excelsior III LP v. Premiere Techs., Inc.*, 476 F.3d 1261 (11th Cir. 2007) .........................14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................11, 12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87 (2d Cir. 2007) .........................................2

*Ballow Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235 (2d Cir. 2006) ...............23, 24, 25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................12

*Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) ...........................................................................19

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005).....................................................................20

*Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229 (S.D.N.Y. 2011) ...................................2, 12

*ECA Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187 (2d
      Cir. 2009) ...............................................................................................................................22

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, No. 11 Civ. 5201, 2012 WL 1570856
      (S.D.N.Y. May 4, 2012)................................................................................................. *passim*

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, No. 11 Civ. 5201, 2012 WL 2400263
      (S.D.N.Y June 26, 2012)....................................................................................................14, 15

*Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544 (E.D.N.Y. 1971) .....................21

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)................................20

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050, 2010 WL 3790810
      (S.D.N.Y. Sept. 28, 2010).......................................................................................................17

*Gannett Co. v. Register Pub'g Co.*, 428 F. Supp. 818 (D. Conn. 1977)...........................23, 24, 25

*Garber v. Legg Mason, Inc.*, 347 F. App'x 665 (2d Cir. 2009)......................................................2

*Hite v. Leeds Weld Equity Partners, IV, LP*, 429 F. Supp. 2d 110 (D.D.C. 2006)......................13

*Howard v. Haddad*, 962 F.2d 328 (4th Cir. 1992)......................................................................21

*In re Barclay's Bank PC Sec. Litig.*, No. 09 Civ. 1989, 2011 WL 31548 (S.D.N.Y. Jan. 5,
      2011) .......................................................................................................................................12

*In re Fannie Mae 2008 Secs. Litig.*, No. 08 Civ. 7831 (Sep. 18, 2009) ........................................20

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 218 F.R.D. 76 (S.D.N.Y. 2003) .....17, 18

*In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ................................................14

*Ledford v. Rapid-Am. Corp.*, No. 86 Civ. 9116 (JFK), 1988 WL 3428 (S.D.N.Y. Jan. 8, 1988) ........................................................................................................................................18

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ........................................................20

*Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008) ................................12

*Litwin v. Blackstone Grp., LP*, 634 F.3d 706,708 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 242 (2011) ................................................................................................................................2

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576 (E.D. Pa. 2009) ........................................................................................................................................11, 20

*N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, No. 08 Civ 5310, 2012 WL 1076143 (S.D.N.Y. Mar. 29, 2012) ........................................................................................16, 21

*N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 Civ. 8781, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ........................................................................................21, 22

*Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, Nos. 11-2340-RDR, 11-2649-RDR, 2012 WL 3028803 (D. Kan. July 25, 2012) ................................................................................18

*Occidental Life Ins. Co. v. Pat Ryan & Assocs.*, 496 F.2d 1255 (4th Cir. 1974) ..........................23

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ......................................19, 20

*Pell v. Weinstein*, 759 F. Supp. 1107 (M.D. Pa. 1991), *aff'd*, 961 F2d 1568 (3d Cir. 1992) ........13

*Press v. Chem. Inv. Servs. Corp.*, 988 F. Supp. 375 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 529 (2d Cir. 1999) ................................................................................................................................12

*Ret. Ass'n v. Ebbers (In Re WorldCom, Inc. Sec. Litig.)*, Nos. 02 Civ. 3288, 03 Civ. 0890, 2004 WL 1097786 (S.D.N.Y. May 18, 2004) ........................................................................22

*Pub. Emps.' Ret. Sys. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475 (S.D.N.Y. 2010) ................22

*SEC v. Nat'l Student Mktg. Corp.*, 457 F. Supp. 682 (D.D.C. 1978) ............................................13

*SEC v. Universal Express, Inc.*, 546 F. Supp. 2d 132 (S.D.N.Y. 2008) ........................................11

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010) ................................................................................................................................19

*Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, 821 F. Supp. 212 (S.D.N.Y. 1993)....24, 25

*Wyo. State Treasurer v. Moody's Investors Serv. Inc. (In re Lehman Bros. Mortg.-Backed Sec. Litig.)*, 650 F.3d 167 (2d Cir. 2011) ...............................................................22

## STATE CASES

*Atocha LP v. Witness Tree, LLC*, 65 Va. Cir. 213 (2004) .......................................................13, 21

*Price v. Griffin*, 359 A.2d 582 (D.C. 1976) ......................................................................23

## OTHER AUTHORITIES

29 Am. Jur. 2d, *Evidence* § 67 (2010) ...........................................................................11

24 C.F.R. § 81.12(c)(3) .....................................................................................................9

15 USC § 77k..................................................................................... *passim*

15 U.S.C. § 77l.................................................................................. *passim*

15 U.S.C. § 77o...............................................................................................21

D.C. Code § 31-5601.01 ..................................................................................21

D.C. Code § 31-5606.05 ...........................................................................13, 21

Va. Code Ann. § 13.1-501 ................................................................................21

Va. Code Ann. § 13.1-522 .........................................................................13, 21

The federal government's mandate to the GSEs from September 2005 through November 2007 was to support the housing market by purchasing mortgage loans from banks which could use the resulting liquidity to provide additional mortgage loans and other forms of credit to borrowers. *See* Am. Compl. ("FAC") ¶ 14. The GSEs heeded their mandate,[1] despite rapidly declining housing and credit markets in 2006–2007, knowledge that the mortgages and mortgage-backed securities they were buying were fraught with risk, and being warned of lax underwriting practices at the relevant underwriters.[2] According to plaintiff, the GSEs purchased from defendants 30 RMBS certificates (collectively, the "Certificates") from 23 securitizations (collectively, the "Securitizations") during this time.

Half a decade later, following the most severe economic downturn since the Great Depression, plaintiff filed this case, claiming that the offering documents issued in connection with the Certificates were materially misleading. At the same time, plaintiff filed 16 other lawsuits against more than 100 other financial institutions and individuals, claiming that they too misled the GSEs into purchasing, during this two-year period, more than 500 other RMBS certificates worth more than $200 billion. Plaintiff asserts claims under the Securities Act of 1933 (the "1933 Act") and the Virginia and District of Columbia ("D.C.") securities laws. According to plaintiff, the GSEs were misled for several years about the most basic facts underlying their business, notwithstanding (1) their status as the two largest and most

---

[1] By December 31, 2006, Fannie and Freddie together had portfolios of $4.3 trillion in residential mortgage loans, or approximately 40% of the entire outstanding U.S. residential mortgage debt. Exhibit ("Ex.") A to the Decl. of John McNichols in Supp. of Defs.' Mot. to Dismiss, dated Aug. 17, 2012 ("McNichols Decl."), at 2 (Fannie Mae 2005 Form 10-K (May 2, 2007)); Ex. B, at 2 (Freddie Mac 2006 Ann. Report (Mar. 23, 2007)); *see* Ex. C, at 71, 88 (Office of Fed. Hous. Enter. Oversight ("OFHEO"), 2007 Report to Cong.) (charting escalating GSE purchases of MBS). The GSEs have been the world's largest issuers of RMBS since 1990. Ex. D, at 12 (Fannie Mae 2006 Form 10-K (Aug. 16, 2007)).

