**quinn emanuel** trial lawyers

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG

October 4, 2013

**VIA ELECTRONIC MAIL AND ECF**

The Honorable Denise L. Cote
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1610
New York, NY 10007-1312

Re:   *FHFA Actions,* No. 11-cv-6188, *et al*. (S.D.N.Y.) (DLC)

Dear Judge Cote:

We write pursuant to our letter of September 25, 2013 to report on FHFA's inquiry regarding the underwriting guidelines applicable to Single Family loans purchased by the GSEs through their respective Single Family "flow" acquisition channels.[1]  As a result of arguments made in *FHFA v. Countrywide Financial Corp., et al*., 12-CV-01059-MRP (MANx) (the "California Action"), and ensuing investigation, we learned for the first time that some of Fannie Mae's acquisition agreements for Alt-A Single Family loans purchased on a "flow" basis incorporated, in part, aspects of certain lenders' guidelines.  Alt-A loans comprised a very small percentage of Fannie Mae's flow business between 2005 and 2006 (less than 1.7%).  Nevertheless, we alerted the Court that we were conducting an investigation to better understand whether and how lenders' guidelines were incorporated into the GSEs' contracts.

In the course of our investigation, we conducted numerous interviews of GSE personnel with Single Family responsibilities at Fannie Mae and Freddie Mac, we collected and reviewed data from each GSE concerning flow loan purchases by product type and lender during the relevant time period, and we reviewed all of the Prospectus Supplements at issue in the ongoing SDNY Actions in which Quinn Emanuel represents FHFA (setting aside UBS, Citi, and JPMorgan).  We also reviewed nine Master Agreements, approximately 150 Amendments to those Master Agreements, over 400 variances or waivers that correspond to the Master Agreements, and over 100 purchase contracts or pricing commitments (documentation that is voluminous and comprises a total of approximately 1.85 GB of data). Variances and waivers – which were often included in Master Agreements – were negotiated modifications to particular portions of Fannie Mae's Selling Guide or Freddie Mac's Lender-Servicer Guide.[2] Fannie Mae refers to these modifications as "variances" and Freddie Mac as "waivers."

---

[1]   The GSEs acquired loans on the Single Family sides of their businesses either through flow or bulk deliveries.  Through the flow channel, sometimes referred to as the Lender Channel, lenders could deliver loans to the GSEs on a continuous basis.  Through the bulk channels, the GSEs purchased pools of loans in individual transactions.

[2]   Many such modifications did not pertain to credit requirements.  Modifications could relate to, for example, document custodian certifications, assessment and payment of delivery fees, or rent loss insurance.

Hon. Denise L. Cote
October 4, 2013

The Agreements, variances, and waivers we have reviewed to date mainly relate to Countrywide because (1) based on our interviews, we understand Countrywide to be one of the GSEs' counterparties (if not the counterparty) that most often obtained variances or waivers; (2) Countrywide in its briefing in the California Action identified variances or waivers it considered to be significant; and (3) the documentation relating to the GSEs' Master Agreements and variances and waivers that might relate to all lenders or originators relevant to these Actions is massive and not readily accessible.

In summary, the information collected and reviewed to date confirms that the vast majority of loans purchased by Fannie Mae and Freddie Mac through their flow channels between 2005 and 2007 are properly described as originated pursuant to applicable sections of the GSEs' guidelines as set forth in Fannie Mae's Selling Guide and Freddie Mac's Seller-Servicer Guide. We have identified areas in which both GSEs negotiated the incorporation, in part, of specific provisions of lenders' guidelines into purchase agreements, but always subject to other requirements of each GSE's Guide. However, even when lenders' guidelines were incorporated in part, it remains our assessment that, as a general rule, the loans purchased by the GSEs' Single Family businesses on a flow basis in that circumstance are properly regarded as having been originated pursuant to Fannie Mae's or Freddie Mac's guidelines.

By way of background, certain large-volume lenders of Single Family loans to the GSEs' flow channels entered into Master Agreements and subsidiary Master Commitments, which allowed a specified volume of loans to be delivered over a specified period of time at agreed-upon prices. For instance, Fannie Mae's Master Agreement No. ML02235 with Countrywide was in effect from 1999 to at least 2006, and regularly implemented new, and replaced old, MBS Pool Purchase Contracts, which specified precise terms of flow loan deliveries. See Ex. A (Sept. 1999 Fannie Mae Master Agreement No. ML02235 with Countrywide, with MBS Pool Purchase Contract No. L08830 (ML02235 Amendment 81, dated March 2006) (providing for a maximum amount of $100,000,000 in flow deliveries between April 1, 2006 and December 1, 2006)). Freddie Mac Master Agreements and Pricing Commitments were similar in form and function.