[2] *See*, *e.g.*, Ex. E (Jody Shenn, *Fannie Refused to Punish Countrywide for Bad Debt, Lockhart Says*, Bloomberg.com (May 7, 2012, 4:19 PM), http://www.bloomberg.com/news/2012-05-07/fannie-refused-to-punish-countrywide-for-bad-debt-lockhart-says.html) (according to the head of OFHEO, the Office "'spent a lot of time' pushing Fannie Mae executives" to address declining underwriting standards at Countrywide in 2006–2007 (citation omitted)).

experienced investors in the RMBS market, (2) their RMBS portfolios exceeding a trillion dollars in 2006, and (3) their issuance of more than $5 trillion worth of their own RMBS from 2005–2007, consisting of loans originated by many of the same originators at issue in this case ("Originators").

Plaintiff's claims fly in the face of reality.  They ignore basic principles of securities and common law and contradict the GSEs' own public statements and matters of public record. Dismissal is required on a host of grounds.[3]

*First,* plaintiff's allegations related to 10 of the 30 Certificates must be dismissed because the complaint alleges that the GSEs purchased these certificates *before* the alleged misstatements were made.  *Second,* plaintiff's underwriting allegations fail to state any actionable facts concerning at least 21 of the 23 Securitizations.  *Third,* plaintiff's control person allegations are fatally conclusory.  *Fourth,* plaintiff's D.C. securities claims fail to plead justifiable reliance, as required by D.C. law.  *Fifth,* the remedy of rescission is not available given plaintiff's years of delay in seeking it.

## BACKGROUND

The documents cited in the Amended Complaint and other public documents of which this Court may take notice[4] reflect two basic facts:  first, the offering documents that accompanied the Certificates clearly informed the GSEs that there were significant risks

---

[3] Several of plaintiff's failings mirror those identified by the UBS defendants in their Memoranda of Law in Support of their Motion to Dismiss the Amended Complaint.  *Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, No. 11 Civ. 5201 (S.D.N.Y.), Dkts. 52 & 72.  Defendants incorporate by reference the grounds for dismissal raised by UBS, but do not reargue them here, in light of the Court's earlier rulings, *see id.*, Dkts. 66 and 113.

[4] The facts set forth below are taken from the Amended Complaint, documents cited in the Amended Complaint, or documents of which the Court may take judicial notice, such as documents filed with the SEC.  *See, e.g.*, *Litwin v. Blackstone Grp., LP*, 634 F.3d 706,708 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 242 (2011); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668–69 (2d Cir. 2009) (considering news articles and regulatory filings offered to show information was publicly available); *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 244 (S.D.N.Y. 2011).  For the Court's convenience, we provide these publicly available documents electronically on a disk simultaneously herewith.

associated with the underlying mortgages; and second, Fannie Mae and Freddie Mac were well aware of the relevant risks from their first-hand familiarity with the Originators.

The Prospectus Supplement for the ABFC 2006-OPT3 RMBS—the lead "example" featured in the Amended Complaint ("FAC") ¶¶ 93–98—disclosed that "[s]ubstantially all of the mortgage loans are of *sub-prime* credit quality" and "*do not meet the customary credit standards of Fannie Mae and Freddie Mac*," ABFC 2006-OPT3 Prospectus Supplement ("P. Supp."), at S-25 (emphases added).[5]  It further disclosed that

> [t]he originator makes sub-prime mortgage loans to borrowers that typically have limited access to traditional mortgage financing for a variety of reasons, including impaired or limited past credit history, lower credit scores, high loan-to-value ratios or high debt-to-income ratios.  As a result of these factors, *delinquencies and liquidation proceedings are more likely with these mortgage loans than with mortgage loans that satisfy customary credit standards*.  In the event the mortgage loans in the mortgage pool do become delinquent or subject to liquidation, *you may face delays in receiving payment and may suffer losses* if the credit enhancements are insufficient to cover the delays and losses.

*Id*. at S-25 (emphases added).[6]

The offering documents contained disclosures specifically addressing the three categories

---

[5] The GSEs understood the risks inherent in investing in subprime mortgage products.  For example, Fannie's 2005 10-K explained that:

> "Subprime mortgage" generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower.  *As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers*.  Subprime mortgage loans are often originated by lenders specializing in this type of business, *using processes unique to subprime loans*.

Ex. A, at 36 (Fannie Mae 2005 Form 10-K) (emphases added).  The GSEs also knew the risks attending Alt-A loans.  According to the SEC, "Single Family officers" at Fannie "routinely prepared presentations and reports concerning not only Fannie Mae's increasing acquisitions of reduced documentation loans, but also the credit risks associated with those loans, including their expected and actual [serious delinquency] rates."  Ex. F, ¶ 160 (Compl., *SEC v. Mudd et al.*, No. 11 Civ. 9202 ("*Mudd*") (S.D.N.Y. Dec. 16, 2011)).  Fannie also knew and admitted that "Alt-A mortgage loans generally have a higher risk of default than non-Alt-A mortgage loans."  Ex. D, at 152 (Fannie Mae 2006 Form 10-K); *see also* Ex. G, at 146 (Fannie Mae 2004 Form 10-K (Dec. 6, 2006)) ("[T]here has been an increasing industry trend towards streamlining the mortgage loan underwriting process by reducing the documentation requirements for borrowers.  Reduced documentation loans in some cases present higher credit risk than loans underwritten with full standard documentation.").

[6] *See* McNichols Decl. ¶ 4 (identifying similar disclosures).

3

of alleged misstatements and omissions on which plaintiff predicates its claims—LTV ratios,

owner occupancy status, and departures from underwriting guidelines.

With respect to LTV ratios, the offering documents expressly warned that "an appraised

value is an *opinion*," not a statement of fact.  ABFC 2006-OPT3 P. Supp., at S-36 (emphasis

added).[7]  They further disclosed that LTV ratios may not be reliable indicators of potential loss.

Thus, the BAFC 2006-G Prospectus Supplement, cited by plaintiff as the lead "example" of an

allegedly inadequate disclosure concerning LTV ratios, FAC ¶ 124, stated:

> The "LOAN-TO-VALUE RATIO" of a Mortgage Loan generally means the ratio, expressed as a percentage, of (i) the principal balance of the Mortgage Loan at origination divided by (ii) the lesser of (a) the appraised value of the related mortgaged property, as established by an appraisal obtained by the Originator generally no more than four months prior to origination (or, with respect to newly constructed properties, no more than twelve months prior to origination), or (ii) the sale price for such mortgaged property.  *In some instances, the [LTV] Ratio may be based on an appraisal that was obtained by the Originator more than four months prior to origination. . . .  The value of any mortgaged property generally will change from the level that existed on the appraisal or sales date.  If residential real estate values generally or in a particular geographic area decline, the [LTV] Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the Mortgage Loans.*

BAFC 2006-G P. Supp., at S-33 (emphases added).[8]  Offering documents issued by the GSEs

contained similar disclosures, reflecting their complete familiarity with industry practice in this

regard.  *See, e.g.*, Ex. H, at B-6 (Fannie Mae Single-Family MBS Prospectus (June 1, 2007))

("[A]ppraisals or other valuation methods are merely estimates of the mortgaged property values

and may not reflect the actual amount received upon sale or liquidation.").  Indeed, at least one

GSE operated under the premise that credit characteristics such as LTV ratios and occupancy

status were *not* apt measurements of credit risk for subprime and Alt-A mortgage products.  As

---

[7] *See also* McNichols Decl. ¶ 5 (identifying similar disclosures).

[8] *See also* McNichols Decl. ¶ 6 (identifying similar disclosures).

three former Fannie executives explained in a March 2012 filing in this Court:

> FNMA management believed that the unique processes by which subprime loans were originated resulted in *additional material risk beyond that which could be measured by the credit characteristics disclosed in the detailed tables*. Similarly, FNMA management believed that Alt-A loans bore *additional material risk of credit losses* because these borrowers affirmatively sought, and paid a premium for, the right to provide less documentation. For these reasons, in addition to the tables depicting the credit characteristics of all of its loans, FNMA began in 2007 to disclose separately the percentages in its portfolio of those loans it classified as subprime and Alt-A.