Whenever Fannie Mae negotiated a variance or Freddie Mac negotiated a waiver in a Master Agreement, the operative agreement required that, except as specifically modified, all other requirements of the Fannie Mae or Freddie Mac Guides must be observed. *See, e.g.*, Ex. B (Excerpts of Fannie Mae Master Agreement No. ML02235 variances negotiated with Countrywide) at CWMDL-FHFA000000622, CWMDL-FHFA000000637-38, CWMDL-FHFA000000651-52, CWMDL-FHFA000000662-63, and CWMDL-FHFA000000665, and Ex. C (Excerpts of Freddie Mac Master Agreement No. MA05121383 with Countrywide) at CWMDL-FHFA000001451-52, CWMDL-FHFA000001455, and CWMDL-FHFA000001509. Moreover, when variances or waivers were negotiated into a contract, Fannie Mae and Freddie Mac sometimes imposed compensating requirements. For example, a lender might be permitted to sell loans with exterior-only appraisals, but only if such loans had lower loan-to-value ("LTV") ratios and/or the borrowers had higher FICO scores than the GSEs would typically permit under their own Guides (Ex. D (Fannie Mae Master Agreement No. ML02235 with Countrywide, Amendment 44, Variance No. 66)); (Ex. E (Freddie Mac Master Agreement No. MA04120883 with Countrywide, Attachment 1, No. 5)). At both GSEs, variances and waivers were revised or withdrawn from time to time during the life of a Master Agreement.

Hon. Denise L. Cote
October 4, 2013

**Freddie Mac**

For Freddie Mac, counsel interviewed multiple employees who either reviewed or approved Master Agreements and waivers, or were responsible for evaluating whether requested waivers met Freddie Mac's risk parameters. We also reviewed a sample of contracts and waivers from the relevant time period. These interviews confirmed that in the instances where Single Family deals were not wholesale underwritten pursuant to the Seller-Servicer Guide, lenders requested from Freddie Mac waivers from specific provisions of the Seller-Servicer Guide for loans delivered during a discrete time period. Freddie Mac's practice was to evaluate the credit risks of those requested waivers and determine the extent to which it was willing to deviate from the requirements of its Seller-Servicer Guide. Additionally, Freddie Mac often included a provision allowing it to "amend, supplement, revise, or terminate" portions of the waivers, ensuring that it had complete oversight and ability to alter any waiver. Ex. F (Excerpts of Freddie Mac Master Agreement No. MA07011083 waivers negotiated with Countrywide). Except as specifically agreed, all requirements of the Seller-Servicer Guide would otherwise apply to all sales to Freddie Mac's flow channel.

Granting waivers that incorporated by reference part of the lender's guidelines was the exception to the general process. We have to date located a few such examples. Freddie Mac executed a waiver in one of its Master Agreements with Countrywide relating to the delivery of Alt-A mortgages. *See* Ex. G (Freddie Mac Master Agreement No. MA04120883 with Countrywide, Attachment 27). It permitted Countrywide to deliver specific types of Alt-A loans originated pursuant to specified Countrywide loan programs. *Id* at 1. Nonetheless, Alt-A loans comprised a small percentage of Freddie Mac's flow business, accounting for just 2.87%, 7.87%, and 9.57% of all loans purchased through its flow channel in 2005, 2006, and 2007, respectively. Freddie Mac also executed a waiver with Bank of America in June 2007. That waiver permits Bank of America to use its own FICO selection method when selecting a FICO score, Indicator score, or borrower eligibility for minimum FICO requirements. Ex. H (Freddie Mac Master Agreement No. MA07042750 with Bank of America, Attachment 1 at 7).

Our general findings regarding Freddie Mac were confirmed in this week's deposition of Ray Romano, the former Senior Vice President of Credit Risk Oversight and later Freddie Mac's Chief Credit Officer, who had risk oversight responsibilities for Freddie Mac's Single Family operations (as well as its investment activities). ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Lenders would approach Freddie Mac requesting a waiver to certain provisions of its Seller-Servicer Guide, which Freddie Mac would grant if it was willing to accept the risk associated with the product. *Id.* at 218:24-219:7. For all purchases, the loans had to be in "complete compliance with the contractual requirements" set forth in the Seller-Servicer Guide, as modified by any contractual waivers. *Id.* at 217:24-218:5. Thus, according to Mr. Romano's testimony, loans sold to Freddie Mac were required to meet the requirements set forth in the Seller-Servicer Guide as modified by any contractual waivers, regardless of the terms stated in the lender's underwriting guidelines.