Ex. I, at 7 (Defs.' Mem. of Law in Supp. of Mot. to Dismiss, *SEC v. Mudd et al.*, No. 11 Civ. 9202 ("*Mudd*") (S.D.N.Y. Mar. 30, 2012)) (emphases added); *see also id.* at 8 ("FNMA's subprime disclosures accurately reflected management's reasonable belief that the *unique origination path of these loans independently increased their risk*." (emphasis added)).

With respect to owner occupancy status (whether a borrower intended to use the mortgaged property as a primary or secondary residence or investment), offering documents explicitly disclosed that this information was based on borrowers' representations. Thus, the ABFC 2006-HE1 Prospectus Supplement, cited in the Amended Complaint as the "example" of an allegedly inadequate disclosure of occupancy status, FAC ¶ 117, stated that "Occupancy Status" was "[b]ased on a representation made by the borrower at the time of origination." ABFC 2006-HE1 P. Supp., at A-7.[9] That would have come as no surprise to the GSEs; they issued securities based on the same understanding. *See, e.g.*, Ex. J at B-7 (Fannie Mae Single-Family MBS Prospectus (Jan. 1, 2006)) ("The actual occupancy of the properties as of the issue date has not been verified.").[10]

---

[9] *See also* McNichols Decl. ¶ 7 (identifying similar disclosures). Plaintiff makes no allegation that any offering document misstated a borrower's representation of her or his intended occupancy status.

[10] Freddie's RMBS offering documents contained similar disclosures. For example, "as is customary in the secondary mortgage market," Freddie explicitly relied on "representations and warranties of the seller with respect to certain matters," including "the accuracy of the information provided by the borrower" and "[t]he accuracy and completeness of any third party reports prepared by qualified professionals, such as property appraisals." Ex. K, at

With respect to underwriting guidelines, the offering documents stated that they were "guidelines only," and that originators had discretion to make "exceptions" based on a variety of *non-exclusive* "compensating factors." ABFC 2006-OPT3 P. Supp., at S-36, -38.[11] Thus, the ABFC 2006-OPT3 Prospectus Supplement, cited as the lead "example" of "key statements with respect to underwriting standards," FAC ¶ 93, stated:

> On a case-by-case basis, *exceptions to [] Underwriting Guidelines are made* where compensating factors exist. . . . As described above, the foregoing risk categories and criteria are underwriting *guidelines only. On a case-by-case basis, it may be determined that an applicant warrants a debt-to-income ratio exception, a pricing exception, a[n LTV] exception, a credit score exception or an exception from certain requirements of a particular risk category. An upgrade will be granted if the application reflects certain compensating factors, among others*: a relatively lower LTV; a maximum of one 30-day late payment on all mortgage loans during the last 12 months; stable employment; a fixed source of income that is greater than 50% of all income; ownership of current residence of four or more years; or cash reserves equal to or in excess of three monthly payments of principal, interest, taxes and insurance.

ABFC 2006-OPT3 P. Supp., at S-36, S-38 (emphases added).[12] The offering documents further disclosed that loans may not comply with guidelines, and that the remedy was to remove and replace such loans:

> The Originator made certain representations and warranties regarding the Mortgage Loans . . . [and], subject to certain limitations, will be obligated . . . to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists deficient documentation or an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the Certificateholders' interests in such Mortgage Loan.

---

20–21 (Freddie Mac Offering Circular (Oct. 14, 2005)). Freddie made "no representations or warranties concerning the accuracy or completeness of that information" and stated that "we generally do not independently verify the accuracy of the seller's representations and warranties." *Id*. at 2, 21.

[11] *See also* McNichols Decl. ¶ 8 (identifying similar disclosures).

[12] *See also* McNichols Decl. ¶ 9 (identifying similar disclosures).

ABFC 2006-OPT3 P. Supp., at S-34.[13]  Thus, the GSEs were fully aware that originators

departed from their underwriting guidelines during the relevant period.  *See* Ex. H, at B-5

(Fannie Mae Single-Family MBS Prospectus (June 1, 2007)); Ex. J (Fannie Mae Single-Family

MBS Prospectus (Jan. 1, 2006)) ("We provide to certificateholders the information as reported to

us by lenders.  If a lender has delivered mortgages that are not within the parameters that a lender

represents and warrants to us, the lender may be obligated to repurchase the affected mortgage

loans.  *Certificateholders should make their own conclusions regarding the data provided in the

Prospectus Supplement*." (emphasis added)).

     The GSEs were also fully aware that originators had generally loosened their

underwriting standards.  Indeed, the GSEs disclosed as much in their own offering documents

when issuing mortgage-backed securities during this time period.  *See*, *e.g.*, Ex. J, at 11 (Fannie

Mae Single-Family MBS Prospectus (Jan. 1, 2006)) (originators have been "reducing the amount

of documentation required to refinance and easing their underwriting standards"); *id*. at 27

("[V]arious lenders (in some cases in conjunction with [Fannie Mae]) have instituted streamlined

refinance procedures and liberalized fee structures and underwriting guidelines.").

     The offering documents plaintiff cites in the Amended Complaint contain numerous other

disclosures of the risks the GSEs chose to assume.  For example:

- "General economic conditions have an impact on the ability of borrowers to repay mortgage loans," and "[a]ny deterioration in housing prices . . . may result in losses on the assets," ABFC 2006-OPT3 Prospectus ("P."), at 15;[14]

- "[A]dverse economic conditions and other factors (which may or may not affect real property values) may affect the mortgagor's timely payment . . . and,

---

[13] *See also* McNichols Decl. ¶ 10 (identifying similar disclosures).  The disclosure stated that this "cure, repurchase or substitution obligation constitutes the sole remedy available to certificateholders . . . for omission of, or a material defect in, a Mortgage Loan document or for a material breach of a representation or warranty of the Sponsor . . . or the Originator."  BAFC 2006-G P. Supp. at S-48; *see also* McNichols Decl. ¶ 11 (identifying similar disclosures).

[14] *See also* McNichols Decl. ¶ 12 (identifying similar disclosures).

accordingly, the actual rates of delinquencies, foreclosures and losses with respect to any mortgage pool. These other factors could include . . . a decrease in employment reducing the demand for housing in an area," ABFC 2006-OPT3 P. Supp., at S-28;[15] and

- Recent loans by the originator have had a "delinquency rate" of 9.75%, and *"the actual loss and delinquency percentages" are "likely to be substantially higher"* and higher still "if the residential real estate market should experience an overall decline in property values" or if there are "adverse economic conditions," *id.* at S-40, -41 (emphasis added).[16]

The Amended Complaint mentions none of these disclosures, nor does it mention any of their numerous analogues.

The disclosures in the single largest offering for which plaintiff has sued, ABFC 2007-WMC1, in which the GSEs purchased $631 million in certificates, FAC at Table 1, could not have been clearer. That Prospectus Supplement warned:

> [S]everal residential mortgage loan originators who originate subprime mortgage loans have recently experienced serious financial difficulties and, in some cases, bankruptcy. Those difficulties have resulted in part from declining markets for their mortgage loans as well as from claims for repurchases of mortgage loans previously sold under provisions that require repurchase in the event of early payment defaults or for material breaches of representations and warranties made on the mortgage loans, such as fraud claims. *These general market conditions may affect the performance of the mortgage loans backing your certificates, and, even if they do not affect performance, may adversely affect the market value of your certificates.*
>
> Credit quality of subprime mortgage loans and less stringent underwriting standards applicable to subprime mortgage loans and the resultant potential for delinquencies on the mortgage loans could lead to losses on your certificates.
>
> * * *
>
> *The underwriting standards* used in the origination of all of the subprime mortgage loans held by the issuing entity *are generally less stringent than those of Fannie Mae or Freddie Mac with respect to a borrower's credit history and in certain other respects.* Borrowers on the mortgage loans may have an impaired or unsubstantiated credit history.