3

Hon. Denise L. Cote
October 4, 2013

**Fannie Mae**

For Fannie Mae, counsel interviewed multiple Single Family employees who either negotiated or prepared Master Agreements and variances, were responsible for evaluating whether requested variances met Fannie Mae's risk parameters, or oversaw the review of loan files as part of the repurchase process. We also reviewed a sample of contracts and variances from the relevant time period. Many but not all of the variances reviewed applied to Countrywide. These interviews confirmed that Fannie Mae bought some Single Family loans through its flow channel pursuant to variances that partially incorporated lender guidelines.

In November 2006, Fannie Mae implemented a standard variance governing Alt-A flow purchases. Prior to that time, it purchased Alt-A loans through its flow channels from various lenders pursuant to "custom variances" that were negotiated with individual lenders. For example, Fannie Mae executed a variance with one non-Countrywide lender in September 2005. That variance permitted the lender to sell Fannie Mae stated income, no ratio, no income/no asset, and stated income/stated asset loans originated pursuant to the lender's guidelines, but made clear: "In the event of a conflict between the eligibility criteria set forth in Attachment 1 [Fannie Mae's standard eligibility requirements] and Lender's guidelines for Stated Income, No Ratio, SISA, or NINA Alt-A I Mortgage products as described in Lender's Underwriting Guidelines, the criteria set forth in Attachment 1 shall control." Ex. J (Fannie Mae Master Agreement No. MA02460 with B, Variance 7, at 2). Further, Fannie Mae's variance with that lender includes even stricter LTV requirements than Fannie Mae's normal requirements when the loan is approved with no documentation. *Id.* at 7. Between 2005 and 2006, as referenced above, Alt-A flow purchases were less than 1.7% of Fannie Mae's flow business. For Countrywide in particular, the total volume of Alt-A loans purchased by Fannie Mae through its flow channel between 2005 and 2007 was relatively small: 529 loans in 2005, 23 loans in 2006 and 6,223 loans in 2007. The volume of Alt-A loans purchased from Countrywide on a flow basis accounted for .02% of Fannie Mae's flow loans purchased in 2005, 0.001% in 2006, and .24% in 2007.[3] Even after Fannie Mae implemented a standard Alt-A variance in November 2006, some lenders continued to deliver Alt-A loans to the flow channel through custom variances. Attached is an Alt-A custom variance with Bank of America. Ex. K (Fannie Mae Master Agreement MA02406 with Bank of America, Variance 61). This variance imposed Fannie Mae's own FICO and LTV ratio eligibility criteria, as well as a number of additional criteria including criteria related to seasoning, owner occupancy, loan type, property eligibility, and subordinate financing.

We have not yet located or reviewed Alt-A flow variances for every lender that is also a defendant in these Actions, but we believe other custom variances granted by Fannie Mae will contain similar language. We would note that there is relatively little overlap between the major lenders of Alt-A flow loans to Fannie Mae during the period 2005-2007 and the major Originators of Alt-A loans supporting the PLS sold to Fannie Mae at issue in these Actions. In fact, only four lenders sold 1% or more of the Alt-A loans Fannie Mae purchased through its

---

[3] Countrywide has maintained, and FHFA agrees, that it was the single largest lender of Single Family loans to Fannie Mae in the relevant time period. *See Mem. in Supp. of Mot. For Disc. of Single Family Documents and in Opp'n to FHFA's Mot. for Protective Order*, 12-CV-01059-MRP (MANx), Dkt. 341, at 10.

Hon. Denise L. Cote
October 4, 2013

flow channel <u>and</u> 1% or more of the Alt-A loans in the supporting loan groups of the securitizations purchased by Fannie Mae.[4]

Fannie Mae sometimes entered into variances other than those concerning Alt-A loans that incorporated aspects of lenders' guidelines. For example, some of Fannie Mae's Interest Only variances referenced portions of lenders' guidelines.[5] *See, e.g.*, Ex. L (Fannie Mae Master Agreement No. ML02561 with Countrywide, Variance 44). As with Alt-A loans, Interest Only loans delivered pursuant to these custom variances are still properly characterized as originated pursuant to Fannie Mae guidelines. As the Court will note in Exhibit L (Variance 44), Countrywide represented that, except to the extent of the variance, all loans would comply with Fannie Mae's Selling Guide. *Id*. at 1. Fannie Mae also imposed its own eligibility restrictions on loans delivered pursuant to this variance. Each loan was required to meet at least one of the following conditions: (1) a FICO score of at least 660, (2) a combined LTV ("CLTV") ratio not exceeding 90% with at least 12 months of reserves, (3) a CLTV ratio not exceeding 90% with a DTI ratio not exceeding 36%, or (4) an Interest Only period that exceeds 5 years. *Id*. at 3.