---

[15] *See also* McNichols Decl. ¶ 13 (identifying similar disclosures).

[16] *See also* McNichols Decl. ¶ 14 (identifying similar disclosures).

ABFC 2007-WMC1 P. Supp., at S-23, -24 (emphases added).[17]  The Prospectus Supplement concluded by not simply flagging risk factors, but literally assuring purchasers that the underlying loans "***will likely experience higher rates of delinquencies, defaults and foreclosures***." *Id.* at S-24 (emphasis added).[18]  Plaintiff nowhere mentions these disclosures either.

Though seemingly intent on denying it now, the GSEs admitted during the relevant period that they understood the potential adverse effects of their decision to purchase "higher-risk mortgage loan products"—a decision made at least in part to fulfill the national policy of increasing home ownership among Americans who would not qualify for mortgage loans under traditional lending standards.  Indeed, as Fannie's former executives explain, "it was no secret that FNMA was purchasing loans made to borrowers who represented potential credit risks.  By 2007, HUD mandated that FNMA target 55% of the loans it guaranteed to 'low- and moderate-income' borrowers."  Ex. I, at 30 (Defs.' Mem. of Law in Supp. of Mot. to Dismiss, *Mudd* (S.D.N.Y. Mar. 30, 2012) (citing 24 C.F.R. § 81.12(c)(3))).  Accordingly, in its 2005 Form 10-K, Fannie Mae explained:

> We have made, and continue to make, *significant adjustments to our mortgage loan sourcing and purchase strategies in an effort to meet these increased housing goals and the subgoals*.  These strategies include entering into some purchase and securitization transactions with lower expected economic returns than our typical transactions.  *We have also relaxed some of our underwriting criteria to obtain goals-qualifying mortgage loans and increased our investments in higher-risk mortgage loan products that are more likely to serve the borrowers targeted by HUD's goals and subgoals, which could increase our credit losses.* The Charter Act explicitly authorizes us to undertake "activities . . . that may be less than the return earned on other activities" in order to support the secondary market for housing for low- and moderate-income families.

---

[17] *See also* McNichols Decl. ¶ 15 (identifying similar disclosures).

[18] *See also* McNichols Decl. ¶ 16 (identifying similar disclosures).

Ex. A, at 25 (Fannie Mae 2005 Form 10-K) (emphases added).

Eventually, these "higher risks" became reality.  By early 2007, the investment community at large, with the GSEs at its vanguard, were confronted with the downside of the federally mandated efforts to increase home ownership across the United States.  *See* Ex. L, at 318, 319 (Fin. Crisis Inquiry Report (Jan. 2011)) (FHFA delivered "blistering" criticisms to Fannie Mae and Freddie Mac, chastising them for "buying and guaranteeing riskier loan products" and private-label securities backed by Alt-A and subprime loans, "[e]ven after internal reports pointed to market problems" and "[d]espite signs in the latter half of 2006 and 2007 of emerging problems."); Ex. M, at 6 (Office of Fed. Hous. Enter. Oversight ("OFHEO"), Report to Cong. (2008)) ("rising delinquency and default rates on recently-originated subprime mortgages" in late 2006 and early 2007 "spurred growing investor awareness of the extent of poor underwriting in subprime lending"); Ex. F, ¶ 81 (Compl., *Mudd* (S.D.N.Y. Dec. 16, 2011)) ("By February 2007, following S&P's downgrade of high-profile subprime lender, New Century Financial Corporation, and other indicia of subprime market turmoil—including HSBC Holdings PLC's announcement that the U.S. subprime market was unstable—investors were increasingly focused on subprime loans and the risks associated with these loans."); Ex. N, at 2 (Jonathan R. Laing, *The Endgame Nears For Fannie and Freddie*, Barron's (Aug. 18, 2008), http://online.barrons.com/article/SB121884860106946277.html#articleTabs_panel_article%3D1) ("As Freddie Mac Chairman and CEO Richard Syron recently put it, the GSEs have been hit by a '100-year storm' in the housing market, accentuated by some higher-risk mortgages that they were forced to buy to meet government affordable-housing targets.").

Months before filing this action in 2011, the GSEs acknowledged that the "primary cause" of loss in value of their residential housing assets was an "exogenous macro-economic

event," namely, an "unprecedented decline in the housing market."  Ex. O, at 31 (Report of Freddie Mac Special Litig. Comm. (Feb. 25, 2011)).  As the largest participants in the residential mortgage market and the most sophisticated investors in RMBS, "enjoy[ing] a near-monopoly" on mortgage securitization for years, Ex. L, at 42 (Fin. Crisis Inquiry Report), and as holders of more than a $1 trillion and issuers of more than $5 trillion of RMBS in 2005–2007,[19] the GSEs were uniquely qualified to make this judgment.  From late 2006 through 2007, residential real estate values had dropped precipitously.[20]  As home prices plummeted into 2007, mortgage delinquency rates more than doubled and credit markets froze.  By June 2007, "credit rating agencies began to reconsider their ratings on private label securities (PLS) backed by subprime mortgages," "financial markets began to reassess the market value of mortgage-related securities," and "falling prices for subprime PLS . . . quickly began to impose large market-value losses on investors."  Ex. M, at 7 (OFHEO, Report to Congr. (2008)).

More than four years after these events, FHFA filed this lawsuit and 16 more like it, alleging the GSEs lost money not because the housing bubble burst, but because they were duped.

## ARGUMENT

### I.    Standard of Review

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

---

[19] *See* Ex. P, at 28 (Freddie Mac 2007 Ann. Report (Feb. 28, 2008)); Ex. Q, at 45 (Fannie Mae 2007 Form 10-K (Feb. 27, 2008)).

[20] Courts take judicial notice of such industry-wide economic downturns.  *See, e.g.*, *SEC v. Universal Express, Inc.*, 546 F. Supp. 2d 132, 137 n.7 (S.D.N.Y. 2008) (judicial notice of "widespread decline in property values"); *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 578 (E.D. Pa. 2009) (judicial notice that "the mortgage industry" and its "financing methods" have "'deteriorated significantly and in unprecedented fashion'" (citation omitted)); *see also* 29 Am. Jur. 2d, *Evidence* § 67 (2010) (judicial notice of world or national economic events, including "unusually poor state of the nation's economy").

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A

pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of

action will not do." *Id*. (internal quotations omitted).  "Factual allegations must be enough to

raise the right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In evaluating allegations regarding offering documents, a court "must review the Offering

Documents as a whole rather than determining whether individual statements are true." *Lin v.

Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008).  "[I]f the complaint

directly contradicts the Offering Documents, the court need not accept the allegations as true."