**Defendants' PLS Disclosures**

Defendants' Prospectus Supplements confirm that, during the relevant time period, the loans underlying the PLS Certificates were underwritten to different guidelines than loans eligible for sale to the GSEs' Single Family flow channels. For example, the Prospectus Supplement that

---

[4] To determine the potential overlap, we compared those lenders that from 2005 to 2007 sold more than 1% of the Alt-A loans to Fannie Mae through its Single Family flow channel with those lenders that originated more than 1% of the Alt-A loans in the loan groups supporting the Fannie Mae-purchased Certificates, as determined by weighting the sample loans proportionally to the size of the supporting loan group. Based on the way Fannie Mae collected data on loans that it purchased and/or guaranteed, "lender" means the entity that sold the loans to Fannie Mae, whether that was the originator of the loan or an aggregator. FHFA identified four overlapping lenders: Countrywide, Bank of America, First Horizon, and SunTrust. Those lenders and their respective percentages of Alt-A loans sold to Fannie Mae and in the supporting loan groups are set forth in the chart below:

| Lender | Alt-A Loans in Fannie Mae Supporting Loan Groups - PLS (%) | Fannie Mae Alt-A Flow Loans-Single Family (%) |
|---|---|---|
| Countrywide | 14 | 6 |
| Bank of America | 7 | 1 |
| First Horizon | 4 | 2 |
| SunTrust | 2 | 9 |

The loans supporting the Fannie Mae-purchased Certificates are in Securitizations at issue in the following cases: Bank of America, Citi, Credit Suisse, Deutsche Bank, First Horizon, Goldman Sachs, JPMorgan, Merrill Lynch, and UBS.
    We conducted a similar analysis of Freddie Mac's Alt-A purchases. None of the lenders that sold 1% or more of the Alt-A loans Freddie Mac purchased through its flow channel also originated 1% or more of the Alt-A loans in the loan groups supporting the Certificates purchased by Freddie Mac, as determined by weighting the sample loans proportionally to the size of the supporting loan group.
[5] Fannie Mae entered into book of business variances with Bank of America between 2002 and 2006, and between 2007 and 2009. Ex. M. This variance provided that Fannie Mae would purchase a specified volume of loans from Bank of America as long as it certified such loans had been originated pursuant to Bank of America's guidelines, with the exception of enumerated guidelines that Fannie refused to accept. *Id*. at 6 (Variance 3). While we have not been able to determine the composition of the loans delivered pursuant to these variances, we have confirmed that no Alt-A or subprime loans were delivered pursuant to this variance.

5

Hon. Denise L. Cote
October 4, 2013

was issued for the ARMT 2005-10 Securitization, which is at issue in the action against Credit Suisse Holdings (USA), Inc., *et al.*, states that:

> The underwriting standards applicable to the mortgage loans typically differ from, and are, with respect to a substantial number of mortgage loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types.

ARMT 2005-10 Prospectus Supplement at S-19.  Nearly identical language also appears in the Prospectus Supplements that were issued for ARMT 2005-11, ARMT 2005-12, ARMT 2006-1, CSFB 2005-11, CSFB 2005-12, and CSMC 2006-1 Securitizations, which are also at issue in the Credit Suisse action.  There have been a total of 449 Prospectus Supplements at issue in these Actions.  Of the 255 Prospectus Supplements relevant to the ongoing SDNY Actions in which Quinn Emanuel represents FHFA (excluding Citi, UBS, and JPMorgan), 224 contain language acknowledging that the underlying loans were originated to guidelines that differ from those that applied when the GSEs' Single Family businesses purchased Single Family loans.[6]

**Countrywide Variances and Waivers**

Shortly after FHFA alerted the Court to this potential issue, Countrywide filed its reply papers in the California Action and raised for the first time that some Master Agreements between Countrywide and Fannie Mae or Freddie Mac expressly incorporated certain Countrywide underwriting guidelines in certain types of variances or waivers.  *See Mem. in Supp. of Mot. For Disc. of Single Family Documents and in Opp'n to FHFA's Mot. for Protective Order*, 12-CV-01059-MRP (MANx), Dkt. 341, at 27-28.  In its opening brief, Countrywide provided examples of variances and waivers granted by Fannie Mae and Freddie Mac that, in its view, "directly influenced Countrywide's loan origination policies and practices."  *See Mem. of P. & A. in Supp. of Mot. For Disc. of Single Family Documents and SEC Produc.*, 12-CV-01059-MRP (MANx), Dkt. 310, at 19-21 (emphasis in original).  We undertook to review Freddie Mac and Fannie Mae waivers and variances corresponding to the waivers and variances Countrywide specified.