*Id*.  Additionally, the "accuracy of offering documents must be assessed in light of information

available at the time they were published.  A backward-looking assessment of the infirmities of

mortgage-related securities, therefore, cannot help plaintiffs' case." *In re Barclay's Bank PC

Sec. Litig.*, No. 09 Civ. 1989, 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011) (internal quotations

omitted).[21]

## II.   Plaintiff Cannot Recover for Certificates Purchased Prior to the Issuance of the Alleged Misrepresentations.

The Amended Complaint alleges the "Date [the] Prospectus Supplement [was] Filed,"

FAC at Table 3, and the "Settlement Date of Purchase," FAC at Table 10–11, for each

Certificate.  This Court has explained that the settlement date is the end of the purchasing

process; it is "the last date by which [the purchaser] could make payment and still effect the

transaction." *Press v. Chem. Inv. Servs. Corp.*, 988 F. Supp. 375, 382 (S.D.N.Y. 1997), *aff'd*,

166 F.3d 529 (2d Cir. 1999).  For 10 of the Certificates (the "Pre-Committed Certificates"), the

---

[21] In addition to well-pled allegations in the complaint, a court adjudicating motion to dismiss "is entitled to consider" (1) "documents attached to [the complaint] or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information . . . plaintiff has knowledge or possession of . . . and relied on . . . in framing the complaint, (4) public disclosure documents . . . filed with the [SEC],  and (5) facts of which judicial notice may properly be taken under [Federal Rule of Evidence] 201." *Eaves*, 785 F. Supp. 2d at 244 (internal quotations omitted).

Amended Complaint alleges that the date the "Prospectus Supplement [was] filed" was *after* the "Settlement Date of Purchase."[22]  In other words, plaintiff alleges that the GSEs bought the 10 Pre-Committed Certificates *before* the alleged actionable misrepresentations were made.  All claims based on those 10 securities must be dismissed.

### A.    Plaintiff Cannot Recover Under Section 12 or State Securities Laws for Alleged Misrepresentations that Post-Date Its Purchases.

A violation of section 12(a)(2) requires that the security in question be sold "by means of a prospectus or oral communication" containing the alleged misrepresentations or omissions.  15 U.S.C. § 77l(a)(2) (2006).  When a party is committed to carrying out a transaction before the prospectus containing the alleged misrepresentations or omissions is filed, the security was not sold "by means of" the prospectus, and claims concerning that prospectus must be dismissed. *See, e.g.*, *Pell v. Weinstein*, 759 F. Supp. 1107, 1115 (M.D. Pa. 1991), *aff'd*, 961 F2d 1568 (3d Cir. 1992).  "Once the decision is made and the parties are irrevocably committed to the transaction, there is little justification for penalizing alleged omissions or misstatements which occur thereafter and which have no effect on the decision."  *SEC v. Nat'l Student Mktg. Corp.*, 457 F. Supp. 682, 703 (D.D.C. 1978).  Here, plaintiff alleges that the GSEs purchased 10 certificates before the filing of their respective Prospectus Supplements.  Section 12 and state securities[23] claims for these Certificates should be dismissed.

---

[22] The 10 certificates are:  STALT 2005-1F (Settlement: 12/30/2005; Prospectus Supplement Filed: 1/5/2006); ABFC 2006-OPT2 – Tranche A1 (10/12/2006; 10/16/2006); ABFC 2006-OPT2 – Tranche A2 (same); ABFC 2006-OPT3 – Tranche A1 (11/14/2006; 11/15/2006); ABFC 2006-OPT3 – Tranche A2 (same); ABFC 2007-WMC1 (11/5/2007, 11/7/2007); ABFC 2006-HE1 (12/14/2006, 12/15/2006); BAFC 2006-H (9/29/2006, 10/2/2006); BAFC 2007-C (4/30/2007, 5/1/2007); and NSTR 2007-C (6/7/2007, 6/11/2007).  These certificates involve nearly $2.5 billion in principal.

[23] Plaintiff's state securities claims involving the Pre-Committed Certificates fail for the same reasons as its section 12 claims.  Like section 12 claims, D.C. and Virginia securities claims arise only when a person "sells a security *by means of an untrue statement* of a material fact."  D.C. Code § 31-5606.05(a)(1)(B) (2012) (emphasis added); Va. Code Ann. §13.1-522(A)(ii) (2012).  Both jurisdictions look to federal law interpreting the 1933 Act when interpreting their own securities laws.  *See Atocha LP v. Witness Tree, LLC*, 65 Va. Cir. 213, 219 (2004); *Hite v. Leeds Weld Equity Partners, IV, LP*, 429 F. Supp. 2d 110, 114 (D.D.C. 2006) (using "nearly-identical language in

### B.   Plaintiff's Section 11 Claim Regarding Pre-Committed Securities Also Fails.

The section 11 claim is barred with respect to the Pre-Committed Securities. *See* 15

U.S.C. § 77k.  In *APA Excelsior III LP v. Premiere Technologies, Inc.*, 476 F.3d 1261 (11th Cir.

2007), the Court of Appeals held that, while section 11 creates "a presumption" that a person

acquiring a security was harmed by their reliance on a "defective registration statement," that

presumption is overcome where the plaintiff purchased the securities in question before

registration.  *Id*. at 1271–72.  In that circumstance, "it would be illogical to cloak Plaintiffs with

a presumption of reliance.  Plaintiffs made their investment decision and were legally committed

to the transaction (and thus could not possibly have relied on the registration statement) months

before the registration statement was in existence."  *Id*. at 1273.

This Court has applied the Eleventh Circuit's decision and rationale to bar section 11

claims.  For example, in *In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y.

2007), this Court held that a plaintiff cannot recover under section 11 if the investment decision

was made prior to the issuance of the registration statement.  "Whether framed as a question of

materiality or reliance, it seems clear as a matter of law and logic that plaintiffs should be

entitled to no recovery when it can be established with certainty that they were not harmed in any

way by the relevant misrepresentations."  *Id*. at 634 (citing *APA Excelsior*).

The Court's decision in *FHFA v. UBS Americas, Inc.*, No. 11 Civ. 5201, 2012 WL

2400263 (S.D.N.Y June 26, 2012), dictates the same conclusion in this case, where plaintiff

claims that the offering documents containing the alleged misrepresentations and omissions were

not filed until *after* the GSEs made their investment decisions.  In *UBS*, this Court declined to

dismiss on timeliness grounds because "[t]he information that was material to investors in

Section 12(2) of the 1933 Securities Act" to interpret D.C. Code § 31-5606.05(a)(1)(B) "in the absence of case law interpreting [that] Code section").

deciding whether to purchase the securities at issue was *only provided at the time that each securitization was marketed to the public—in the form of lengthy Prospectus Supplements* that purported to convey in detail the soundness of the underlying assets." *Id.* at *5. With the 10 Pre-Committed Certificates, the allegedly subsequently issued Prospectus Supplements could not have factored into plaintiff's already consummated purchase. Section 11 claims for the 10 Pre-Committed Certificates should be dismissed.

III.   **Plaintiff's Allegations Concerning Abandonment of Underwriting Guidelines Are Legally Inadequate for 21 of 23 Securitizations.**

Plaintiff claims that the offering documents at issue contained misstatements concerning compliance with underwriting guidelines. This claim has four parts: (1) allegations derived from a so-called "forensic review" of loans from two Securitizations involving only a single originator; (2) generalized allegations from "government investigations and private litigants"; (3) allegations regarding eventual changes in "credit ratings"; and (4) allegations regarding the "overall poor performance of the mortgage loans." FAC ¶¶ 129–181. The first is irrelevant to 21 of the 23 Securitizations, the second is immaterial, the third is not actionable, and the fourth is a logical fallacy. None sheds light on the alleged "inclusion of non-conforming loans in the *particular* securitizations sold to the GSEs" for the 21 Securitizations that the "forensic review" ignores. *See Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, No. 11 Civ. 5201, 2012 WL 1570856, at *9 (S.D.N.Y. May 4, 2012) (statute of limitations analysis concerns particular Securitizations at issue). Dismissal is warranted with respect to those 21 Securitizations.