In this review, we found no evidence that Freddie Mac purchased through its flow channel loans corresponding to 6 of the 13 examples of waivers identified by Countrywide.  Of the remaining 7 examples, we have been able to locate waivers corresponding to 6 categories.[7]  We conducted an

---

[6] A significantly lower percentage of the Countrywide Prospectus Supplements—49 of 86—contain language disclaiming that the loans underlying the Securitizations were originated under Fannie Mae or Freddie Mac's underwriting standards.  This is consistent with other information indicating Countrywide was one of the lenders that obtained the most and most significant variances and waivers (if not *the* leader in doing so).

[7] Some of the variances are described imprecisely, making the matching process difficult.  Countrywide itself specifically identifies only one of the 13 waivers as having been granted to Freddie Mac.  *See Mem. of P. & A. in Supp. of Mot. For Disc. of Single Family Documents and SEC Produc.*, 12-CV-01059-MRP (MANx), Dkt. 310, at 20 n.74.  It also cites one Freddie Mac Master Agreement without identifying which waiver is at issue.  *Id.* at 21 n.85.

6

Hon. Denise L. Cote
October 4, 2013

analysis of the waivers we identified by comparing the waivers to both Freddie Mac's Seller-Servicer Guide and the applicable Countrywide guidelines. This analysis generally indicated that while Freddie Mac's waivers did modify the requirements of its Seller-Servicer Guide in certain instances, the waivers did not have the effect of incorporating, without limitation, the applicable Countrywide guidelines. For instance, although Freddie Mac adopted Countrywide's LTV/CLTV ratios in its Interest Only program waiver, it required full-documentation borrowers to have higher FICO scores both for owner-occupied properties and investment properties. *See* Ex. N (Freddie Mac Master Agreement No. MA 07011083 with Countrywide, Attachment 34, at 4).

Fannie Mae did purchase through its flow channel loans that appear to correspond to Countrywide's variance examples. Our review to date indicates that most of these variances are typical of Fannie Mae variances that agree to modify some Fannie Mae loan origination standards but otherwise require compliance with Fannie Mae's Selling Guide. Our analysis has also revealed that Fannie Mae's variances modified specific requirements of its Selling Guide in certain instances and that some of these variances explicitly imposed more stringent standards than the lender would typically require. For instance, where Fannie Mae agreed to purchase Negatively Amortizing Cost of Funds Index Adjustable Rate Mortgages ("COFI ARMs"), it would only purchase loans secured by owner-occupied principal properties and imposed a more stringent LTV minimum than either the Fannie Mae Guide or Countrywide guidelines would typically require for purchase loans. *See* Ex. O (Fannie Mae Master Agreement No. ML02235 with Countrywide, Variance 1).

Our current understanding, based on the investigation; interviews; and contract, variance, and waiver review conducted to date, is that Countrywide was likely the lender in the time period relevant to these Actions that negotiated the most significant variances and waivers with the GSEs with respect to the loans they sold in the Single Family flow channel. Because our efforts to collect relevant Master Agreements and variances and waivers are ongoing, however, FHFA cannot rule out the possibility that similar variances and waivers were granted to some of the lender Defendants that are parties in these Actions. FHFA is continuing to obtain and review variances and waivers of the type attached to this letter, relating to Countrywide and other lenders, and will report further to Your Honor.

Hon. Denise L. Cote
October 4, 2013

Respectfully submitted,

| | |
|---|---|
| /s/ Christine H. Chung | /s/ Richard A. Schirtzer |
| Christine H. Chung | Richard A. Schirtzer |
| (christinechung@quinnemanuel.com) | (richardschirtzer@quinnemanuel.com) |
| QUINN EMANUEL URQUHART & SULLIVAN, LLP | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| 51 Madison Avenue, 22nd Floor | 51 Madison Avenue, 22nd Floor |
| New York, New York 10010 | New York, New York 10010 |
| *Attorney for Plaintiff Federal Housing Finance Agency* | *Attorney for Plaintiff Federal Housing Finance Agency* |