A.   **Allegations Based on Plaintiff's "Forensic Review" Are Relevant to Only Two Securitizations.**

In furtherance of its underwriting allegations, the Amended Complaint discusses a "forensic review" of the OOMLT 2007-6 and OOMLT 2007-FXD1 Securitizations. The review, however, provides zero information regarding the other 21 Securitizations on which FHFA has

sued.[24]  Plaintiff's conclusory assumption that allegations concerning underwriting of two

Securitizations can be extrapolated to the other 21 Securitizations is contrary to decisions of this

Court.

It is elementary that claims regarding compliance with underwriting guidelines fail

without "allegations specific to [a defendant's] origination practices that relate to the . . . offer

that is relevant here."  *N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, No. 08 Civ. 5310,

2012 WL 1076143, at *5 (S.D.N.Y. Mar. 29, 2012) (internal quotations omitted); *see UBS*, 2012

WL 1570856, at *9 (limiting analysis to facts concerning "*particular* securitizations").  Here,

plaintiff's "forensic review" involves only two Securitizations in which *"one hundred percent of*

*the mortgage loans" were originated by a single originator*—Option One—pursuant to the

Option One "Non-Prime" Underwriting Guidelines.  FAC ¶ 133 (emphasis added).  The review

alleges no facts concerning compliance with underwriting guidelines relating to either the 14

Securitizations that do not contain Option One loans (and did not involve Option One "Non-

Prime" Underwriting Guidelines) or the other seven Securitizations containing Option One loans

from which not a single loan was reviewed.[25]

Indeed, the "forensic review" is so limited in scope that it does not touch on a single loan

relevant to any allegation against any of the 12 individual defendants.  Nor do the OOMLT

2007-6 and 2007-FXD1 Securitizations contain a single loan that could possibly form the basis

---

[24] Defendants do not concede that plaintiff has made adequate allegations as to the two Securitizations that were purportedly the subject of a "forensic review."  To the contrary, defendants reserve the right to challenge the adequacy of such allegations upon obtaining sufficient information regarding that review.

[25] The ABFC 2006-OPT1, ABFC 2006-OPT2, ABFC 2006-OPT3, ABFC 2006-HE1, OOMLT 2005-5, OOMLT 2007-2, and OOMLT 2007-HL1 Securitizations also contain at least some Option One loans.

of plaintiff's allegations against three of the four corporate defendants[26] against which plaintiff

brings claims for primary liability.[27]   In sum, the "forensic review" provides no factual basis for

plaintiff's underwriting allegations concerning at least 21 Securitizations, 12 individual

defendants, and three of the four relevant corporate defendants.

> ### B.    Generalized Allegations Based on Government Investigations and Unadjudicated Complaints Are Legally Inadequate.

For the remaining 21 Securitizations, the Amended Complaint relies largely on reports

issued by state or federal governments and hearsay allegations of other plaintiffs' lawyers, none

of which has been subject to final adjudication on the merits, and all of which are untethered to

the allegations in the Amended Complaint.  Such reliance is legally improper.

"Paragraphs in a complaint which are based on, or rely on, complaints in other actions

that have been dismissed, settled, or otherwise not resolved are, as a matter of law, immaterial

within the meaning of Rule 12(f)."  *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09

Civ. 4050, 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) (internal quotations omitted).[28]

Thus, large swathes of this section of the Amended Complaint, including references to

complaints filed by a state Attorney General and a private party (AIG), FAC ¶¶ 148–49, 155–56,

158–59, 168–70, 172, are immaterial.[29]   Allegations based on government reports (such as the

---

[26] Option One Mortgage Acceptance Corporation was the depositor for both Securitizations involved in the "forensic review."  FAC at Table 1.  ABF Corp., BOA Mortgage, and BOA Funding had no involvement in either of the two Securitizations.

[27] The fact that the two Securitizations subjected to the so-called "forensic review" are not connected to nearly all of the named defendants in this action, *inter alia*, distinguishes the Amended Complaint in this case from the *UBS* Complaint.  *See UBS*, 2012 WL 1570856, at *20.

[28] *See also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) ("Second Circuit case law makes it clear that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial . . . .").

[29] The parties in the Massachusetts Attorney General matter settled before final adjudication on the merits, and the *AIG* case is in the preliminary stages of litigation.

Office of the Comptroller of the Currency "Worst Ten" reports or the FCIC Report, *id*. ¶¶ 147, 151–52, 157, 171), which have not been adjudicated on the merits, are similarly infirm and must be struck under Rule 12(f).[30]

Stripped of this improper material, what remains is the allegation that defendants pursued subprime mortgage originators by "offering to pay more for their mortgages than competing Wall Street banks and offering to perform less due diligence than [their] competitors." FAC ¶ 154. That conclusory allegation, which says nothing about the Securitizations, does not sustain plaintiff's claim.

In addition to these general infirmities, the Amended Complaint includes no allegations whatsoever related to the originators involved in the NSTR 2007-C and STALT 2005-1F securitizations. Even assuming that plaintiff's vague allegations regarding originators' general practices could support a plausible claim concerning underwriting practices for the other Securitizations—which they do not—plaintiff's failure to allege a single fact regarding the originators of the NSTR 2007-C and STALT 2005-1F Securitizations is fatal to those claims. *See*, *e.g.*, *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, Nos. 11-2340-RDR, 11-2649-RDR, 2012 WL 3028803, at *29-30 (D. Kan. July 25, 2012) (dismissing underwriting allegations where complaint "does not make any allegations . . . which specifically address the underwriting practices of the loan originators for the certificates" beyond delinquency rates and credit rating downgrades).

### C.    Credit Rating Downgrades Cannot Support Plaintiff's Underwriting Claim.

Plaintiff next claims that the "collapse in the credit ratings of the GSE Certificates" is

---

[30] *See In re Merrill Lynch*, 218 F.R.D. at 79 ("[R]eferences to an Attorney General's conclusory report following a preliminary investigation in a case that never was presented for nor reached an adjudication upon the merits, are also immaterial under Rule 12(f)."); *Ledford v. Rapid-Am. Corp.*, No. 86 Civ. 9116 (JFK), 1988 WL 3428, at *1–2 (S.D.N.Y. Jan. 8, 1988) (striking allegations referring to state agency investigation and report; merits not adjudicated).

"further evidence of the originators' systematic disregard of underwriting guidelines."  FAC ¶

175.  Plaintiff's allegation impermissibly pleads misstatement-by-hindsight.  *See Denny v.*

*Barber*, 576 F.2d 465, 470 (2d Cir. 1978).  The fact that credit agencies eventually downgraded

ratings in the midst of a souring economy and freezing credit markets says nothing about

whether the Originators "abandoned" their underwriting guidelines years before.  Credit ratings

are subjective opinions[31] rendered by third parties based on the conditions at hand at the time

they are formed.  Further, they are "*forward-looking* opinions."  Ex. R (*Standard & Poor's*

*Ratings Services Credit Ratings Definitions & FAQs,* http://www.standardandpoors.com/ratings/

definitions-and-faqs/en/us (last visited Aug. 16, 2012)) (emphasis added).  Thus, credit

downgrades based on poor loan performances in 2008 and later do not establish misstatements in

offering documents issued years earlier.  Indeed, plaintiff's reliance on credit downgrades (and

increased delinquencies) is especially unavailing here, where the disclosures for the

Securitizations specifically warned the GSEs that these events could occur.  *See Olkey v.*

*Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (affirming dismissal when

"prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed").

**D.    Hindsight Reliance on the Allegedly "Overall Poor Performance of the
          Mortgage Loans" Is Improper.**

Finally, plaintiff claims that the purportedly "poor performance" of the underlying loans

proves "they were not underwritten in accordance with . . . underwriting guidelines."  FAC ¶

175.  This hindsight allegation is a conclusory, implausible fallacy.

While plaintiff claims the loans backing the Securitizations "would have experienced

---

[31] *See Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 394 (S.D.N.Y. 2010)
("[W]hether the credit quality of the mortgage pool was properly considered or adequate to support a particular
rating [i]s not a matter of objective fact.  It [i]s instead a statement of opinion by each agency that it believed, based
on the models it used and the factors it considered, that the credit quality of the mortgage pool underlying each
Certificate was sufficient to support the assigned rating." (internal quotations omitted)).

substantially fewer payment problems and substantially lower percentages of defaults,

foreclosures, and delinquencies" had they been underwritten differently, *id*. ¶ 180, that allegation

is conclusory.  It is also a logical fallacy, improperly predicated on the assumption that an earlier

event caused a later one.  The Amended Complaint ignores that, since late 2006, there has been a

national housing crisis of historic proportions and an ensuing global financial crisis.  As Fannie

Mae has said in its own defense, a "hundred-year storm . . . befell the U.S. housing and credit

markets. . . .  That is simply not securities fraud."  Ex. S, at 2 (Mem. of Law in Supp. of Fannie

Mae's Mot. to Dismiss, *In re Fannie Mae 2008 Secs. Litig.*, No. 08 Civ. 7831 (Sep. 18, 2009)).

Rather, as Freddie has explained, the "*primary cause*" of the GSEs' losses was an "exogenous

macro-economic event"—an "unprecedented decline in the housing market."  Ex. O, at 31

(Report of Freddie Mac Special Litig. Comm.) (emphasis added).[32]  "There can be no serious

dispute" that since 2005 "the mortgage industry and mortgage-backed securities have faced

historically unprecedented declines with *widespread consequences*."  *Luminent Mortg. Capital,*

*Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 578 (E.D. Pa. 2009) (emphasis added).

Nowhere does the Amended Complaint consider these facts or their effects on the performance

of the underlying loans, making plaintiff's allegation implausible.[33]  Allowing subsequent

performance to support a securities claim improperly transforms the securities laws into an

insurance policy.  *Cf. Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347–48 (2005) (it is

---

[32] *See also, e.g.*, Ex. T, at 117 (Fannie Mae 2009 Form 10-K (Feb. 26, 2010)) ("current economic environment, including lower home prices and high unemployment, has had an adverse effect on the performance of the loans underlying our Alt-A and subprime private-label securities").

[33] *See, e.g., Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon . . . the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." (brackets and internal quotations omitted)); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("[T]he substantial period between the alleged fraud and [plaintiff's] loss, coupled with the concurrence of that loss with the real estate market crash, is additional support for the conclusion that the fraud was not a substantial cause of [plaintiff's] injury.").

inappropriate "to transform a private securities action into a partial downside insurance policy"). It is particularly inappropriate where, as here, disclosures warned about the risk of poor performance. *See N.J. Carpenters Health Fund*, 2012 WL 1076143, at *6 (dismissing claim where "Offering Documents disclosed the high-risk nature of the loans backing the certificates"). As Fannie's former executives have stated, "reliance on the relative performance of and credit losses caused by different types of loan products is a red herring and is legally insufficient" to establish securities fraud.  Ex. I, at 45 (Defs.' Mem. of Law in Supp. of Mot. to Dismiss, *Mudd* (S.D.N.Y. Mar. 30, 2012)).[34]

## IV.    Plaintiff's "Control Person" Claims Are Conclusory.

Plaintiff also brings "control person" allegations against defendants Bank of America Corporation, Bank of America, National Association, and the individual defendants under the 1933 Act and the D.C. and Virginia securities laws.  FAC ¶¶ 223–236, 255–268, 287–300; 15 U.S.C. § 77*o*(a) (2006); D.C. Code § 31-5606.05(c); Va. Code Ann. § 13.1-522(C).[35]  To state a "control" liability claim, a plaintiff "must allege (1) a primary violation of the Securities Act and (2) 'control' by the defendant."   *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 Civ. 8781, 2010 WL 1257528, at *7 (S.D.N.Y. Mar. 31, 2010); *Howard v. Haddad*, 962 F.2d

---

[34] Notably, the Amended Complaint contains no allegation that the loans or Securitizations at issue performed poorly compared to others, let alone that the alleged underwriting deficiencies contributed to any such poor performance.  *See, e.g.*, *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 586 (E.D.N.Y. 1971) ("Section 11(e) provides a causation defense to a defendant who proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted . . . .  We cannot consider any damages caused, not by defendants' omissions, but by independent forces." (ellipsis in original) (internal quotations omitted))

[35] Section 15 of the 1933 Act creates liability for "[e]very person" who "controls any person liable" under section 11 or 12.  15 U.S.C. § 77o(a).  The D.C. and Virginia Codes adopt the same formulation of "control" as the federal law.  D.C. Code § 31-5601.01; *id.* § 31-5601.02 (D.C. statute "shall be coordinated with the federal acts and statutes" and "rules and regulations"); Va. Code Ann. §13.1-501; *Atocha LP*, 65 Va. Cir. at 225 ("Given the close similarity between the statutes, federal cases concerning control are informative.").

328, 331–32 (4th Cir. 1992).[36]  "[M]ere allegations of a corporate affiliation between defendants are insufficient to indicate control by one over another."  *Pub. Emps.' Ret. Sys. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010).  A plaintiff must allege that a defendant's actions went beyond "providing advice that the banks chose to follow," which alone "does not suggest control" to sustain a claim.  *Wyo. State Treasurer v. Moody's Investors Serv. Inc. (In re Lehman Bros. Mortg.-Backed Sec. Litig.)*, 650 F.3d 167, 187 (2d Cir. 2011).  A "control person" claim must be based on more than a "formulaic recitation" of elements.  *Pub. Emps.' Ret. Sys.*, 714 F. Supp. 2d at 484.  Claims that fail to provide "fair notice of [plaintiff's] theory of control" must be dismissed.  *Alameda Cnty. Emps.' Ret. Ass'n v. Ebbers (In Re WorldCom, Inc. Sec. Litig.)*, Nos. 02 Civ. 3288, 03 Civ. 0890, 2004 WL 1097786, at *2–3 (S.D.N.Y. May 18, 2004).

Plaintiff's "control" claims here are entirely conclusory.  For example, plaintiff claims Bank of America Corporation "controlled the business operations of BOA Securities, ABF Corp., BOA Mortgage, and BOA Funding."  FAC ¶ 229.  As recognized by this Court when considering nearly identical allegations, status as a defendant's "sole corporate parent," *id.*, is an insufficient "'basis from which to infer control,'" since parent and subsidiary corporations are "'legally distinct entities.'"  *Pub. Emps.' Ret. Sys.*, 714 F. Supp. 2d at 485 (dismissing claim that parent controlled depositors) (quoting *In re WorldCom Inc. Sec. Litig.*, 2004 WL 1097786, at *3); *see also N.J. Carpenters Health Fund*, 2010 WL 1257528, at *7 (same).

Plaintiff's "control" allegations against Bank of America, N.A. are similarly deficient.  Plaintiff's generalized conclusion about the relationships between Bank of America, N.A. and several other distinct legal entities fails to provide "fair notice" of facts sufficient to plausibly

---

[36] To the extent that all primary violation claims against a defendant are dismissed, the control person claims must be dismissed as well.  *ECA Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 209 (2d Cir. 2009).

show control person liability.[37]  Plaintiff's allegations of guilt-by-association fail as a matter of law.[38]

## V.       Plaintiff's D.C. Securities Claims Fail.

Plaintiff's D.C. securities claims also must be dismissed because plaintiff fails to plead justifiable reliance.  Under D.C. law, "where the complaint alleges certain misstatements . . . some element of reliance must be shown to demonstrate that such statements caused the injury complained of."  *Price v. Griffin*, 359 A.2d 582, 588 (D.C. 1976).  A plaintiff must show that its reliance was justifiable in light of the circumstances surrounding the transaction, which "take[s] into account the relative business background and knowledge of the parties."  *Id.* at 588 & n.11. Plaintiff makes no attempt to meet this requirement, requiring dismissal.

## VI.      Plaintiff's Demand for Rescission Fails.

"Case law from [the Second Circuit] has categorically stated that an action for rescission must be initiated without unreasonable delay."  *Ballow Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235, 240 (2d Cir. 2006) (alternations and internal quotations omitted).  As then-District Judge Newman explained, "[r]escission is a radical move, and the law exacts the election of that course to be asserted without wait."  *Gannett Co. v. Register Pub'g Co.*, 428 F. Supp. 818, 827 (D. Conn. 1977) (internal quotations omitted).  "This principle is stringently administered."  *Id.* at 828.  Failure to make a timely rescission demand precludes such relief.  *Ballow*, 435 F.3d at 239.  A plaintiff bears the burden of alleging and proving "reasonable dispatch as an essential element for [the] action of rescission."  *Occidental Life Ins. Co. v. Pat Ryan & Assocs.*, 496 F.2d

---

[37] *See* FAC ¶ 228 (conclusorily asserting that Bank of America, National Association "controlled all aspects of the business of Depositor Defendants;" failing to differentiate between control of ABF Corp., BOA Mortgage, and BOA Funding).

[38] This Court has held that allegations that an individual signed a registration statement are sufficient to establish a control person claim under Section 15.  *UBS*, 2012 WL 1570856, at *21.  Defendants respectfully disagree, and hereby preserve this argument for appellate review.

1255, 1268 (4th Cir. 1974).

That a plaintiff seeks rescission for fraud or securities claims does not alter the result. The prompt demand requirement has "long [been] a requisite for equitable rescission at common law," it is "applicable to a claim for rescission or rescissionary damages in § 12(2) actions," *Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, 821 F. Supp. 212, 220 (S.D.N.Y. 1993), and it extends to state securities claims as well, *Gannett*, 428 F. Supp. at 828–29 (applying requirement to Connecticut securities law).  Nor does the existence of statutes of limitations or repose change the result.  "The rule requiring promptness in demanding rescission has consistently been applied apart from the statute of limitations, and serves significantly different purposes."  *Gannett*, 428 F. Supp. at 829 (footnote omitted); *Westinghouse*, 821 F. Supp. at 221 (rejecting argument that statute of limitations controlled promptness of demand).  "[T]he law has never allowed the defrauded party to experiment with the property or speculate on its value for as long as he likes within the statute of limitations and then force the wrongdoer to take back a changed item."  *Gannett*, 428 F. Supp. at 829.

Here, plaintiff fails to allege any prompt rescission demand.  Nor would such an allegation be plausible; plaintiff cannot plausibly claim that a September 2, 2011 demand to rescind purchases between 2005 and 2007, Compl. ¶ 280, complies with the "stringently administered" principle that a rescission request must be "initiated without unreasonable delay." *Ballow*, 435 F.3d at 240; *Gannett*, 428 F. Supp. at 827–28.  Dismissal is required in such circumstances.  *See*, *e.g.*, *Westinghouse*, 821 F. Supp. at 219–22 (delay of four months was "fatal" to Section 12 claim where plaintiff was "on notice of the alleged misstatements" in late February and failed to demand rescission until June).

Indeed, this Court has held that the GSEs were "alerted to th[e] possibility by the ratings

24

agencies in early 2008" that the "securitizations in fact contained loans that failed to meet the standards set out in the offering materials." *UBS*, 2012 WL 1570856, at *10. Plaintiff's delay of more than three years to demand rescission bars its claim. *Westinghouse*, 821 F. Supp. at 220–22. Further, when "the property in dispute consists of stocks or fungibles of fluctuating value," the requirement of a prompt rescission demand is "particularly compelling." *Gannett*, 428 F. Supp. at 828. Otherwise, a plaintiff could "sit back without notification," proceed to "watch the market go up or down," and "speculat[e] on the success or value at the total risk" of the defendant. *Id.* (internal quotations omitted). Such a result would be unfair, as "[t]he securities laws contemplate no such investment guarantee." *Id.* (internal quotations omitted). The requirement of a prompt demand avoids the "[p]rejudice [that] inevitably flows from delay where there is a precipitous decline in the value of the stock the [plaintiff] now seeks to return." *Id.*[39]

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court dismiss claims relating to the 10 Pre-Committed Certificates, claims alleging "abandonment" of underwriting guidelines for 21 of the Securitizations, claims for control person liability, and claims for rescission.

---

[39] Plaintiff's more than three-year delay in demanding rescission also defeats "the very aim of rescission: to return the parties to *status quo ante.*" *Gannett*, 428 F. Supp. at 828 (internal quotations omitted) (emphasis added). "Promptness is required . . . because of the strong policy against forcing return of the property on the seller when lapse of time or actions taken by the buyer during that time have changed the property." *Id.* at 829. Here, intervening events have severely impacted the housing market since early 2008, when the Court found that the GSEs were on notice of their claims. As the GSEs have stated, a "financial crisis and severe economic recession . . . accelerated in late 2008 and continued to deepen in 2009." Ex. T, at 2 (Fannie Mae 2009 Form 10-K (Feb. 26, 2010)). Intervening events make it impossible to return the parties to their original positions, barring rescission. *See, e.g.*, *Ballow*, 435 F.3d at 240–41 (equity does not support rescission when parties cannot be returned to original positions).

Respectfully submitted,

WILLIAMS & CONNOLLY LLP                    RICHARDS KIBBE & ORBE LLP


By:   /s/ John McNichols                          By:    /s/ Daniel C. Zinman
        Brendan V. Sullivan, Jr.                            Daniel C. Zinman
        David S. Blatt                                       Neil S. Binder
        Edward J. Bennett                                  One World Financial Center
        John McNichols                                     New York, NY 10281
        725 Twelfth Street, N.W.                          Telephone: (212) 530-1800
        Washington, D.C. 20005                           Facsimile: (212) 530-1801
        Telephone: (202) 434-5000                        dzinman@rkollp.com
        Facsimile: (202) 434-5029                        nbinder@rkollp.com
        jmcnichols@wc.com

*Attorneys for Defendants Bank of America*        *Attorneys for Defendants George Carp, Robert*
*Corporation; Bank of America, National*          *Caruso, George Ellison, Adam Glassner,*
*Association; Merrill Lynch, Pierce, Fenner &*     *Daniel Goodwin, Juliana Johnson, Michael*
*Smith, Inc. (f/k/a Banc of America Securities*    *Kula, William Maxwell, Mark Ryan, and*
*LLC); Asset Backed Funding Corporation;*         *Antoine Schetritt*
*Bank of America Mortgage Securities, Inc.;*
*and Banc of America Funding Corporation*

Dated:  August 17, 2012